**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 26-2297

Caption [use short title]: Coinbase Financial Markets, Inc. v. Tong et al.

**Motion for:** Motion pursuant to Circuit Rule 27.1(d) for Injunction Pending Appeal pursuant to Fed. R. App. P. 8(a) and for Referral to the Panel Considering the Related Kalshi Motions.

Set forth below precise, complete statement of relief sought:

Appellant Coinbase Financial Markets, Inc. seeks "an order . . . granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C). Specifically, Plaintiff seeks an injunction enjoining Defendants from enforcing certain Connecticut state laws against Coinbase. Coinbase also requests that the motion be referred to the same three-judge panel that will consider two motions for injunctions pending appeal in parallel cases.

**MOVING PARTY:** Coinbase Financial Markets, Inc.

**OPPOSING PARTY:** Tong et al.

- [x] Plaintiff
- [ ] Defendant
- [x] Appellant/Petitioner
- [ ] Appellee/Respondent

**MOVING ATTORNEY:** Judson O. Littleton

**OPPOSING ATTORNEY:** Joseph E. Gasser, Assistant Attorney General

[name of attorney, with firm, address, phone number and e-mail]

| Moving Attorney | Opposing Attorney |
|---|---|
| Gibson, Dunn & Crutcher LLP | Connecticut Office of the Attorney General |
| 1700 M Street, N.W. Washington, DC 20036-4504 | 165 Capitol Ave., Hartford, CT 06106 |
| Tel: 202.955.8500; Email: jlittleton@gibsondunn.com | Tel: 860.808.5400; Email: joseph.gasser@ct.gov |

Court- Judge/ Agency appealed from: United States District Court for the District of Connecticut (Oliver, J.)

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
- [x] Yes
- [ ] No (explain):

Opposing counsel's position on motion:
- [ ] Unopposed
- [x] Opposed
- [ ] Don't Know

Does opposing counsel intend to file a response:
- [x] Yes
- [ ] No
- [ ] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? [x] Yes [ ] No

Has this relief been previously sought in this court? [ ] Yes [x] No

Requested return date and explanation of emergency: Plaintiff requests expedited consideration. Plaintiff is potentially subject to civil or criminal enforcement under the Connecticut state laws challenged in this appeal. Defendants have not agreed to withhold the enforcement of those laws during the pendency of appeal.

Is the oral argument on motion requested? [x] Yes [ ] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? [ ] Yes [x] No If yes, enter date:

**Signature of Moving Attorney:**

*/s/ Judson O. Littleton*

**Date:** August 21, 2026

Service : [x] Electronic [ ] Other [Attach proof of service]

No. 26-2297

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

COINBASE FINANCIAL MARKETS, INC.,

*Plaintiff-Appellant,*

v.

WILLIAM TONG, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Connecticut
No. 3:25-cv-2121 (Oliver, J.)

# COINBASE FINANCIAL MARKETS, INC.'S MOTION FOR AN INJUNCTION PENDING APPEAL AND FOR REFERRAL TO THE PANEL CONSIDERING THE RELATED KALSHI MOTIONS

**[EXPEDITED CONSIDERATION REQUESTED]**

Trevor Bondy Gopnik
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
tgopnik@gibsondunn.com

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant*
*Coinbase Financial Markets, Inc.*

Plaintiff-Appellant Coinbase Financial Markets, Inc. ("Coinbase") respectfully moves under Fed. R. App. P. 8(a)(1)(C) for an injunction pending appeal barring defendants from enforcing Connecticut state laws against Coinbase with respect to event contracts traded on federally regulated derivatives exchanges. Coinbase also respectfully requests that this motion be referred to the same three-judge panel that will consider two motions for injunctions pending appeal in parallel cases, *KalshiEX LLC v. Cafferelli*, No. 26-2239 and *KalshiEX LLC v. Williams*, No. 26-1835. *See* App. Dkt. No. 27, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir. Aug. 19, 2026).

## INTRODUCTION

More than half a century ago, Congress amended the Commodity Exchange Act (CEA) to grant the federal government "exclusive jurisdiction" over derivatives traded on federally registered exchanges to a single regulator: the Commodity Futures Trading Commission. 7 U.S.C. § 2(a)(1)(A). By doing so, Congress recognized that a single regulator for these national markets would avoid the fragmentation and regulatory chaos of state-by-state regulation—which would impede the valuable services that these markets provide.

This appeal concerns a type of derivative known as an event contract. Event contracts allow market participants to place trades based on the occurrence or nonoccurrence of real-world events, such as election results, economic indicators, or weather. These contracts can provide valuable hedging, information-aggregation, and price discovery benefits. Event contracts are traded on CFTC-registered designated contract markets, referred to as DCMs. In January 2026, Coinbase[1]—a CFTC-registered futures commission merchant (or FCM), which serves as an intermediary between traders and DCMs—began offering its customers access to event contracts traded on DCMs, including sports-related event contracts. Like transactions in other derivatives traded on federally registered exchanges, event-contract transactions fall squarely within the CFTC's exclusive jurisdiction. Yet a number of states across the country—including

[1] Coinbase, Inc., through its affiliates like Coinbase Financial Markets, is a pioneer in the cryptocurrency industry. Throughout its history it has focused on updating the financial system for its users while complying with all relevant federal and state laws. For that reason, it has led the industry in advocating for responsible rules and calling for clarity on critical regulatory questions, carefully safeguarding the company's reputation as a trustworthy financial platform focused on creating economic freedom in the United States and around the world. Coinbase Financial Markets, Inc. is a Delaware corporation with its principal place of business in New York. It has been registered with the CFTC since August 16, 2023. Coinbase's parent company, Coinbase Global, Inc., is publicly traded on the Nasdaq Stock Market.

Connecticut—have claimed the authority to regulate those same transactions as "gambling" under their own varied state laws.

In December 2025, Coinbase and KalshiEX LLC ("Kalshi")—a DCM—each filed suit against Connecticut officials seeking injunctive relief and a declaration that the CEA preempts the application of Connecticut state laws to event contracts traded on CFTC-registered exchanges. *See Coinbase Financial Markets, Inc. v. Tong, et al.*, No. 3:25-cv-02121 (D. Conn.) ("Coinbase Action"); *KalshiEX LLC v. Cafferelli, et al.*, No. 3:25-cv-02016 (D. Conn.) ("Kalshi Action"). Both Coinbase and Kalshi thereafter filed motions for preliminary injunctive relief against Connecticut officials responsible for enforcing state laws.

On August 10, 2026, the district court issued companion orders denying Coinbase's and Kalshi's preliminary-injunction motions. Coinbase Action, Dkt. No. 93 (attached hereto as Exhibit A); Kalshi Action, Dkt. No. 94 (attached hereto as Exhibit B). In its order denying Coinbase's motion, the court attached and expressly incorporated the analysis from its companion decision in the Kalshi Action, stating that both cases presented "the same operative facts and legal questions." *See* Ex. A at 3. Both Coinbase and Kalshi appealed those respective decisions and moved in the district court for

emergency injunctions pending appeal, *see* Coinbase Action, Dkt. No. 95; Kalshi Action, Dkt. No. 97. The district court denied both motions. Coinbase Action, Dkt. No. 98; Kalshi Action, Dkt. No. 99. Kalshi thereafter moved for an injunction pending appeal in this Court, *see* App. Dkt. No. 23, *KalshiEX LLC v. Cafferelli, et al.*, 26-2239 (2d Cir.) (the "Kalshi Motion," attached hereto as Exhibit C), which the Court has referred to a three-judge panel to resolve.[2]

Given that the Kalshi Action and the Coinbase Action have traveled in parallel and present the same fundamental preemption issues, Coinbase has moved in this Court to consolidate this appeal with Kalshi's appeal so that they may be heard and resolved in tandem. App. Dkt. No. 12, *Coinbase Financial Markets, Inc. v. Tong, et al.*, 26-2297 (2d Cir.).

Coinbase now moves under Fed. R. App. P. 8(a)(1)(C) for an injunction pending appeal, which would bar defendants from enforcing applicable provisions of Connecticut law against Coinbase with respect to sports-related event contracts listed on federally regulated exchanges. Because Kalshi has sought the same interim relief based on substantially overlapping district-court orders—and in order to avoid burdening this Court with overlapping briefing in an interim posture—Coinbase respectfully requests leave to adopt

[2] *See* App. Dkt. No. 27, *KalshiEX LLC v. Cafferelli*, 26-2239 (Aug. 19, 2026).

and incorporate the arguments presented in the Kalshi Motion pursuant to Fed. R. App. P. 28(i).[3] And Coinbase requests that this motion be referred to the same three-judge panel that will be resolving the Kalshi Motion.

In short, until this Court resolves the fundamental preemption question presented here—which is also being addressed by numerous other courts across the country—Connecticut should not be permitted to enforce its laws against conduct that may well lie beyond its authority altogether. A brief injunction pending appeal will preserve the status quo and cost defendants nothing, while an enforcement action taken while courts resolve these critically important legal questions would inflict irreversible harm on conduct that is permitted by federal law.

## LEGAL STANDARD

This Court may grant an injunction pending appeal to prevent irreparable harm. *See* Fed. R. App. P. 8(a). In determining whether to grant a stay or injunction pending appeal, the Court considers the same factors as a

[3] Federal Rule of Appellate Procedure 28(i) provides that, in cases involving "more than one appellant," "including consolidated cases," "any party may adopt by reference a part of another's brief." As noted above, because this appeal presents "essentially the same legal issues" as those raised in Kalshi's recent appeal to this Court, Coinbase has filed an unopposed motion to consolidate this appeal with Kalshi's appeal.

district court considering a preliminary-injunction motion. The movant must demonstrate "that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225–26 (2d Cir. 2020).

## ARGUMENT

### I. Coinbase Is Likely To Succeed On The Merits Of Its Appeal.

For the reasons set out in the Kalshi Motion, Ex. C at 10–23, and hereby adopted by Coinbase, the CEA preempts applicable provisions of Connecticut law as applied to event contracts traded on CFTC-registered and regulated platforms. *See also* Coinbase Action, Dkt. No. 5.

The only appellate court thus far to rule on these issues after full merits briefing and argument held that, at minimum, state laws regulating trading on a DCM—including state gambling laws—are preempted by the CEA. *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228, 229 (3d Cir. 2026), *aff'g* 2025 WL 1218313 (D.N.J. Apr. 28, 2025). And the CFTC has unambiguously agreed with this view, having sought or supported injunctions across the country, including in this Circuit, against state enforcement exactly like Connecticut

seeks to preserve in this case. *See, e.g.*, *United States v. Minnesota*, 2026 WL 2150211 (D. Minn. July 27, 2026) (granting CFTC's motion for preliminary injunction against Minnesota and finding "the CEA's grant of exclusive jurisdiction over transactions involving swaps likely preempts" state law); *KalshiEX LLC v. Johnson*, No. 26-cv-01715, 2026 WL 1223373 (D. Ariz. May 5, 2026) (granting CFTC's motion for preliminary injunction); *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026); *United States v. New York*, 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026); *see also* Dkt. 19, *KalshiEX LLC v. Furcolo*, 1:26-cv-00327 (D. R.I. May 28, 2026) (CFTC motion to intervene in support of preliminary injunction).

The same preemption principles apply to bar state regulation of FCMs like Coinbase. Congress defined the CFTC's "exclusive jurisdiction" to regulate swaps by reference to instruments and transactions—not categories of registrant. Section 2(a)(1)(A) of the CEA reaches "accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on" a DCM. 7 U.S.C. § 2(a)(1)(A). Coinbase, as a federally registered FCM, manages its customers' "accounts" and facilitates their event-contract "transactions" exclusively on Kalshi's DCM.

All of Coinbase's activities with respect to those accounts and transactions fall within the scope of this exclusive CFTC jurisdiction.

Federal law governs every aspect of these transactions through a three-layered regulatory scheme: (1) the CFTC has exclusive jurisdiction to review and approve the event contracts; (2) the DCMs that list those contracts must register with the CFTC and comply with extensive regulations governing market access, trade integrity, and market monitoring (17 C.F.R. §§ 38.151, 38.250–.255); and (3) the FCMs that serve as intermediaries between traders and a DCM must likewise register with the CFTC and satisfy comprehensive regulatory oversight of their services to customers. The CEA's exclusive jurisdiction provision preempts state regulation at each one of those levels. In short, as a result of the express preemption provision in Section 2(a)(1)(A) and the comprehensive CFTC regulatory scheme, only the CFTC—not States—has jurisdiction to regulate both DCMs *and* FCMs.

Of course, that makes sense. Allowing Connecticut to regulate federally registered intermediaries whose role is to facilitate traders' access to DCMs would give Connecticut the power to effectively close a federally registered market to Connecticut residents. Congress thus structured the express preemption provision in Section 2(a)(1)(A) and the rest of the CEA to ensure

that States do not have authority to regulate federally registered entities with respect to transactions conducted on DCMs.

## II. Coinbase Will Suffer Irreparable Harm Absent Relief.

Absent injunctive relief, Coinbase faces irreparable harm that is both imminent and unrecoverable. And Coinbase has no way to avoid this harm while it pursues this appeal.

If Coinbase shuts down its services to comply with applicable state laws—whether to avoid state enforcement or because of it—Coinbase will suffer significant economic hardship and will be at odds with its federal regulator. Coinbase has invested substantial resources, including technological capabilities and business partnerships, in building its prediction-markets platform to offer event contracts in compliance with federal law. *See* Coinbase Action, Dkt. No. 5-10, Declaration of Andrew Sears ("Sears Decl."), ¶¶ 19–20. If forced to cease operations, these investments will be lost. And Coinbase will not be able to recover those economic losses because sovereign immunity bars Coinbase from obtaining monetary damages against the State. *See Diaz v. United States*, 517 F.3d 608, 612 (2d Cir. 2008); *Am. Fin. Servs. Ass'n v. Burke*, 169 F. Supp. 2d 62, 70 (D. Conn. 2001).

Coinbase would also suffer irreparable harm to its reputation and customer goodwill if forced to shut down. Coinbase has a hard-earned reputation as an innovative industry leader that complies with applicable laws and regulations. Being forced to shutter its prediction-markets operations would undermine that reputation and customer trust in Coinbase and its affiliates to be able to provide comprehensive financial services. *See* Sears Decl. ¶ 14. Such reputational harms are "difficult to establish and measure" and therefore irreparable. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Finally, Coinbase's status as a federally registered FCM might be compromised if it complies with the applicable state laws, or even if it is temporarily enjoined from operating in-state. The CFTC—Coinbase's federal regulator—has made clear that its registrants may not be able to remain in compliance with federal law if they are forced to comply with certain state laws, such as gambling laws. *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, Order Directing Kalshi to Continue Exercising DCM Functions (CFTC Aug. 11, 2026), https://tinyurl.com/3tausnrv; *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Comm'n Regulation 40.6(a)*, Order

Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (CFTC July 14, 2026), https://tinyurl.com/3fuwrv35.

If Coinbase follows its federal regulator's direction and continues facilitating access to event contracts, it faces the threat of criminal and civil liability under Connecticut laws for doing so. Indeed, Connecticut has threatened multiple prediction markets that are similarly situated to Coinbase with penalties under Conn. Gen. Stat. §§ 53-278b, 53-278d and the Connecticut Unfair Trade Practices Act. Dkt. No. 5-1 at 11. This threat of enforcement under preempted state law constitutes irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

In essence, Coinbase faces the long-recognized "Hobson's choice" of complying with a law that federal law forbids Connecticut to apply, or risk civil and criminal liability for exercising a federal right. Under well-established law, that constitutes irreparable harm. *See Morales*, 504 U.S. at 381.

## III. The Equities And The Public Interest Favor An Injunction.

Coinbase adopts the Kalshi Motion's arguments regarding the equities and public interest. Ex. C at 25–26. In short, compared to the irreparable harm Coinbase faces in the absence of injunctive relief, Connecticut would

suffer no cognizable harm from the brief injunctive relief Coinbase seeks because it lacks any legitimate interest in enforcing a preempted law. *See Felder v. Casey*, 487 U.S. 131, 138 (1988). And the public interest strongly favors preserving the status quo pending appeal, particularly given the unsettled and serious legal questions at the heart of this case that courts are actively addressing nationwide.

## IV. Coinbase Requests Expedited Consideration By The Same Motions Panel Considering Kalshi's Pending Motions.

Coinbase remains presently exposed to civil and criminal enforcement under the Connecticut laws challenged in this appeal, and defendants have declined Coinbase's request to agree to refrain from any attempt to enforce those laws during the pendency of the multiple appeals pending before this Court. Accordingly, Coinbase requests the earliest practicable consideration of this motion, and respectfully submits that referring it to the same motions panel that is addressing Kalshi's two pending motions is the most efficient course for resolving it.

Coinbase reserves the right to seek immediate relief should defendants initiate an enforcement action before the panel rules.

## CONCLUSION

For the reasons stated above, the Court should refer this motion to the panel considering Kalshi's pending motions for an injunction pending appeal, and ultimately grant an injunction pending appeal.

Dated: August 21, 2026

Respectfully submitted,

*/s/ Judson O. Littleton*

Trevor Bondy Gopnik
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
tgopnik@gibsondunn.com

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,448 words, excluding the parts of the motion exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT 14-point typeface.

Dated: August 21, 2026

*/s/ Judson O. Littleton*

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 21, 2026, I caused the foregoing to be filed with the Clerk of the United States Court of Appeals for the Second Circuit by email pursuant to Local Rule 25.2. Participants in the case were also served by email pursuant to Local Rule 25.2.

Dated: August 21, 2026

*/s/ Judson O. Littleton*

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

# INDEX OF EXHIBITS

| Exhibit | Date | Document |
|---|---|---|
| A | August 10, 2026 | Mem. & Order, Dkt. No. 93, *Coinbase Financial Markets, Inc. v. Tong, et al.*, No. 3:25-cv-02121 (D. Conn.) |
| B | August 10, 2026 | Mem. & Order, Dkt. No. 94, *KalshiEX LLC v. Cafferelli, et al.*, No. 3:25-cv-02016 (D. Conn.) |
| C | August 17, 2026 | Motion, App. Dkt. No. 23, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir.) |

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COINBASE FINANCIAL MARKETS, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>WILLIAM TONG, in his official capacity as Attorney General of Connecticut; BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; and KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection,<br><br>Defendants. | : | **MEMORANDUM & ORDER**<br><br>25-CV-2121 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff Coinbase Financial Market's ("Coinbase") Motion for a Preliminary Injunction (the "Motion"). Coinbase seeks an order enjoining Defendants, various Connecticut officials, from enforcing Connecticut's gaming regulatory scheme against Coinbase. Coinbase contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, and largely in line with the Court's companion order in *KalshiEX LLC v. Cafferelli*, No. 25-CV-2016, ECF No. 94, the Motion is **DENIED**. For ease of reference, the Court's opinion in *KalshiEX LLC* is attached to this Order as **Exhibit A.**

## I. BACKGROUND

### A. Factual Background

Because this case presents essentially the same legal issues addressed in the Court's companion opinion in *KalshiEX LLC*, the Court incorporates by reference the background

discussion set forth in Section I.A of that opinion, including the background on derivative contracts, the federal regulation of swaps and event contracts, Kalshi's designation as a designated-contract market ("DCM"), Connecticut's gaming regulatory scheme, and the cease-and-desist letter Connecticut sent to Kalshi. Familiarity with that background is assumed. Accordingly, the Court recounts below only those facts specific to Coinbase and any additional facts necessary to resolve the present Motion.

Coinbase "operates a cryptocurrency exchange platform." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 146 (2024). As relevant here, in January 2026, Coinbase began offering Kalshi's list of event contracts, including sports-event contracts, through its platform.[1] Unlike Kalshi, which is a DCM, Coinbase is a "Futures Commission Merchant ('FCM'), and it serves as an intermediary for customers trading regulated derivatives listed on a DCM, including event contracts on Kalshi."[2] Like Kalshi, however, Coinbase is a CFTC-registered entity, meaning it is regulated by the CFTC under the same regulatory scheme laid out by the Commodity Exchange Act ("CEA").[3]

As did Kalshi in *KalshiEX LLC*, Coinbase seeks a preliminary injunction prohibiting Defendants from enforcing Connecticut's gaming laws against the offering of Kalshi's sports-event contracts. Coinbase advances the same legal theory as Kalshi, contending that the contracts at issue are "swaps" within the meaning of the CEA and that any state regulation of those contracts is therefore preempted by federal law. Coinbase's claims likewise arise from

[1] Compl., ECF No. 1 ¶ 3; *see also* Oral Arg. Tr., ECF No. 84 at 11:22.

[2] ECF No. 1 ¶ 5.

[3] *Id.* ¶ 6.

the same cease-and-desist letter the Connecticut Department of Consumer Protection ("DCP") issued to Kalshi.[4] Coinbase does not allege that Defendants directed any separate enforcement action or other conduct specifically toward Coinbase. Thus, apart from Coinbase's status as an FCM rather than a DCM, this case presents the same operative facts and legal questions addressed in the Court's companion opinion.

### B. Procedural History

Coinbase initiated this action on December 18, 2025.[5] On the same day, Coinbase also filed the Motion.[6] Defendants responded on January 9, 2026,[7] and Coinbase replied on January 30, 2026.[8] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[9] The Court held oral argument on the Motion on February 11, 2026.[10]

---

[4] Coinbase does, however, also point to a similar cease-and-desist letter issued by the DCP to Robinhood, a company Coinbase contends is similarly situated to Coinbase as an FCM that offers access to Kalshi's event contracts.

[5] ECF No. 1.

[6] ECF No. 5.

[7] ECF No. 44.

[8] ECF No. 74.

[9] ECF No. 58-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[10] ECF No. 82.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.[11]

### A. Likelihood of Success on the Merits

The Court, in assessing Plaintiff's likelihood of success on the merits, incorporates the analysis set forth in Section II.A of *KalshiEX LLC*. For the same reasons, the Court concludes Coinbase has failed to establish a likelihood of success on demonstrating either that (1) Kalshi's sports-event contracts, offered through Coinbase, constitute "swaps" within the meaning of the CEA, and (2) that Connecticut gambling laws are preempted by federal law as applied to those contracts.

[11] The Court recognizes that Coinbase's briefing is not identical to Kalshi's and that Coinbase advances certain arguments not raised in the companion case, including arguments, for example, that its alleged loss of goodwill among customers in the absence of an injunction demonstrates irreparable harm. The Court has considered each of those arguments and concludes that none alter its analysis or the disposition of the Motion.

**B. Irreparable Harm**

The Court, in assessing the irreparable harm faced by Coinbase in the absence of an injunction, incorporates the analysis set forth in Section II.B of *KalshiEX LLC*. For the same reasons, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

Lastly, in assessing the balance of equities and public interest, the Court incorporates the analysis set forth in Section II.C of *KalshiEX LLC*. For the same reasons, the Court concludes that the balance of the equities and the public's interest weigh in favor of Defendants.

## III. CONCLUSION

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous orders at ECF Nos. 78, 83, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 10, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>-against-<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,<br><br>Defendants. | : | **MEMORANDUM & ORDER**<br><br>25-CV-2016 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

# I. BACKGROUND

## A. Factual Background

### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

---

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

**2. CFTC Regulation of Swaps and Event Contracts**

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

---

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.
>
> *Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

### 4. The Connecticut Regulatory Scheme for Gaming

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

---

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

#### 5. The Department of Consumer Protection's Cease-and-Desist Letter

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

---

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

---

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. <u>DISCUSSION</u>

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

[36] ECF No. 75 at 2 (emphasis added).

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

---

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

---

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id*.

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

---

"something that has some logical proximate relationship to the preceding event." *Id*. at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern."). "A local government's legislative exercise of 'historic police powers of the State [ ]' is not to be superseded by a federal statute unless it was 'the clear and manifest purpose of Congress' to do so." *New York SMSA Ltd. P'ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area "where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that "Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation."[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA's drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi's claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express,

---

[48] ECF No. 30-1 at 19.

implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.*

First, Kalshi has not demonstrated that field preemption exists based on "the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC's "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM is limited by the CEA's provision that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress' enactment of the Special Rule, demonstrates Congress' "intent that some state law and regulation should operate in tandem with the CEA." *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

---

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

[55] *Id.*

[56] *Id.*

circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

---

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

---

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

---

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. <u>CONCLUSION</u>

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>-against-<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,<br><br>Defendants. | : | **MEMORANDUM & ORDER**<br><br>25-CV-2016 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

## I. BACKGROUND

### A. Factual Background

#### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

**2. CFTC Regulation of Swaps and Event Contracts**

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.
>
> *Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

### 4. The Connecticut Regulatory Scheme for Gaming

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

**5. The Department of Consumer Protection's Cease-and-Desist Letter**

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

---

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

---

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. <u>DISCUSSION</u>

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

[36] ECF No. 75 at 2 (emphasis added).

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

---

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

---

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

---

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id*.

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

---

"something that has some logical proximate relationship to the preceding event." *Id*. at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern."). "A local government's legislative exercise of 'historic police powers of the State [ ]' is not to be superseded by a federal statute unless it was 'the clear and manifest purpose of Congress' to do so." *New York SMSA Ltd. P'ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area "where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that "Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation."[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA's drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi's claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express,

[48] ECF No. 30-1 at 19.

implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.*

First, Kalshi has not demonstrated that field preemption exists based on "the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC's "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM is limited by the CEA's provision that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress' enactment of the Special Rule, demonstrates Congress' "intent that some state law and regulation should operate in tandem with the CEA." *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

---

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

---

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

---

[55] *Id.*

[56] *Id.*

Case: 26-2297, 08/24/2026, DktEntry: 13.1, (96 of 208)

circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

---

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

---

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. <u>CONCLUSION</u>

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

# EXHIBIT C

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 26-2239

Caption [use short title]: KalshiEX LLC v. Cafferelli

**Motion for:** emergency motion pursuant to Circuit Rule 27.1(d) for injunction pending appeal pursuant to Fed. R. App. P. 8(a)

Set forth below precise, complete statement of relief sought:

Plaintiff KalshiEX LLC seeks "an order ... granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C). Plaintiff seeks an injunction enjoining Defendants from enforcing Connecticut gambling laws against Kalshi. Plaintiff requests emergency relief as soon as possible.

**MOVING PARTY:** KalshiEX LLC

**OPPOSING PARTY:** Cafferelli

[X] Plaintiff [ ] Defendant

[ ] Appellant/Petitioner [ ] Appellee/Respondent

**MOVING ATTORNEY:** Neal Kumar Katyal

**OPPOSING ATTORNEY:** Joseph E. Gasser, Assistant Attorney General

[name of attorney, with firm, address, phone number and e-mail]

| Moving Attorney | Opposing Attorney |
|---|---|
| Milbank LLP | Connecticut Office of the Attorney General |
| 1101 New York Ave. NW, Washington, DC 20005 | 165 Capitol Ave., Hartford, CT 06106 |
| 202.835.7505 / nkatyal@milbank.com | 860.808.5400 / joseph.gasser@ct.gov |

Court- Judge/ Agency appealed from: D. Conn. (No. 3:25-cv-02016), Hon. Vernon D. Oliver

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[X] Yes [ ] No (explain):

Opposing counsel's position on motion:
[ ] Unopposed [X] Opposed [ ] Don't Know

Does opposing counsel intend to file a response:
[X] Yes [ ] No [ ] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? [X] Yes [ ] No

Has this relief been previously sought in this court? [ ] Yes [X] No

Requested return date and explanation of emergency: As soon as possible.
Kalshi is potentially subject to civil or criminal enforcement under the Connecticut laws challenged in this appeal. Defendants have not agreed to withhold enforcement of those laws during the pendency of appeal.

Is the oral argument on motion requested? [X] Yes [ ] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? [ ] Yes [X] No If yes, enter date:

**Signature of Moving Attorney:**
/s/ Neal Kumar Katyal **Date:** 08/17/2026 Service : [X] Electronic [ ] Other [Attach proof of service]

**Form T-1080** (rev. 10-23)

# 26-2239

IN THE

## United States Court of Appeals for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

BRYAN T. CAFFERELLI, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut
No. 3:25-cv-2016 (Oliver, J.)

**KALSHIEX LLC'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL**
**[RELIEF NEEDED AS SOON AS POSSIBLE]**

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

August 17, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant KalshiEX LLC discloses Kalshi Inc. as its parent company. No publicly held corporation owns 10% or more of KalshiEX LLC's stock.

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

I. LEGAL BACKGROUND .......... 3

II. FACTUAL AND PROCEDURAL BACKGROUND .......... 6

LEGAL STANDARD .......... 9

ARGUMENT .......... 10

I. KALSHI IS LIKELY TO PREVAIL ON APPEAL .......... 10

A. The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law .......... 10

B. The District Court Erred In Holding Kalshi's Contracts Are Not Swaps .......... 16

C. The District Court Erred In Rejecting Preemption .......... 20

II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT RELIEF .......... 23

III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION .......... 25

CONCLUSION .......... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

INDEX OF EXHIBITS

## TABLE OF AUTHORITIES

**CASES:** Page(s)

*Agudath Israel of Am. v. Cuomo*,
980 F.3d 222 (2d Cir. 2020) .......... 10

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .......... 2, 15, 16

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 16

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) .......... 12

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .......... 25

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .......... 3

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .......... 4, 22

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sep. 12, 2024) .......... 6

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 8, 13, 15, 24

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) .......... 6, 7

*KalshiEX LLC v. Williams*,
2026 WL 2017466 (S.D.N.Y. July 13, 2026) .......... 3

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 2, 4, 12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......... 6, 14

## TABLE OF AUTHORITIES—Continued

Page(s)

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 11

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) .......... 11, 15, 16

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 23

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .......... 25

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 24

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) .......... 2, 17

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 19

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) .......... 12

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .......... 24

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 11

*United States v. Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) .......... 13, 18

**STATUTES:**

7 U.S.C. §§

1a(19)(iv) .......... 5

## TABLE OF AUTHORITIES—Continued

Page(s)

1a(47)(A)(ii) .......... 5, 13

1a(47)(A)(iii) .......... 19

1a(47)(A)(iv) .......... 5, 19

1a(47)(A)(vi) .......... 18

1a(47)(B) .......... 18

2(a)(1)(A) .......... 1, 2, 4, 11, 19, 20, 21

2(e) .......... 20

7(d) .......... 6

7a-2(c)(1) .......... 5

7a-2(c)(5)(C) .......... 5

7a-2(c)(5)(C)(i) .......... 5, 12, 13, 16, 21

16(e)(1)(B)(i) .......... 19, 20

16(e)(2) .......... 21

16(h) .......... 21, 22

15 U.S.C. § 8302(d)(1) .......... 18

31 U.S.C. § 5362(1)(A) .......... 22

31 U.S.C. § 5362(1)(E)(ii) .......... 22

Conn. Gen. Stat. § 12-852 .......... 15

Conn. Gen. Stat. § 12-853 .......... 15, 16

Conn. Gen. Stat. § 12-863 .......... 15

## TABLE OF AUTHORITIES—Continued

Page(s)

**RULES & REGULATIONS:**

17 C.F.R. §§

38.4(b) .......... 5, 6

38.5(b) .......... 6

38.151(b) .......... 6, 15

38.251(a) .......... 6

40.2(a) .......... 5, 6

40.11(c) .......... 6

40.11(c)(2) .......... 6

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) .......... 5, 17

Conn. Agencies Regs. § 12-865-4 (2022) .......... 15

Fed. R. App. P. 8(a) .......... 9

Further Definition of “Swap,”
77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 20

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .......... 8, 12, 13, 16

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (1974) .......... 11

Hearings Before the S. Comm. on Agric. & Forestry,
93d Cong. (1974) .......... 14, 15

## TABLE OF AUTHORITIES—Continued

Page(s)

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .................................. 2, 4, 15, 21

H.R. Rep. No. 106-711, pt. 2 (2000) ........................................................ 22

**OTHER AUTHORITIES:**

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2TNLP5 ............................................................14

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language (deluxe ed. 2001) ........................................................ 16, 17

Kaja Andric, *The Knicks Are the Hottest Ticket in Town. Hottest Jersey, Too.*, N.Y. Times (June 13, 2026), https://perma.cc/L674-XU9T ........................................................................ 13, 14

Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited August 17, 2026) ............................................................ 25, 26

Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited August 17, 2026) ............................................. 25, 26

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ................................................11, 12

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/DR28-UFPV ...........................................................................................13

*Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ..........17

## INTRODUCTION

An injunction pending appeal is urgently needed because Defendants have threatened to prosecute KalshiEX LLC ("Kalshi") under Connecticut gambling laws for offering contracts subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Permitting that prosecution would flout the plain text of the Commodity Exchange Act ("CEA"), disregard the longstanding position of the CFTC, and break from the precedents of this Court and the only court of appeals to resolve the preemption question. The district court therefore badly erred in denying Kalshi a preliminary injunction, and this Court's intervention is necessary to prevent Kalshi from suffering irreparable harms under preempted state law before this Court has a chance to weigh in.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Section 2(a) of the CEA expressly preempts state regulation of trading on DCMs like Kalshi by granting the CFTC "exclusive jurisdiction" over all instruments "traded or executed" on DCMs, including "agreements" in general and "transactions involving swaps" in particular. 7 U.S.C. § 2(a)(1)(A). There is no way to read that provision to permit concurrent state jurisdiction over event contracts traded on DCMs, which plainly qualify as "agreements" and easily fit within the statutory

definition of "swaps." *Id.* Indeed, Congress announced its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

The decision to preempt state law reflects Congress's view that exchanges "could not operate efficiently, and perhaps not at all," if subject to state law. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). If Connecticut could use its gambling laws to regulate instruments traded on federally designated exchanges, so could 49 other states. The result would be "total chaos," as a patchwork of contradictory, state-specific regulations would destroy the uniform, nationwide markets that Congress envisioned. *Id.* (citation omitted). Accordingly, this Court has long recognized that the CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

Nonetheless, the district court denied Kalshi's request for a preliminary injunction. It concluded that the CEA does not preempt the application of state law to instruments traded on DCMs based primarily on "purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And it got Congress's intent flat wrong. For as long as derivatives trading has existed, states have sought to ban it as a form of gambling. Congress addressed these efforts by drawing a clear line: States may apply their gambling laws to

almost any *off*-exchange transaction, but the CFTC alone may regulate instruments traded on DCMs.

In concluding otherwise, the district court exposed Kalshi to extensive irreparable harms. If Kalshi declines to comply with preempted state laws, it risks criminal prosecution and massive liability because Defendants have refused to agree to nonenforcement while this appeal is pending. If Kalshi complies, it will violate its federal obligation to provide impartial nationwide access and incur substantial, unrecoverable financial harms. Defendants, by contrast, suffer no harm from complying with the Supremacy Clause.

Kalshi therefore respectfully requests that the Court issue an injunction pending appeal.[1]

## BACKGROUND

### I. LEGAL BACKGROUND

A. Before Congress regulated derivatives, many states prohibited futures trading as "gambling." *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). Congress began regulating derivatives trading with the Grain Futures Act of 1922. In 1936, Congress passed the CEA, extending the regulatory

[1] The Southern District of New York recently denied Kalshi a preliminary injunction in a similar case. *KalshiEX LLC v. Williams*, 2026 WL 2017466, at *11 (S.D.N.Y. July 13, 2026). Kalshi's motion for an injunction pending appeal in that case is fully briefed in this Court. *See KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir.), Dkt. Nos. 27-31.

framework for grain futures to other commodities. These early statutes did not preempt state law. States remained free to regulate derivatives transactions, including by prohibiting "gambling in grain futures." *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

Then came the CEA's 1974 amendments, which created the CFTC and granted it "exclusive jurisdiction" over on-DCM trading, thus "supersed[ing]" state laws. 7 U.S.C. § 2(a)(1)(A). Congress intended to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35. This Court and others immediately recognized the CEA's preemptive effect. *E.g.*, *Leist*, 638 F.2d at 322.

The 1974 amendments swept broadly but did not preempt *all* state derivatives regulation. Rather, Section 2(a) grants the CFTC "exclusive jurisdiction" over "accounts, agreements ..., and transactions involving swaps or contracts of sale of a commodity for future delivery ..., traded or executed on" DCMs. 7 U.S.C. § 2(a)(1)(A). But after granting the CFTC "exclusive jurisdiction" over instruments "traded or executed *on*" DCMs, Section 2(a) preserves state authority with respect to *off*-DCM transactions by explaining that, "[e]xcept as hereinabove provided," the CEA does not "supersede or limit the jurisdiction" of "regulatory authorities" under state laws. 7 U.S.C. § 2(a)(1)(A) (emphasis added).

B. This appeal concerns event contracts, a derivative within the CFTC's exclusive jurisdiction. Before 2010, event contracts could be regulated as "either options or futures contracts." Concept Release, 73 Fed. Reg. 25,669, 25,670 (May 7, 2008). In 2010, Congress brought event contracts within the CFTC's jurisdiction over "swaps," which Congress defined to include contracts tied to "the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," agreements that are or "become[ ] commonly known to the trade as a swap," or any combination thereof. 7 U.S.C. § 1a(47)(A)(ii), (iv).

In 2010, Congress added a "Special [R]ule" to the CEA expressly addressing trading of "event contracts" on DCMs. 7 U.S.C. § 7a-2(c)(5)(C). That provision describes event contracts as "agreements, contracts, transactions, or swaps in excluded commodities" based on "occurrence[s]." *Id.* § 7a-2(c)(5)(C)(i); *see id.* § 1a(19)(iv) (defining "excluded commodity" to include certain "occurrence[s]"). It then provides that the CFTC "may" review and prohibit certain event contracts—including contracts involving "gaming" or unlawful "activity" under state or federal law—if it decides that they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i).

Under the CEA, DCMs may list new contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R.

§§ 38.4(b), 40.2(a). If the CFTC concludes an event contract may fall within the Special Rule, it may subject the contract to a 90-day public-interest review. 17 C.F.R. § 40.11(c). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

The CEA does not contain any other event-contract-specific limitations. But it sets out a "comprehensive regulatory structure" that governs derivatives exchanges. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Those exchanges must become DCMs and comply with CEA and CFTC regulations. 7 U.S.C. § 7(d); 17 C.F.R. § 38.5(b). Among many requirements, DCMs must offer "impartial access" to their platforms and monitor for "manipulation." *Id.* § 38.151(b), 38.251(a).

## II. Factual and Procedural Background

In 2020, the CFTC certified Kalshi as a DCM. *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi offers event contracts related to climate, health, popular culture, economics, and more.

In January 2025, Kalshi began offering contracts involving sports events. *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *5 (M.D. Tenn. Feb. 19, 2026). After Kalshi self-certified its sports contracts, the CFTC requested a written "[d]emonstration of [c]ompliance" with the CEA. *Id.* Kalshi

responded with detailed filings describing the contracts' compliance with applicable law. The CFTC took no further action, constituting approval under the CEA's self-certification system. *Id.*

In December 2025, the Connecticut Department of Consumer Protection ("DCP") sent Kalshi a cease-and-desist letter asserting that Connecticut gambling law prohibits Kalshi's sports-event contracts. Ex. A at 1. DCP warned that Kalshi's failure to cease offering sports contracts may result in "civil penalties" or "criminal penalties" under state law. *Id.* at 2. Kalshi filed this suit, arguing that the CEA preempts Connecticut's enforcement action.

The CFTC agreed. Following Kalshi's suit, the CFTC and United States filed suits against Connecticut and seven other states contending that the CEA preempts state regulation of on-DCM trading.[2] The CFTC explained that state-by-state regulation would conflict with "the text, structure, and history of the CEA," "fundamental[ly] threat[en]" Congress's design, and create "a seismic shift" in the status quo. CFTC Br. 2, *N. Am. Derivatives*

---

[2] *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.); *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz.); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill.); *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky.); *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn.); *United States v. New Mexico*, No. 1:26-cv-1912 (D.N.M.); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y.); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.).

*Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br.").

The CFTC also published a Notice of Proposed Rulemaking ("NPRM"). *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM recognizes that the CEA "expressly preempts state laws"; confirms sports-event contracts fall under CFTC jurisdiction; and sets out a detailed framework to explain why many sports-event contracts are "consistent with the public interest." *Id.* at 35,808, 35,828-36.

In the meantime, Kalshi has litigated preemption against numerous other states. Of the cases on appeal, only the Third Circuit has resolved this question, concluding that the CEA's "text preempts state gambling laws that seek to regulate futures trading," including "Kalshi's sports-related event contracts." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 230 (3d Cir. 2026). But federal district courts have split. The Southern District of New York recently denied Kalshi a preliminary injunction in a similar case. New York then filed a state-court lawsuit seeking a TRO barring *all* Kalshi's event contracts and prohibiting Kalshi from operating nationwide. *New York v. KalshiEX LLC*, No. 1:26-cv-6550 (S.D.N.Y.). In response, the CFTC issued an emergency order "direct[ing] Kalshi to continue to operate its exchange in accordance with its normal practices" even if New York obtains a TRO. Ex.

B at 1. The Order finds that New York's action is a "market emergency" because the "sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory jurisdiction." *Id.* at 1, 5.

The district court below denied Kalshi a preliminary injunction. It first held that Kalshi's sports-event contracts are not "swaps" because they concern "outcomes" rather than events and are not associated with "potential financial, economic, or commercial consequence[s]"—which the court interpreted to require that the event "by its very nature, has embedded within it" potential financial consequences. Ex. C at 17, 21 ("Op.") (citation omitted). The court further held that even if Kalshi's contracts are swaps, the CEA does not preempt Connecticut's gambling laws. Op.23-32. The CFTC's separate lawsuit against Connecticut remains pending before the same judge. *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.).

Kalshi appealed. After Defendants declined to withhold enforcement, Kalshi sought an injunction pending appeal in the district court, which was denied on August 15, 2026. D. Ct. Dkt. No. 99 at 1.

## LEGAL STANDARD

This Court may grant an injunction pending appeal to prevent irreparable harm. *See* Fed. R. App. P. 8(a). In determining whether to grant

a stay or injunction pending appeal, the Court considers the same factors as a district court considering a preliminary injunction motion: Movants must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 225-226 (2d Cir. 2020) (per curiam). A stronger showing is needed to obtain an injunction pending appeal than a stay. *Id.* at 226.

## ARGUMENT

This case cries out for relief pending appeal. The decision below privileges extratextual policy considerations over statutory text, breaks from the Third Circuit, and ignores the CFTC's emphatic confirmation of its exclusive jurisdiction to regulate Kalshi's event contracts. Without relief, Kalshi will suffer irreparable harm from being forced to choose between criminal liability under preempted state law and violating its federal obligations.

### I. Kalshi Is Likely To Prevail On Appeal.

#### A. The CFTC's Exclusive Jurisdiction Over Kalshi's Contracts Preempts State Law.

1. Permitting Connecticut to apply its gambling laws to sports event contracts traded on Kalshi violates the Supremacy Clause because the CEA

expressly preempts state regulation of instruments traded on DCMs. Section 2(a) grants the CFTC "*exclusive* jurisdiction" over "accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery …, traded or executed on" a DCM. 7 U.S.C. § 2(a)(1)(A) (emphasis added). That language unmistakably preempts state efforts to exercise *concurrent* jurisdiction over instruments like event contracts when they are "traded … on" a DCM like Kalshi. *Id.*

The "plain meaning of 'exclusive' " "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). Indeed, the Supreme Court long ago held that a statute granting "exclusive" "jurisdiction" means that "matters regulated by the [statute] cannot be regulated by the States." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233-234 (1947) (citation modified); *accord Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2008 (2026) (state law preempted where Congress gave agency "comprehensive and exclusive authority").

Statutory history confirms the point. When Congress considered the 1974 amendments, Senate drafters deleted a CEA provision preserving State law "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis). This and other changes "wholly and unequivocally eliminated" each ground on which the CEA had previously

been found not to preempt. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-693 (1982).

This Court has therefore long recognized that "the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. Other courts agree. *E.g.*, *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (barring state-law "commercial gambling" claim because the CEA preempts all inconsistent state law); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"). The CFTC agrees—and always has. *See* 91 Fed. Reg. at 35,808 (the CEA "expressly preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-registered exchanges"); Van Wart, *supra*, at 694-695.

Kalshi's sports event contracts plainly fall within Section 2(a)'s preemptive scope, which covers "agreements" traded on DCMs as well as "transactions involving swaps" traded on DCMs. The Special Rule makes clear that "[e]vent contracts" are "*agreements*, contracts, transactions, or *swaps* in excluded commodities," and it recognizes that event contracts—including contracts "involving … *gaming*"—may be traded on DCMs if the CFTC does not prohibit them as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).

Event contracts are obviously "agreements" traded on DCMs, and they readily qualify as "swaps." *Id.* The CEA's broad, six-part definition of "swap" includes contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The terms "associated with" and "potential" "reflect[ ] congressional intent to … cover many transactions and agreements." *United States v. Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026). "Kalshi's sports-event contracts fit comfortably" within that broad definition. *Flaherty*, 172 F.4th at 227 (quoting *id.* at 233 (Roth, J., dissenting)).

Sports events carry obvious financial consequences. As the CFTC put it, sports teams "generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807, 35,830. For example, each 2026 New York Knicks "home playoff game was worth roughly $91 million" to New York City businesses, with the full postseason generating "as much as $832 million."[3] Retailers, merchandisers, and sponsors also experienced a surge in demand with each

[3] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/DR28-UFPV.

new win.[4] Given sports events' financial implications, market participants use Kalshi's contracts to hedge against sports-related financial risk. For example, one insurance company "expects to hedge about $30 million annually through" Kalshi to help athletics departments, teams and sponsors to "manage the financial risks of performance incentives in athletes' and coaches' contracts."[5]

2. The CEA's text resolves this case, but every other indicator of Congressional intent confirms preemption. Thus, even absent express preemption, implied field and conflict preemption would apply.

To begin, field preemption applies because the CEA is "a comprehensive regulatory structure" governing the "futures trading complex." *Curran*, 456 U.S. at 356 (citation omitted). It leaves no room for state regulation of on-DCM trading. Congress sought to bring "the futures markets" "under Federal regulation" in the 1974 amendments because "different State laws would just lead to total chaos." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 249, 685 (1974) (statements of Sen.

---

[4] Kaja Andric, *The Knicks Are the Hottest Ticket in Town. Hottest Jersey, Too.*, N.Y. Times (June 13, 2026), https://perma.cc/L674-XU9T.

[5] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2TNLP5.

Clark). The conference report unmistakably emphasized Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35.

Moreover, federal and state law squarely conflict in at least three ways.

*First*, it is impossible for a DCM to comply with both Connecticut law and the CEA. Connecticut law prohibits accepting wagers from outside of Connecticut. *See* Conn. Gen. Stat. § 12-863. Kalshi cannot run a nationwide exchange while permitting only transactions from Connecticut—to say nothing of compliance with 49 other states' laws. As the CFTC has confirmed, it is "impossible" for DCMs to comply with such restrictions, because exchanges cannot "fulfill [their] federal mandate" "to provide 'impartial access' to all eligible participants nationwide" under state-by-state regulation. CFTC Br. 26-27 (quoting 17 C.F.R. § 38.151(b)). In addition, all three "master wagering licenses" allowed under Connecticut law have been issued. *See* Conn. Agencies Regs. § 12-865-4 (2022); Conn. Gen. Stat. §§ 12-852–12-853. Accordingly, if Connecticut law applies, Kalshi cannot operate in the State at all.

*Second*, as the Third Circuit has held, state regulation "directly conflicts" with the CEA because it produces "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230; *see Monsanto*, 146 S. Ct. at 2010 (state law preempted where

Congress's goal of "[u]niformity" "would otherwise be impossible" (citation modified)); *Am. Agric.*, 977 F.2d at 1156-57 (state law preempted where it "would directly affect trading on" a DCM).

*Third*, letting Connecticut ban Kalshi's contracts would conflict with the "method" Congress prescribed to regulate event contracts. *Arizona v. United States*, 567 U.S. 387, 406 (2012). The Special Rule provides that the CFTC *alone* "may" prohibit contracts involving "gaming" if it determines they are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). And in the CFTC's view, many sports-event contracts "can be operated consistent with the public interest." 91 Fed. Reg. at 35,836. Letting states second-guess the CFTC's determination creates an obvious conflict.

### B. The District Court Erred In Holding Kalshi's Contracts Are Not Swaps.

In rejecting preemption, the district court relied primarily on its conclusion that sports event contracts cannot qualify as "swaps." Op.13-23. That determination is flatly contrary to the Special Rule, which recognizes that "[e]vent contracts" include "swaps" that may "involve … gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). The court's arguments otherwise uniformly fail.

*First*, the court interpreted the word "event" to exclude "outcomes." Op.16. But an outcome *is* an event. *See, e.g.*, *Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language (deluxe ed. 2001) (defining

"event" as "the outcome, issue, or result of anything" or as "something that happens"). The CFTC has long recognized that event contracts "may" be based on "the results of political elections, or the outcome of particular entertainment events." 73 Fed. Reg. at 25,669.

The district court's contrary rule would cause the CFTC's jurisdiction to rise and fall on semantics. Virtually any event can be characterized as the outcome of another. For example, the court suggested that a contract on "whether a game proceeds to overtime or whether a series reaches a seventh game" might be a swap. Op.17 n.38. But whether a game proceeds to overtime depends on the *outcome* of regulation play, and whether a series reaches game seven depends on the *outcome* of game six. The district court's reasoning therefore collapses.

*Second*, the court concluded that sports outcomes categorically lack potential commercial consequences. To do so, the court rewrote the swap definition to require that an event, "by its very nature, ha[ve] embedded within it" or be "inherently joined" with a potential financial consequence. Op.20 (citation omitted). But the text "says no such thing." *Castro-Huerta*, 597 U.S. at 642. Instead, it requires a connection to "potential" financial consequences—*i.e.*, those that merely "exist[ ] in possibility." *Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). The court

acknowledged that the CEA's text does not "explicitly require" an inherent connection but demanded one anyway. Op.21. But courts must enforce the textual limits as Congress wrote them. The "swap" definition excludes events without any prospect of financial consequences, subject to normal causation principles. *See Minnesota*, 2026 WL 2150211, at *12 (noting swap definition's "words of limitation"). The statute contains express exclusions, 7 U.S.C. § 1a(47)(B), and empowers the CFTC to create still more, 15 U.S.C. § 8302(d)(1), underscoring that Congress did not intend implied exclusions.

The district court's interpretation is not only atextual; it is impossible to apply. For instance, the district court maintained that a game's "advertising costs" supply the necessary financial consequences, but a win's financial implications to "sponsors" do not—an incomprehensible distinction. Op.22. The court identified certain sports-event contracts that it believed lacked economic consequences, including "combo" contracts depending on multiple events. Op.19. But the "swap" definition includes "any *combination*" of swaps. 7 U.S.C. § 1a(47)(A)(vi) (emphasis added). None of the court's other cherry-picked examples supports the untenable conclusion that *no* sports events carry even *potential* economic consequences.

*Third*, the district court drew unsupported inferences from the CEA's context and purpose to bolster its narrowing construction. The court observed that the rest of the swap definition "primarily concerns financial instruments and economic measures." Op.21. That is wrong. The definition includes swaps on "weather," "energy," and "metal"—none of which is a financial measure or instrument—as well as *any* "agreement … that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. §§ 1a(47)(A)(iii), (iv). Likewise, the court relied on Dodd-Frank's purported "focus on regulating" financial market risk, Op.21, but statutes often reach beyond the "principal evil" that animated them, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

*Finally*, the court adopted its extratextual interpretation to avoid "strip[ping] states of their ability to regulate sports betting." Op.19. But the CEA does no such thing. The statute preempts state law as to on-DCM trading but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks. Section 2(a)(1)(A)'s savings clause makes clear that, except for the grant of exclusive jurisdiction to the CFTC over on-DCM trading, "nothing" in the section "restrict[s]" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7

U.S.C. § 2(a)(1)(A); *see id.* § 16(e)(1)(B)(i) (no preemption as to off-DCM transactions).

Moreover, the court erred in concluding that if Kalshi's sports-event contracts are swaps, run-of-the-mill sports bets must also be swaps. *See* 7 U.S.C. § 2(e). Swaps are necessarily capable of being "traded" on an exchange (and Kalshi's are). *Id.* § 2(a)(1)(A); *see* Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (distinguishing swaps from customary consumer transactions because swaps are "traded on organized markets and over the counter"). Sports bets, on the other hand, happen *off-exchange*; they are customer-to-company transactions where a bookmaker sets prices. The tradability requirement explains why bond insurance—which, like a credit default swap, pays out upon a bond issuer's default—is not a swap and can be entered into off-DCM. Applying the CEA's text as written therefore does not threaten state regulation of traditional sports betting any more than it threatens state insurance regulation.

### C. The District Court Erred In Rejecting Preemption.

The district court went a step further: It held that even if Kalshi's contracts are swaps, the CFTC's exclusive jurisdiction over them does not preempt state law. Op. 23-32. That cannot possibly be right.

*First*, the district court relied on Section 2(a)'s savings clause but skipped its critical proviso. Section 2 does not "supersede" or "limit" the jurisdiction of "other regulatory authorities"—"*[e]xcept as hereinabove provided*." 7 U.S.C. § 2(a)(1)(A) (emphasis added). And the text "hereinabove" grants exclusive jurisdiction to the CFTC over on-DCM transactions. Congress added that proviso for the purpose of "clarifying" that "where applicable," the jurisdiction of the CFTC "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35.

*Second*, the district court misconstrued the Special Rule's grant of authority to the *CFTC* as reflecting congressional intent to "preserve *state* laws" regulating gambling. Op.26-27 (emphasis added). That is baffling: The Special Rule grants only the CFTC—not 50 states—discretion to prohibit as "contrary to the public interest" event contracts involving "gaming" or unlawful activity under state or federal law. 7 U.S.C. § 7a-2(c)(5)(C)(i).

*Third*, the court interpreted Section 16's express-preemption clauses—applicable to off-DCM transactions—as delimiting "Congress' intended scope of preemption," rather than expanding it. Op.27. Section 16(e)(2) preempts the application of state gaming laws to certain agreements "excluded or exempted" from the CEA's regulatory scheme, such that they may be traded *off*-DCM. Op.27; *see* 7 U.S.C. § 16(e)(2). Meanwhile, Section 16(h) prevents

states from regulating swaps as insurance—even if traded off-DCM. 7 U.S.C. § 16(h). The provisions therefore extend the preemptive force of the CEA to a select set of off-DCM transactions; they do not claw back Section 2(a)'s preemption of on-DCM trading. Indeed, Congress's enactment of these provisions turned on its recognition that "the current" CEA already "supersedes and preempts" state laws with respect to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000).

*Fourth*, the court overlooked overwhelming evidence that Congress views DCM-traded instruments traded as meaningfully distinct from the sort of sports betting regulated under Connecticut laws. The Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA") regulates interstate "bets or wagers" over the Internet, including bets pertaining to "sporting event[s]," 31 U.S.C. § 5362(1)(A). But UIGEA makes clear that "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under" the CEA is *not* a "bet or wager." *Id.* § 5362(1)(E)(ii).

*Fifth,* if the district court were correct, nothing would stop states from prohibiting *all event contracts* or *all futures trading* as gambling—as many states did a century ago. *Dickson*, 288 U.S. at 198. The court's theory lacks "any limiting principle" and "upend[s] decades of well-settled and Congressionally-mandated exclusive jurisdiction." CFTC Br. 3.

*Finally*, the court erred in rejecting conflict preemption. It maintained that the impartial-access requirement "does not require DCMs to offer contracts nationwide" and theorized that Kalshi could operate a Connecticut-only market. Op.29-30 (citation omitted). But Kalshi can do no such thing. The CFTC has explained that a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions. CFTC Br. 26-27. The court's contrary reasoning would require DCMs to offer up to 50 different markets for the same contracts—precisely the "seismic shift" that the CEA's express-preemption clause was designed to prevent. *Id.* at 2.

## II. KALSHI WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

Unless the Court enjoins the application of Connecticut gaming law, Kalshi will face a "Hobson's choice" of "violat[ing]" state law and exposing itself to "huge liability," or "suffer[ing] the injury of obeying the law" during the proceedings and any further appeal. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

If Kalshi does not immediately comply with Defendants' demands, it faces massive civil or even criminal liability. Even the district court recognized that "the prospect of criminal prosecution" can inflict irreparable injury. Op.33. Kalshi should not be required to risk prosecution under Connecticut's laws while this Court considers whether those very same laws

are preempted. Moreover, any state-court liability judgment secured by Connecticut in the meantime could raise nettlesome jurisdictional complications if Kalshi later prevails before this Court.

If Kalshi does comply with Defendants' demands, by contrast, it would incur enormous and unrecoverable "economic and reputational harm, including loss of business and goodwill." *Flaherty*, 172 F.4th at 231. Blocking tens of thousands of Connecticut users, many of whom have open investments, Ex. D ¶¶ 24-25, would inflict an immediate loss of business. Kalshi could not recoup those losses given Defendants' immunity from damages liability—a reality the district court ignored. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) ("loss of money" is "irreparable" if the funds "cannot be recouped" (citation modified)). Kalshi's reputation, too, will suffer, so users may not immediately (or ever) return even if Kalshi prevails on appeal. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" constitutes irreparable harm).

Compliance with Defendants' demands will also subject Kalshi to conflicting state and federal commands. Immediate compliance with Connecticut law would require terminating trading in Connecticut—which in turn would prevent Kalshi from "fulfill[ing] its federal mandate." CFTC Br.

26-27. The CFTC's recent emergency order directing Kalshi to disobey a potential state-court TRO in New York highlights the irreconcilable conflict posed by state regulation of Kalshi. *See* Ex. B at 1. Absent an injunction, Defendants could put Kalshi to an untenable choice between compliance with state law and a direct order from Kalshi's federal regulator to do the opposite.

## III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

The irreparable harms Kalshi will suffer absent relief outweigh any alleged harms to Defendants. The government has no stake in enforcing "an unconstitutional law," so an injunction "is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation modified).

The district court invoked Connecticut's interest in effectuating state gambling statutes to deny preliminary relief. Op.36. But Connecticut has not "los[t] its ability to regulate gambling" anywhere *except* on federally regulated DCMs. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025). Connecticut may apply its gambling laws to off-DCM conduct during this appeal.

Nor has Connecticut shown any harms to Connecticut customers; Kalshi already protects its customers nationwide by including robust Know-

Your-Customer procedures and options for users to self-exclude from trading, take trading breaks, and set personal funding caps.[6] Kalshi, moreover, is subject to rigorous oversight—just from the CFTC, not Connecticut. The question is not whether Kalshi should be regulated, but rather by whom. Congress's answer is the CFTC.

## CONCLUSION

The Court should grant an injunction pending appeal.

Date: August 17, 2026

Respectfully submitted,

/s/ Neal Kumar Katyal

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant KalshiEX LLC*

[6] Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited August 17, 2026); Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited August 17, 2026).

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,169 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point type face.

Date: August 17, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on August 17, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS.

Date: August 17, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

# INDEX OF EXHIBITS

| Exhibit | Date | Document |
|---|---|---|
| A | 12-02-2025 | Connecticut Cease & Desist Letter to KalshiEX LLC (D. Ct. Dkt. No. 1-1) |
| B | 08-11-2026 | Order Directing Kalshi to Continue Exercising DCM Functions, *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC |
| C | 08-10-2026 | Memorandum & Order (D. Ct. Dkt. No. 94) |
| D | 12-05-2025 | Declaration of Xavier Sottile (D. Ct. Dkt. No. 30-5) |

# EXHIBIT A

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

December 2, 2025

**Via Certified Mail and E-Mail**

KalshiEX LLC
594 Broadway #407
New York, NY 10012

Case No. 2025-77

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that KalshiEX LLC, d/b/a Kalshi ("Kalshi"), is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ("Contracts"). Kalshi's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"). The Department, therefore, orders Kalshi to immediately cease and desist advertising and offering its Contracts to Connecticut residents.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ." Conn. Gen. Stat. § 53-278a. Professional gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Sports wagering is a form of gambling and is defined as:

> [R]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

Conn Gen. Stat. § 12-850(34).

Kalshi's platform allows users to purchase Contracts based on their belief that a particular sport outcome will occur, such as a specific team winning a game, division, or championship. The user is paid based on the outcome of the sporting event and not based on the occurrence or nonoccurrence of such event. These Contracts constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events.

450 Columbus Boulevard, Suite 901, Hartford, Connecticut 06103-1840
General Information (860) 713-6100
Website: ct.gov/dcp
*An Affirmative Action / Equal Opportunity Employer*

# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*

Public Act 21-23 authorized online sports gambling in Connecticut, but only for specific licensed entities. Kalshi does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would allow Kalshi to provide online gaming to Connecticut residents; nor do Kalshi's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g. Even if Kalshi possessed an online gaming operator's license, Kalshi's Contracts still violate numerous other Connecticut laws and public policies in that Kalshi allows for individuals under 21 years of age to place wagers and allows illegal wagers on Connecticut intercollegiate teams. Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30).

Moreover, Kalshi's Contracts are void under Conn. Gen. Stat. 52-553, which prohibits wagering contracts. More specifically, Section 52-553 states:

> All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . .

Kalshi's Contracts likewise fail to meet any of the exemptions of Conn. Gen. Stat. § 52-553.

Kalshi's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA. Not only are Kalshi's actions deceptive, they are also unfair in that Kalshi, by operating outside of the regulatory environment, is able to gain a competitive advantage over appropriately licensed entities.

Kalshi is hereby ordered to immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents. Kalshi must, however, allow all Connecticut residents to withdraw any funds currently held by Kalshi. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Kristofer Gilman
Director of Gaming

# EXHIBIT B

**UNITED STATES OF AMERICA**

**Before the**

**U.S. COMMODITY FUTURES TRADING COMMISSION**

---

In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration

---

**ORDER DIRECTING KALSHI TO CONTINUE EXERCISING DCM FUNCTIONS**

On August 1, 2026, KalshiEX LLC ("Kalshi"), a designated contract market ("DCM"), submitted to the Commodity Futures Trading Commission (the "Commission") for review notification of a market emergency in light of the State of New York's pending motion for a temporary restraining order that would prohibit Kalshi from offering event contracts from New York, its principal place of business. Kalshi notes that this emergency risks the DCM's ability to comply with Core Principles 2, 4, 6, 7, 9, 11, 12, and 21.

For the following reasons, and consistent with the Commission's statutory mandate to exercise exclusive jurisdiction over commodity derivatives markets in the United States, the Commission agrees that the threat facing Kalshi and the markets that the Commission regulates compels the exercise of emergency power and directs Kalshi to continue to operate its exchange in accordance with its normal practices and the Commodity Exchange Act's ("CEA's") Core Principles.

## I. Background

The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate, among other things, "transactions involving swaps" that are traded on

DCMs.[1] Kalshi obtained designation as a CFTC-regulated contract market on November 3, 2020. Kalshi lists CFTC-regulated event contracts for trading as swaps, as defined in the CEA.[2] Accordingly, the Commission has exclusive jurisdiction to regulate event contracts traded on Kalshi's DCM.

At 12:01 a.m. on July 31, 2026, Letitia James, in her capacity as Attorney General of the State of New York, on behalf of the People of the State of New York, filed a Complaint against Kalshi in the Supreme Court of the State of New York for the County of New York, alleging that Kalshi's operations contravene New York gambling laws.[3] The State also moved for a temporary restraining order ("TRO") that would prohibit Kalshi from "operating a business that offers contracts relating to sports, culture, elections, and other events" "within or from New York or to persons in New York."[4] New York offers no limitation on, or definition of, "other events," which means that it seeks to prohibit Kalshi from offering *all* event contracts. New York additionally seeks disgorgement of all Kalshi's profits obtained in connection with the offering of event contracts, plus a penalty of three times the amount of its profits.[5] New York seeks $36 billion in compensatory damages "at minimum pending accounting," excluding punitive damages and

---

[1] *Id.* § 2(a)(1)(A).
[2] *Id.* §§ 1a(47); 2(a)(1)(A).
[3] *People of the State of New York v. KalshiEX LLC*, Index No. 453272/2026 (July 31, 2026); *see People of the State of New York v. KalshiEX LLC*, No. 1:26-cv-06550, Dkt. No. 1 (S.D.N.Y. July 31, 2026) (removed to federal court).
[4] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-3.
[5] *Id.*

costs.[6] As New York acknowledged in its verified petition, Kalshi's publicly reported valuation is $22 billion.[7]

That next day, Kalshi provided correspondence to the Commission notifying it of an imminent market emergency that would arise if New York obtained a TRO against the company. Kalshi noted that the TRO would enjoin the operation of the DCM completely, not just a category of contracts, and would require the DCM to refund customers and disgorge profits from trades already completed. Beyond the DCM itself, Kalshi noted that the TRO would expose traders to substantial losses exceeding the collateralized value of the contracts and result in market disruptions. According to the DCM, the disruptive effect of New York's lawsuit may be felt even before a TRO would be granted.

## II. Authority

Section 8a(9) of the CEA provides that whenever the Commission "has reason to believe that an emergency exists," the Commission may "direct [a] registered entity . . . to take such action as in the Commission's judgment is necessary to maintain or restore orderly trading in or liquidation of any futures contract."[8] "The term 'emergency' as used [in Section 8a(9)]" includes "threatened or actual market manipulations" as well as any "major market disturbance which prevents the market from accurately reflecting the forces of supply and demand."[9]

---

[6] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-7.
[7] *KalshiEX*, 1:26-cv-06550, Dkt. No 1-1 ¶ 8.
[8] 7 U.S.C. § 12a(9).
[9] *Id.*

An emergency order issued by the Commission is "subject to review only in the United States Court of Appeals for the circuit in which the party seeking review resides or has its principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit."[10]

**III. Findings**

Transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities."[11]

The Commission's mission is to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets through sound, principles-based regulation. As part of this mission, the Commission ensures continued public confidence in its markets by monitoring for manipulation, supporting price transparency, and ensuring market orderliness.

Having reviewed the complete record in this matter, the Commission makes the following findings:

The Commission finds that New York's enforcement action and TRO motion constitute an emergency because they constitute a "major market disturbance which prevents the market from accurately reflecting the forces of supply and demand" with respect to event contracts.[12] Even though New York's enforcement action has been removed to federal court and may be delayed by

---

[10] *Id.*
[11] *Id.* § 5(a).
[12] *Id.* § 12a(9).

remand proceedings, the threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory jurisdiction—as well as to the individuals and entities that trade in the Commission's regulated marketplaces—and thus justifies exercise of the Commission's statutory emergency power. Put simply, New York's lawsuit threatens to prevent a CFTC-registered DCM from offering event contracts to anyone in the world. That unprecedented assertion of state authority cuts at the very heart of the Commission's jurisdiction and would have significant adverse ramifications for national and international financial markets.

If New York's lawsuit, with the extreme relief it seeks, is permitted to continue, then a single State will effectively become the nationwide regulator of event-contract swaps on DCMs. That is the antithesis of the structure that Congress designed for federal derivatives regulation. When Congress created the Commission, "[t]he Act's proponents were concerned that the states . . . might step in to regulate the futures markets themselves. This, they feared, might have subjected the national futures trading apparatus to conflicting regulatory demands."[13] Given the statutorily identified "national public interest" in derivatives transactions, Congress vested a federal agency—the Commission—

[13] *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see also* H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

with "exclusive jurisdiction" over derivatives transactions traded or executed on DCMs, including event contracts.[14] Allowing one State to use its gambling laws to ban an exchange from offering a class of derivatives—not only to citizens in its own borders, but to anyone, anywhere—would run counter to the system Congress created and that derivatives markets have, for over half a century, relied upon.

If New York can force Kalshi to shut down, the market consequences would be swift and severe. Traders across the United States rely on exchanges like Kalshi to hedge and speculate on events associated with potential financial, economic, and commercial consequences.[15] For instance, traders can currently use Kalshi to take positions on whether the Federal Open Market Committee will move the Federal Funds Rate, when traffic in the Strait of Hormuz will return to normal levels, whether a crypto asset will reach a certain price, whether a State will experience a significant drought in a specific timeframe, and whether the United States will enter a recession in a specific quarter. Individuals or entities with exposure to these underlying events, or who wish to have exposure to these events, can use Kalshi-listed contracts for risk management purposes, which is one of the fundamental purposes of federal derivatives regulation.[16] The immediate loss of access to a major derivatives exchange would have a significant effect on the financial risk profiles of market participants across the country and the world.

If New York is permitted to ban a DCM from offering event contracts, those contracts will no longer truly represent the forces of supply and demand. All event

---

[14] 7 U.S.C. §§ 2(a)(1)(A), 5(a).
[15] *Id.* § 1a(47)(A)(ii).
[16] *Id.* § 5(a).

contracts would necessarily price in a "risk premium" that the market itself could be dissolved by the fiat of a single State. That, in turn, would undermine the market's core price discovery function, and it would violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process.[17]

The market distortions may be exacerbated by the fact that DCMs are headquartered in different States. Kalshi, like other prominent DCMs, is headquartered in New York, and thus, a state ban on offering event contracts "within or from" the jurisdiction would necessarily preclude it from offering contracts to anyone, whether inside or outside New York. Other DCMs, however, are located in States that do not seek to enforce gambling law against derivatives transactions. Traders may prefer to find it "safer" to direct their investments to exchanges that are not headquartered in New York and therefore cannot be directed by the State to cease offering all event contracts. In that circumstance, there would be an additional "risk premium" associated with contracts listed by a New York-based DCM, leading to prices that do not reflect natural supply and demand. This would create inter-exchange arbitrage based on perceived legal risks rather than anything related to the events underlying the relevant contracts. It would also undermine one of the CEA's animating purposes: "to promote … fair competition among boards of trade, other markets and market participants."[18]

---

[17] Core Principle 4, 7 U.S.C. § 7(d)(4).
[18] 7 U.S.C. § 5(b).

In the more immediate term, there would be additional market distortions caused by New York's course of action. If Kalshi shuts down, there would be an immediate influx of trading activity from Kalshi onto other exchanges. That spike in activity would artificially impact event-contract prices for reasons having nothing to do with the events underlying the relevant contracts.

Furthermore, New York's proposed TRO would likely require Kalshi to liquidate all open trading positions, causing additional, significant market disturbances. Traders who hold existing positions in event contracts rely on those contractual entitlements to inform their decision making. For instance, a crypto asset trader may have taken a position on Kalshi as to the price of Bitcoin at the end of 2026, and that contract-backed expectation would have informed subsequent trading decisions in Bitcoin and other assets. A forced liquidation of that position could disrupt that trader's strategy, which could require the trader to, in turn, unwind other positions. Likewise, an arbitrageur may have taken a position on Kalshi and an opposite position on another trading platform; if the Kalshi position is liquidated, then the trader is simply left with the opposing position, a one-way exposure that the trader never intended to accept. As a result of dynamics of this variety, there may be significant price volatility in derivatives markets and other markets, threatening systemic harm. This contravenes CEA Core Principles 4 and 9, which require a DCM to "prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process" and "provide a competitive, open, and

efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market."[19]

Finally, and more generally, the logical implications of New York's enforcement efforts are not limited to event-contract markets; they threaten to unsettle derivatives markets generally. If New York can ban event contracts, it logically could ban any derivatives product that the Commission regulates, including basic futures contracts, on the erroneous basis that trading in these products contravenes New York's gambling laws. In that case, New York would wield existential control over every entity that offers derivatives products and is headquartered in New York—the financial capital of the world. That prospect is intolerable to the efficient operation of interstate derivatives markets and warrants emergency action from the Commission.

Under the Commission's statutory emergency powers, it may direct Kalshi and its affiliates to continue to perform its functions as an exchange in accordance with the CEA's Core Principles and its normal practices.[20] This exercise of the Commission's emergency authority will give market participants the necessary assurances that a CFTC-registered DCM cannot be shut down by a single State and that the trades they execute will be duly cleared and fulfilled.

---

[19] Core Principle 4 and Core Principle 9, 7 U.S.C. §§ 7(d)(4), 7(d)(9).

[20] *See* CFTC, Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (July 14, 2026) (exercising statutory emergency power to order Kalshi to fulfill trades that have been executed).

**NOW THEREFORE:**

**IT IS HEREBY ORDERED** that, pursuant to Section 8a(9) of the CEA, the Commission having reason to believe that the threat to its market justifies the exercise of its statutory emergency power, Kalshi shall continue to perform its functions as an exchange in accordance with the CEA's Core Principles and its normal practices.

Issued in Washington, DC, on this 11th day of August, 2026.

By the Commission,

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Date: August 11, 2026

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>-against-<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,<br><br>Defendants. | : | **MEMORANDUM & ORDER**<br><br>25-CV-2016 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Plaintiff KalshiEX LLC's ("Kalshi") Motion for a Preliminary Injunction (the "Motion"). Kalshi seeks an order enjoining Defendants, various Connecticut officials, and the Connecticut Department of Consumer Protection ("DCP"), from enforcing Connecticut's gaming regulatory scheme against Kalshi. Kalshi contends that federal law preempts Connecticut's gaming regulatory regime and related statutes. For the reasons that follow, the Motion is **DENIED**.

# I. <u>BACKGROUND</u>

## A. Factual Background

### 1. Derivatives, Swaps, and Event Contracts Under the CEA

Derivative contracts, some types of which are at issue in this case, are financial tools that traders use to mitigate risk. "A derivative is a financial instrument or contract whose price is directly depending upon (i.e., derived from) the value of one or more underlying assets–for

example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 671 (D. Md. 2025) (cleaned up). In a classic example of a derivatives contract, a farmer may enter into an agreement with a buyer to trade a crop, like wheat, at a predetermined price on a specific future date, effectively locking in value and removing the risk of unexpected price drops.[1] A "future" is a type of derivative contract between parties to buy or sell an asset at a predetermined price on a future date that is listed on an organized exchange. *See generally,* Beylin, *supra* n.1.

Congress regulates many derivatives through the Commodity Exchange Act ("CEA"), a federal statute that provides a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). Originally enacted to regulate futures contracts in agricultural commodities, the CEA has since "expanded well beyond its agricultural-commodity roots." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026). "In 1974, Congress created the Commodity Futures Trading Commission (CFTC) and gave this agency the authority to

---

[1] To shed some further light on how such a contract would play out, "a farmer could go 'short' through the futures contract (i.e., sell the grain under the contract) to neutralize her risk that grain prices fluctuate. Through selling wheat under the futures contract, the farmer effectively sells at a price fixed at the time of execution with settlement taking place in the future through an exchange of the referenced commodity for cash. If prices for wheat increase, the farmer will (i) lose money under the futures contract because the price of wheat at the time of delivery under the futures contract exceeds what she sold it for, but (ii) experience increased revenues from the harvest. If, on the other hand, prices fall, the farmer will (i) profit under the futures contract, and (b) suffer offsetting losses as she sells her harvest at the lower price." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. Chi. Bus. L. Rev. 77, 78–79 (2025).

regulate all futures contracts . . ." *Id.* (citing 7 U.S.C. § 2(a)(1)(A); Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395).

Among other extensive regulatory changes, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act of 2010") "brought much of the swaps market within the CFTC's purview for the first time." *Phillips*, 155 F.4th at 113. As part of the Dodd-Frank Act of 2010, Congress expanded the CEA's reach to include "swap[ ]" contracts, 7 U.S.C. § 2(a)(1)(A), which it defined within the CEA as contracts in which a party's "payment" depends on the "occurrence, nonoccurrence, or [ ] extent of the occurrence of an event" that is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Swaps generally involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. "For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another."[2] Unlike futures and options, "which contemplate delivery of or performance related to a commodity at some future time, swaps are pure financial instruments based on the difference between two fluctuating values." *Phillips*, 155 F.4th at 112 (cleaned up).

The contracts involved in this case are commonly referred to as event contracts, another category of derivative contracts regulated by the CEA. Although the CEA repeatedly uses the term "event contract," it does not define it; nor do any regulations issued by the CFTC. Courts have used the term to describe financial instruments that identify a future event with several

---

[2] ECF No. 46 at 7.

possible outcomes, a payment schedule for the outcomes, and an expiration date. *See KalshiEX LLC v. CFTC*, No. 23-CV-3257, 2024 WL 4164694, at *2 (D.D.C. Sep. 12, 2024). Event contracts are typically traded on an exchange, and their value is determined by market forces. This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a unique financial instrument that tracks real-world market perceptions. *Id.* The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *Id.* For example, one might purchase a position on an event contract titled "Will it rain tomorrow?" with a $1 fixed payout.[3] If that person purchased a 70-cent "yes" position "and it rained the next day, [that person] would earn a 30-cent profit when the contract settles" while the person "who didn't predict correctly would lose their [30-cent] investment."[4]

### 2. CFTC Regulation of Swaps and Event Contracts

The CEA "gives the CFTC 'exclusive jurisdiction' 'with respect to,' among other covered contracts, 'transactions involving swaps' 'traded or executed on a contract market' that the agency has designated." *Schuler*, 2026 WL 1295806, at *1 (quoting 7 U.S.C. § 2(a)(1)(A)). An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a). Once the CFTC designates an entity as a DCM, the entity must comply with the CEA's "core principle[s]" and the CFTC's regulations. *Id.* § 7(d)(1)(A). Of note, the CFTC has promulgated regulations that

[3] Commodity Futures Trading Comm'n, Understanding Prediction Markets and Event Contracts, https://www.cftc.gov/LearnandProtect/PredictionMarkets.

[4] *Id.*

govern the "access requirements" that a DCM must follow. *Id.* § 7(d)(2)(A)(i). These regulations require a DCM to "provide its members . . . with impartial access to its markets and services." 17 C.F.R. § 38.151(b); *see also id.* § 37.202(a). The DCM must both follow "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner" and set "[c]omparable fee structures." *Id.* § 38.151(b); *see also id.* § 37.202(a).

The CEA also contains a "[s]pecial rule for review and approval of event contracts and swap contracts" created by Congress as part of the 2010 amendments to the Dodd-Frank Act (the "Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule applies to contracts in certain excluded commodities. As relevant here, the CEA defines an excluded commodity to include "an occurrence, extent of an occurrence, or contingency" that is both "beyond the control" of the contracting parties and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).[5]

Under the Special Rule, DCMs may list relevant contracts without prior CFTC approval by self-certifying that those contracts comply with applicable law and regulations. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2) (listing submission requirements). If a DCM lists contracts "in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," the CFTC can then review and prohibit these contracts when they are "contrary to the public interest" because they involve "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C.

[5] *Cf.* 7 U.S.C. § 1a(47)(A) (defining "swap" as "any agreement, contract, or transaction" "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence").

§ 7a-2(c)(5)(C)(i).[6] Contracts contrary to the public interest "may [not] be listed or made available for clearing or trading on or through a registered entity," such as a DCM. *Id.* § 7a-2(c)(5)(C)(ii).

### 3. Kalshi's Registration as a CFTC-Designated Contract Market

Kalshi is a financial services company that operates a prediction market, which allows users to buy and sell event contracts on its platform.[7] The CFTC certified Kalshi as a DCM in 2020. *KalshiEX*, 2024 WL 4164694, at *4. Kalshi initially offered event contracts about technology, health, crypto, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2. But in January 2025, Kalshi self-certified several contracts related to sporting events and began to list them on its exchange.[8] These sports-event contracts allow users to place positions on "for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship."[9] But they may also ask:

> Will Michigan win by more than 7.5 points? Or will Michigan and UConn score more than a combined 144.5 points? Or will a specific player score more than 10 points? Or pretty much anything else that might happen during a sporting event.
>
> *Schuler*, 2026 WL 1295806, at *2.

As of February 11, 2026, the date of the hearing on the Motion, Kalshi's value sat at around $11 billion.[10] The vast majority of the contracts listed on Kalshi's site—between 80%

---

[6] Effective as of 2011, the CFTC issued a similar regulation, providing that a "registered entity shall not list for trading" contracts contrary to the public interest—the same types of contracts enumerated above. 17 C.F.R. § 40.11(a)(1).

[7] Compl., ECF No. 1 ¶ 18.

[8] *Id.* ¶ 43.

[9] *Id.*

[10] Oral Arg. Tr., ECF No. 82 at 68:21–69:3.

and 90%—were sports-events contracts;[11] between 80% and 90% of Kalshi's revenue came from its sports-events contracts;[12] and the CFTC had not subjected a single one of these contracts to review under the Special Rule, let alone prohibited any contract after such review.[13]

### 4. The Connecticut Regulatory Scheme for Gaming

The Gaming Division of the DCP "regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with [the state's] gaming laws."[14] It does so pursuant to Connecticut's long-held police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the state to enact laws to suppress gambling cannot be doubted …."); *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (noting that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*") (emphasis added); *see also id.* at 467–68 (referring to "old laws banning sports gambling," and noting that as of 1992, "all forms of sports gambling were illegal in the great majority of States").

Connecticut regulates gambling via a "tightly controlled, exclusive sports wagering market" created in 2021 by the Connecticut General Assembly.[15] 2021 Conn. Acts, No. 21-

---

[11] *Id.* at 41:4–13.

[12] *Id.* at 68:15–20.

[13] *Id.* at 16:16–17; 101:19–24.

[14] ECF No. 1 ¶ 20.

[15] Defs. Opp'n, ECF No. 46 at 5.

23; Conn. Gen. Stat. § 12-850 *et seq.* The Gaming Division is the DCP's largest division, made up of "64 employees . . . that include[] investigators, sworn law enforcement officers, [and] six attorneys."[16] Eight of these employees are specifically dedicated to sports-related enforcement.[17]

Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering"). Conn. Gen. Stat. §§ 12-850(27), 12-850(13). Such online gaming operators must obtain a license from the DCP by contracting directly with one of the state's three master wagering licensees to offer its services.[18]

"Sports wagering," per Connecticut law, is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a

[16] ECF No. 82 at 113:2–7.

[17] *Id.* at 115:22.

[18] Conn. Gen. Stat. § 12-857(a). Connecticut law defines a "master wagering licensee" as "(A) the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; (B) the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe, if licensed to operate online sports wagering, online casino gaming and fantasy contests pursuant to section 3 of this act; or (C) the Connecticut Lottery Corporation, if licensed pursuant to section 4 of this act to operate retail sports wagering, online sports wagering, fantasy contests and keno and to sell tickets for lottery draw games through the Internet, an online service or a mobile application[.]" 2021 Conn. Acts, No. 21-23 § 1(16); *see also* Conn. Gen. Stat. § 12-850(21).

combination of sporting events." Conn. Gen. Stat. § 12-850(34). Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties. Conn. Gen. Stat. §§ 53-278b, 53-278d.

**5. The Department of Consumer Protection's Cease-and-Desist Letter**

In 2025, Kalshi's sports-event contracts drew the attention of the DCP. On December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter, stating that Kalshi was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.[19] The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."[20]

The cease-and-desist letter elaborated that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."[21] It went on to say that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.[22] The letter further contended that Kalshi's contracts are "void" under state law prohibiting wagering

---

[19] Porter Decl. Ex. 1 (C&D Letter), ECF No. 30-3 at 2.

[20] *Id.*

[21] *Id.* (citing Conn. Gen. Stat. § 12-850(34)).

[22] *Id.* at 3 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

contracts and that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."[23] The letter warned Kalshi that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d."[24]

Though Plaintiff initially asserted that the cease-and-desist letter "did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful,"[25] Defendants limited their briefing to Kalshi's sports-event contracts and later clarified at oral argument that the scope of the letter only extended to sports gaming contracts.[26]

On December 8, 2025, per the parties' joint stipulation, the Court ordered Defendants "to refrain from taking enforcement action against Kalshi" for conduct mentioned in the cease-and-desist letter pending disposition of the Motion.[27]

---

[23] *Id.*

[24] *Id.* at 3.

[25] Pl. Mem., ECF No. 30-1 at 16.

[26] ECF No. 82 at 76:2–3.

[27] ECF No. 35.

### B. Procedural History

Kalshi initiated this action on December 3, 2025.[28] On December 5, 2025, Kalshi filed the Motion.[29] Defendants responded on January 9, 2026,[30] and Kalshi replied on January 30, 2026.[31] A number of Indian tribes and gaming associations also filed an amicus brief in this case.[32] The Court held oral argument on the Motion on February 11, 2026.[33]

### C. Nationwide Litigation

Numerous courts have considered similar motions by Kalshi, seeking to enjoin state gaming commissions from enforcing state law against it.[34] Federal courts have found both in Kalshi's favor, granting its preliminary injunction motions, and against it, denying such motions. *Compare KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, No. 26-CV-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (granting preliminary

---

[28] ECF No. 1.

[29] ECF No. 30.

[30] ECF No. 46.

[31] ECF No. 75.

[32] ECF No. 56-1. The Brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 16 tribes: Agua Caliente Band of Cahuilla Indians; Elk Valley Rancheria; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Sandia; Rincon Band of Luiseño Indians; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Tunica-Biloxi Indian Tribe; and Yuuhaviatam of San Manuel Nation.

[33] ECF No. 81.

[34] The Court is aware of 14 lawsuits that Kalshi has brought against states in their respective federal district courts: Nevada, New Jersey, Maryland, Ohio, New York, Connecticut, Illinois, Tennessee, Utah, Iowa, Arizona, Montana, Minnesota, and Rhode Island.

injunctions) *with KalshiEX LLC v. Schuler* ("*Schuler II*"), No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 WL 958171 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (denying preliminary injunctions).

Many state courts are likewise considering similar actions involving Kalshi.[35] In contrast to the federal courts that have addressed this issue, every state court to have issued a ruling has ruled against Kalshi. *See Massachusetts v. KalshiEX, LLC*, 2584-CV-2525, Order on Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss (Mass. Sup. Ct. Jan. 20, 2026), available here; *Nessel v. KalshiEX LLC*, 26-1087-CZ, Order Granting Temporary Restraining Order (Mi. Circuit Ct. June 29, 2026), available here; *Nevada v. KalshiEX, LLC*, 26-0C-50, Joint Stipulation and Order (Nev. Dist. Ct. July 24, 2026), available here. Massachusetts, Nevada, and Michigan state courts have all ordered Kalshi to implement geofencing in order to bar Kalshi's offerings to users in those respective states. While Massachusetts's order has been stayed pending appeal, Kalshi has pledged to implement geofencing in Nevada by August 12, 2026, and faces the same deadline for doing so in Michigan.

[35] The Court is aware of four civil enforcement actions brought by states against Kalshi that remain pending in their respective state courts. Each of those cases—filed in Nevada, Washington, Massachusetts, and Michigan—was remanded to state court after removal. In addition, a criminal enforcement action is pending against Kalshi in Arizona state court. Numerous other state-filed actions have also been removed by Kalshi, and the question of whether those cases should be remanded is currently being litigated.

## II. DISCUSSION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "In general, '[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quoting *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023)). As discussed below, the Court concludes that all factors weigh in favor of Defendants and accordingly **denies** the motion for a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court begins with assessing Plaintiff's likelihood of success on the merits. "In general, to establish a 'likelihood of success on the merits' the movant for injunctive relief 'need only make a showing that the probability of his prevailing is better than fifty percent.'" *Abrams v. Waters*, No. 17-CV-1659 (CSH), 2018 WL 1469057, at *4 (D. Conn. Mar. 26, 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). Here, the merits of the case center on whether (1) Kalshi's sports-event contracts constitute "swaps" within the meaning of the CEA, and, if so, (2) whether Connecticut gambling laws are preempted by federal law as applied to Kalshi's sports-event contracts. Kalshi has not demonstrated that it is likely to succeed on the merits on either of these issues, as explained below.

#### 1. Whether Sports-Events Contracts Are Swaps

As noted in Section I.A.1–2, *supra*, to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), a contract must be a "swap[ ]. . . traded or executed on" a DCM.

Connecticut argues that the sports-event contracts at issue are not "swaps" within the meaning of the CEA and therefore fall outside the CFTC's exclusive jurisdiction. For the reasons that follow, the Court largely agrees.

First, the Court notes that it has the authority to interpret the CEA, including its definition of a swap. "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("*Crypto*") (comparing *Batterton v. Francis*, 432 U.S. 416, 430–31 (1977) (evaluating a statute that expressly "authorize[d]" the Secretary of Health, Education, and Welfare the power to define a statutory term through statutory language: "unemployment (as determined in accordance with standards prescribed by the Secretary)" (cleaned up)), with 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over "accounts, agreements . . ., and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC). "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). Nothing in the CEA takes statutory interpretation away from courts. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi agrees, but states that "a challenge to the CFTC's determination [of what constitutes a swap] *must* be brought against the CFTC itself."[36] The Court is not persuaded. In support of its argument, Kalshi relies on a wholly inapposite Ninth Circuit case, *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015). That case indeed holds, as Kalshi

[36] ECF No. 75 at 2 (emphasis added).

Case: 26-2233, 03/24/2026, DktEntry: 23.1, Page 170 of 208

states, that a "collateral attack on agency decision would be prohibited 'end-run.'"[37] But unlike in *Big Lagoon*, where California challenged a Bureau of Indian Affairs decision to hold a parcel of land in trust for an Indian tribe, Kalshi has failed to identify what exact CFTC decision Connecticut is seeking to collaterally attack here. Kalshi's reliance on *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992) is similarly misplaced. That case held that certain state law claims asserted by soybean farmers were preempted by the CEA; it did not address whether a court may determine, in the first instance, whether the contracts at issue fall within the CFTC's exclusive jurisdiction. Nothing in *American Agricultural Movement* precludes a court from resolving that threshold question here.

As noted above, the CEA defines swaps as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define "occurrence" or "event," so the Court may "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Although dictionaries may illuminate ordinary meaning, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012), statutory language must be construed in context, not in isolation. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Thus, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron*

---

[37] *Id.*

*Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), including Congress's decision to use the distinct terms "occurrence" and "event."

The Court finds that the statutory phrase "occurrence, nonoccurrence, or the extent of the occurrence of an event" is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event. The Court finds persuasive the analysis of the District of Nevada in *Crypto*, which reached the same conclusion after examining contemporaneous dictionary definitions of "occurrence" and "event." *See* 815 F. Supp. 3d at 1181–83. That court ultimately interpreted "occurrence" to mean "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* Crucially, though "some dictionaries suggest 'event' could mean 'outcome,' Webster's and Merriam-Webster's noted this definition of event is an 'archaic' use of the word," not its ordinary meaning. *Id.* at 1182 (quoting Webster's New College Dictionary (2009) (definition of event), Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (definition of event)). Thus, "event" as used in the CEA cannot also encompass "outcome," and, conversely, the statutory phrase cannot be read to make every outcome an "occurrence . . . of an event."

In the context of sporting events, "the ordinary meaning of event . . . would be the sporting event itself, not who wins it." *Crypto*, 815 F. Supp. at 1183. For example, a boxing match would constitute the relevant "event," and it "could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* The term "event" does not encompass the result of the event, meaning who wins the boxing match is not a separate event in and of itself. Indeed, "[a]n ordinary American interpreting the word 'event'

would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Id.*

Kalshi's sports-event contracts fail to satisfy this portion of the statutory definition of a swap because they do not depend on whether an underlying sporting event occurs, fails to occur, or occurs to a particular extent. Instead, Kalshi's sports-event contracts depend on the event's outcomes or discrete in-game occurrences. Treating those outcomes as separate "events" would depart from the ordinary meaning of the term. Thus, Kalshi's sports-event contracts do not fall within § 1a(47)(A)(ii). [38]

Separately, the Court finds that Kalshi's sports-event contracts are also not swaps because they are not "associated with a potential financial, economic, or commercial consequence," as required by 7 U.S.C. § 1a(47)(A)(ii). Kalshi asserts that "[s]ports events have *actual* and *significant* financial consequences," and that they "readily meet the swap definition, which requires only *potential* consequences."[39] It further contends that—when it comes to a limiting principle—"the definition of swap is broad but not limitless"; to qualify as a swap, an event contract must be based on "an event that has a potential consequence for stakeholders."[40]

The Court agrees with the Defendants and the *Hendrick* court that Kalshi's position that sports-event outcomes are associated with financial consequences "knows no limiting

---

[38] The Court notes that, although neither the statute nor the parties define "sports-event contracts," this holding and the accompanying analysis is limited to contracts that depend on a sporting event outcome or an in-game occurrence—for example, which team wins or advances or whether a player scores a touchdown. The Court does not decide on this limited record whether the same analysis would apply to other types of sports-related event contracts (e.g. whether a game proceeds to overtime or whether a series reaches a seventh game), as the record does not establish that such contracts are offered or are at issue, and the parties have not addressed these types of contracts.

[39] ECF No. 75 at 3.

[40] ECF No. 82 at 36:23; 37:10–12.

principle." *Hendrick*, 817 F. Supp. 3d at 1027. In asserting that an event contract qualifies as a swap if it is based on "an event that has a potential consequence for stakeholders,"[41] Kalshi does little to clarify the scope of the statutory phrase. The proposed limitation simply replaces one undefined concept with another: what qualifies as a "potential consequence," and which "stakeholders" are relevant? Kalshi's formulation provides no meaningful basis for drawing those lines, and its own examples illustrate the difficulty of that proposed limitation.

For example, Kalshi draws a distinction between contracts on the winner of a sporting event, which it contends qualify as swaps, and contracts on the game's exact final score, which it does not offer because, in its view, they are "divorced from . . . an outcome that would have an effect on the team or their sponsors" and thus fall outside the statutory definition of a "swap."[42]But it is not clear to the Court why the identity of the winning team, as opposed to the game's final score, is meaningfully different for purposes of the statutory requirement that the event have a potential financial, economic, or commercial consequence. There are many sporting events in which the winner has little or no practical consequence beyond the contest itself, while the precise score may carry significant financial and commercial implications. For example, the winner of a late-season game between two teams already eliminated from postseason contention may have relatively limited economic significance, whereas a losing team reaching a scoring threshold that secures playoff qualification or advancement under a tournament's rules may have substantial financial consequences for players, coaches, teams,

---

[41] ECF No. 82 at 37:12.

[42] *Id.* at 101:3–10.

broadcasters, sponsors, and other stakeholders. Kalshi offers no principled basis for concluding that the former satisfies the statutory definition of a swap while the latter necessarily does not.

Or, for instance, Kalshi has represented that it would not list a contract on whether or not a player at a blackjack table wins their hand because "it would be very difficult to argue that that's not gaming" and because that is an example of a "transaction that has implications for the people in the transaction, but no extrinsic implications for people outside of the transaction."[43] But Kalshi has offered "no principled reason" for why a "'combo' on both the Giants and Broncos winning," which is a type of contract Kalshi does offer, is meaningfully different.[44] Whether both the Giants and Broncos happen to win on a given weekend may have no independent financial, economic, or commercial consequence at all, apart from its significance to participants in Kalshi's market and others who have wagered on that particular combination of outcomes. Conversely, a blackjack hand could have significant financial consequences for the casino, the player, or others with contractual or commercial interests tied to the game. If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted.

Nor could Congress have intended to strip states of their ability to regulate sports betting outside of a CEA-regulated DCM. If the Court were to accept that sports-event contracts are, indeed, swaps, and 7 U.S.C. § 2(a)(1)(A) put such contracts under CFTC's

---

[43] ECF No. 82 at 45:8–23.

[44] ECF No. 46 at 18.

exclusive jurisdiction, but 7 U.S.C. § 2(e) requires swaps to be listed on DCMs, "then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange."[45]

Kalshi's argument that § 2(e) applies only to contracts listed on DCMs does not resolve this issue. That interpretation would create an anomalous regulatory gap, allowing entities to offer swaps outside of CEA-regulated exchanges while avoiding the very oversight and standardization requirements Congress enacted through Dodd-Frank. If companies could offer swaps in this regulatory "Wild West," there would be no principled reason why other types of swaps—including credit default swaps—could not similarly be traded outside the CEA framework. Such a reading would undermine Dodd-Frank's objectives and create a regime in which significant categories of derivatives could evade federal regulation. The better reading is that Congress did not intend to transform all sports-event contracts into federally regulated swaps that must be traded on CEA exchanges.

The Court thus interprets the phrase "associated with a potential financial, economic, or commercial consequences" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence. This interpretation is consistent with the interpretation of the *Hendrick* court, which held that "the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence."[46] *Hendrick*, 817 F. Supp. 3d at 1027. In reaching that

---

[45] ECF No. 46 at 19.

[46] In their briefing, Defendants pointed the Court to the *Hendrick* court's definition of a swap and asked the Court to adopt it. ECF No. 46 at 17. At the oral argument on the Motion, however, Defendants suddenly changed course and stated that was no longer their position. ECF No. 82 at 84:21–23. Instead, they urged the Court to require the phrase "associated with" to encompass

conclusion, the *Hendrick* court explained that the relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event. *Id*.

Although the Court articulates this principle somewhat differently than the *Hendrick* court, it relies on the same considerations that informed *Hendrick*'s interpretation. The *Hendrick* court supported its reading by examining the surrounding statutory text, which primarily concerns financial instruments and economic measures; Dodd-Frank's focus on regulating systemic risks in the financial markets; the CFTC's post-enactment guidance distinguishing swaps from ordinary consumer transactions; and federalism principles recognizing the states' traditional role in regulating gambling. *Id.* at 1027–31. The Court adopts that reasoning and incorporates it here rather than repeating the extensive analysis set forth in *Hendrick*.

It is true, as Kalshi points out, that the text of the CEA does not explicitly require an event to be "inherently joined or connected with" a potential financial consequence.[47] Nor does the statutory text recite "that the event or contingency, by its very nature, has embedded within it" such a consequence, as the Court interprets the statute above. Nevertheless, the Court must give independent meaning to the phrase "associated with" by identifying a meaningful boundary on what it requires. Reading "associated with" to encompass any event that could have some conceivable financial, economic, or commercial consequence would render the

---

"something that has some logical proximate relationship to the preceding event." *Id*. at 85:5–6. The Court declines to accept this proposed formulation because it was neither briefed nor meaningfully developed at oral argument.

[47] ECF No. 75 at 3–4.

phrase effectively limitless, because virtually any uncertain event could produce some downstream financial effect.

The Court therefore interprets "associated with" to require a connection between the financial, economic, or commercial consequence and the event or contingency itself, rather than consequences arising solely from externalities such as endorsement contracts triggered by a team's success, bonus provisions in player or coaching contracts, side wagers, or other downstream financial arrangements created by independent actors. This interpretation ensures that the statutory phrase "associated with a potential financial, economic, or commercial consequence" captures events that are connected to financial, economic, or commercial consequences by their own nature, while excluding events that acquire such significance only through external market activity.

Applying this framework, the Court concludes that Kalshi's sports-event contracts that are based on outcomes of or discrete moments within sporting events (e.g. who wins, whether there is a fumble, etc.) are not based on events that, by their very nature, have embedded within them potential financial, economic, or commercial consequence (unlike the occurrence of a sports game itself, which has, embedded within it, potential financial consequences arising from ticket sales, broadcast rights, and advertising costs). Rather, these contracts are based on the results of sporting contests—events that may have incidental financial implications for teams, players, sponsors, broadcasters, and others, but that do not themselves become financial, economic, or commercial events merely because third parties may derive economic value from, or assign financial significance to, those results. In other words, the fact that a particular outcome of or within a sporting event may have downstream economic

consequences does not satisfy § 1a(47)(A)(ii), because those consequences arise from externalities surrounding the event rather than from the event itself.

This interpretation is reinforced by the CEA's statement of purpose. The CEA provides that transactions subject to the Act "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Thus, Congress envisioned the Act as facilitating legitimate risk management and price discovery in the nation's commodity markets. It is not apparent to the Court what risk-management or hedging function contracts premised on the outcomes of or within sporting contests actually serve. Kalshi has said so itself, conceding in a previous litigation that "at least in general, contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

Because Kalshi's sports-event contracts are not swaps under the CEA, they do not fall within the CFTC's exclusive jurisdiction, and the CEA does not preempt state regulation of those contracts.

### 2. Whether Connecticut Gambling Laws Are Preempted

The Court's conclusion that Kalshi's contracts are not swaps is sufficient to resolve the Motion. Nevertheless, even if the contracts were properly characterized as swaps, Kalshi's preemption arguments would still fail for the independent reasons discussed below.

Under the Supremacy Clause, federal law prevails when it conflicts with state law. *See* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding.”); *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that “[a] fundamental principle of the Constitution is that Congress has the power to preempt state law”). “In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.” *N.Y. SMSA Ltd. P’ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010) (cleaned up).

“The key to the preemption inquiry is the intent of Congress.” *Id.* at 104. “If a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains.” *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). That is, even when a federal statute contains an express preemption clause, the Court must still consider whether Congress’ preemptive intent may be inferred from the scope of the statute such that “Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law.” *Id.* at 76–77 (cleaned up). “[T]he party asserting that federal law preempts state law bears the burden of establishing preemption.” *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

“Traditionally, there has been a presumption against preemption with respect to areas where states have historically exercised their police powers.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104; *see also Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (“There is typically a presumption against preemption in areas of regulation that are traditionally

allocated to states and are of particular local concern.”). “A local government's legislative exercise of ‘historic police powers of the State [ ]’ is not to be superseded by a federal statute unless it was ‘the clear and manifest purpose of Congress’ to do so.” *New York SMSA Ltd. P’ship*, 612 F.3d at 104 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But this presumption against preemption does not generally apply when a state regulates in an area “where there has been a history of significant federal presence.” *United States v. Locke,* 529 U.S. 89, 108 (2000).

**a. Field Preemption**

Kalshi first asserts that “Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation.”[48] Kalshi asserts that field preemption exists here based on the statutory text of the CEA, the statutory purpose of the CEA, the CEA’s drafting history, and the comprehensive nature of the regulatory scheme created by the CEA. Numerous federal courts have now considered these arguments, and the Court finds persuasive the reasoning of those decisions rejecting Kalshi’s claim that Congress intended the CEA to occupy the field.

Field preemption exists where a federal regulatory scheme is “so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it.” *Fid. Fed. Sav. & Loan Ass’n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (cleaned up). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption “categories” “are not ‘rigidly distinct,’” and “‘field’ preemption may fall into any of the categories of express,

---

[48] ECF No. 30-1 at 19.

implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.*

First, Kalshi has not demonstrated that field preemption exists based on "the text and structure of the statute at issue." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, the CFTC's "exclusive jurisdiction" with respect to "transactions involving swaps" on a DCM is limited by the CEA's provision that "nothing contained in th[e] section shall . . . supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." 7 U.S.C. § 2(a)(1)(A). "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7.

Second, the structure of the CEA as a whole, and particularly Congress' enactment of the Special Rule, demonstrates Congress' "intent that some state law and regulation should operate in tandem with the CEA." *Id.* Specifically, because the Special Rule provides the CFTC with authority to prohibit event contracts that are "contrary to the public interest" because they "involve . . . activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), the Special Rule's "plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 793 F. Supp. 3d at 680 (emphasis in original). Additionally, given that the power to regulate

gambling is a traditional police power exercised by Connecticut, as did the Southern District of New York, this Court "also declines to interpret the CEA's grant of exclusive jurisdiction as leaving no room for supplementary state legislation." *Williams*, 2026 WL 2017466, at *7 (cleaned up).

Next, "Congress' intended scope of preemption under the CEA is demonstrated in the Act's express prohibition of state regulation in certain contexts." *Id.* While not at issue here, Section 16 of the CEA, for example, displaces state gambling and bucket-shop laws as applied to transactions involving swaps in limited circumstances, including certain electronic trading facilities and agreements excluded or exempted from the CEA. 7 U.S.C. § 16(e)(2). It also provides that swaps may not be regulated as insurance contracts under state law. *Id.* § 16(h). "These provisions provide 'strong evidence' that when enacting § 2 of the CEA with a grant of exclusive jurisdiction to the CFTC, Congress did not intend to regulate so broadly as to exclude all state gambling laws from regulating transactions involving swaps." *Williams*, 2026 WL 2017466, at *7 (quoting *Martin*, 793 F. Supp. 3d at 681). Had Congress intended to occupy the field with respect to the types of contracts at issue here, it could have expressly said so, as it did in other contexts under § 16. The absence of such language, coupled with the CEA's preservation of state authority and its recognition of concurrent state regulation in certain areas, weighs against a finding of field preemption.

Lastly, the Supreme Court has cautioned against interpreting ambiguous or obscure statutory language, divorced from its context, as conferring broad and transformative authority on the Executive Branch—what Justice Scalia famously described as "hiding elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The Court finds it unlikely that, through Dodd-Frank, Congress intended to displace the States' historic

police powers over sports betting and instead vest exclusive regulatory authority over such activity in the CFTC—a relatively small financial regulator with no historical role or particular expertise in regulating sports betting. The briefing does not identify, and the Court is not aware of, any congressional appropriation of funds or allocation of resources to the CFTC for the purpose of regulating sports betting, either at the time Dodd-Frank was enacted or at any point thereafter.

Taken together, the CEA's text, structure, and targeted preemption provisions demonstrate that Congress did not intend the statute to occupy the field of state regulation at issue here. Accordingly, Kalshi is unlikely to succeed on its field-preemption claim.

**b. Conflict Preemption**

Kalshi also asserts that Connecticut's gambling laws are conflict-preempted as applied to Kalshi, "because it would be 'impossible' for Kalshi 'to comply with both state and federal law,' and because Connecticut's laws stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in the CEA."[49] Defendants respond that Kalshi has not demonstrated that Connecticut's gambling laws would conflict with the CEA, or that they pose any obstacles to federal objectives.[50] The Court agrees and holds that Kalshi has failed to show a likelihood of success that conflict preemption applies in this matter.

"Conflict preemption of state law occurs where 'it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Williams*,

---

[49] ECF No. 30-1 at 25 (quoting *Crosby*, 530 U.S. at 372–73).

[50] ECF No. 46 at 27–29.

2026 WL 2017466, at *7 (quoting *Crosby*, 530 U.S. at 372–73). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up). The "mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (cleaned up).

First, Kalshi has not demonstrated impossibility of compliance with both Connecticut gambling laws and the CEA. Kalshi claims that adhering to Connecticut's gambling laws would be impossible without violating the CFTC's requirement that a DCM provide "impartial access to its markets and services," because Kalshi would be required to limit access to its exchange to persons living only in Connecticut, which would be impossible for a nationwide platform such as Kalshi.[51] The Court does not agree. "The purpose of the impartial access requirement is to prevent DCMs from having certain discriminatory access requirements for their platform; it does not require DCMs to offer contracts nationwide." *Williams*, 2026 WL 2017466, at *8 (citing 17 C.F.R. § 38.151(b) (providing that impartial access includes "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner"); Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80572, 80579 (proposed Dec. 22, 2010) (to be codified at 17 C.F.R. pts. 1, 16, and 38) ("The purpose of the proposed impartial access requirements is to prevent DCMs from using discriminatory access requirements as a competitive tool against certain participants.").

---

[51] ECF No. 30-1 at 28.

It is unclear why Kalshi could not seek out a license pursuant to Connecticut law and establish a category of Connecticut market participants that does not discriminate within the state. *See* 75 Fed. Reg. at 80579 ("A DCM can satisfy the requirement that membership and participation criteria are impartial, transparent, and non-discriminatory by establishing clear and impartial guidelines and procedures for granting access to its facilities and publishing such guidelines and procedures on its Web site. Such requirements may establish different categories of market participants, but may not discriminate within a particular category."); *Martin*, 793 F. Supp. 3d at 686 ("Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws are preempted simply because *not* obtaining a license limits Kalshi's geographical access . . . . So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."); *KalshiEX LLC v. Schuler* (*"Schuler I")*, No. 25-CV-1165, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) ("Kalshi offers nothing but its own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"). The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law. Because the two regimes can coexist, Kalshi's attempt to evade Connecticut's requirements fails.

Nor has Kalshi demonstrated that Connecticut's gambling laws frustrate Congress' objectives underpinning the CEA or serve as an obstacle to the CEA's regulatory scheme. Kalshi contends that "once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with

federal law."[52] Penalties imposed by Connecticut's criminal law, Kalshi continues, "substantially interfere with the CFTC's discretion."[53]

The Court, again, disagrees. "The mere fact that state laws . . . overlap to some degree with federal . . . provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. As Defendants point out, the CFTC itself "has *banned* the conduct that the State law seeks to address [when it] expressly outlawed contracts on conduct 'that involves, relates to, or references . . . gaming, or an activity that is unlawful under any State or Federal Law,' 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2)."[54] Kalshi's conduct thus appears unlawful under the scheme that Kalshi claims protects it from regulation by state law.

Additionally, as previously discussed, the CEA's text and structure, as well as the historical context of Connecticut's interest in regulating gambling through its police power, demonstrate that Congress did not intend to preempt all state actions that may relate to DCMs. The "objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the

---

[52] ECF No. 30-1 at 27.

[53] *Id.* at 27.

[54] ECF No. 46 at 29.

marketplace for swaps."[55] Far from determining that a likely conflict exists, the Court holds that "Connecticut gaming law is harmonious with those objectives."[56]

Lastly, "although Kalshi can list any contract that it self-certifies, its self-certification is not tantamount to a declaration that the contract is lawful." *Williams*, 2026 WL 2017466, at *9. It is ultimately the CFTC that holds the authority to conduct a review and determine whether a sports-event contract listed by Kalshi is legal. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). Though the CFTC has not subjected any of Kalshi's contracts to such a review, "the agency's inaction is not proof that the sports-event contracts are regulated by or permissible under the CEA—and the Court has concluded they are not." *Schuler I*, 2026 WL 657004, at *9.

Accordingly, the Court holds that Connecticut's gambling laws complement rather than conflict with federal law. Because Kalshi has not demonstrated a likelihood of success on its preemption claim, this factor weighs against granting a preliminary injunction.

**B. Irreparable Harm**

Plaintiff has not demonstrated that in the absence of the injunction it seeks, it is likely to suffer an irreparable harm that cannot be otherwise remedied. In order to satisfy the irreparable harm requirement, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is . . . actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary

[55] *Id.*

[56] *Id.*

circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005). "Irreparable harm may be found where damages are difficult to establish and measure." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Kalshi argues that if it chooses not to comply with the DCP's cease-and-desist letter, it will face "the extraordinary harms associated with the threat of civil liability and criminal prosecution."[57] Next, it claims that compliance "would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation," including the loss of business from its more than 24,000 Connecticut users and millions of dollars in open investments, the substantial time and expense of implementing state-specific geolocation capabilities, and unrecoverable economic losses due to Connecticut's Eleventh Amendment immunity.[58] Finally, Kalshi argues that an injunction is necessary to prevent disruption to its users' existing contracts and the broader market, as well as to avoid irreparable harm to Kalshi's reputation, goodwill, and continued status as a CFTC-designated contract market.[59]

Although the prospect of criminal prosecution can, in appropriate circumstances, support a finding of irreparable injury, *see Black v. Cakor Rest., Inc.*, No. 22-CV-1447, 2022 WL 17689840, at *6 (S.D.N.Y. Dec. 15, 2022), Kalshi has not demonstrated that such harm is actual and imminent here. As Defendants note, the DCP lacks independent authority to initiate criminal prosecutions, and any potential criminal enforcement remains speculative.[60] Moreover, any civil penalties imposed on Kalshi may be challenged and vacated should Kalshi

---

[57] ECF No. 30-1 at 29.

[58] *Id.* at 29–30; *see also* ECF No. 82 at 13:15–20.

[59] ECF No. 30-1 at 30–31.

[60] ECF No. 46 at 30.

ultimately prevail on the merits. As in *Hendrick*, the Court concludes that Kalshi's asserted injuries "are largely monetary" and thus do not constitute irreparable harm. *Hendrick*, 817 F. Supp. 3d at 1035.; *see also Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (holding that where "monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm").

Nor has Kalshi shown that its asserted compliance costs constitute irreparable harm. Its claimed injuries—including the expense of implementing state-specific geolocation capabilities and lost business in Connecticut—are the type of "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005)). Defendants also persuasively argue that these asserted harms are, to a significant extent, self-inflicted, as Kalshi continued offering sports-event contracts despite repeated regulatory warnings and adverse judicial decisions rejecting similar preemption arguments.[61] Additionally, Kalshi represented at oral argument that geofencing in one state, such as Connecticut, "effectively means geofencing everywhere."[62] But courts in other states have already directed Kalshi to cease offering its sports-event contracts in those jurisdictions.[63] To the extent Kalshi will comply with these orders by August 12—as it has already indicated it will in Nevada,—it will have already implemented geofencing restrictions in those states. Accordingly, requiring Kalshi to restrict access in Connecticut would appear unlikely to impose the substantial additional costs Kalshi discusses.

---

[61] *Id.* at 31.

[62] ECF No. 82 at 12.

[63] *See* Section I.C, *supra*.

Case: 26-2979, 03/14/2026, DktEntry: 23.1, Page 190 of 208

Finally, Kalshi has not offered evidence that the CFTC is likely to revoke its designation as a DCM if it complies with Connecticut law. As Defendants point out, Kalshi's assertion that the CFTC *could* take such action is speculative, particularly given that Kalshi has continued to litigate similar disputes in other states without any indication that the CFTC has sought to alter its designation.[64] Likewise, Kalshi's asserted reputational harms and alleged disruption to users and nationwide markets rest on predictions that are too conjectural to support a finding of irreparable injury. The Court finds that monetary damages here would be an adequate remedy. Accordingly, the Court concludes that the balance of the evidence weighs against a finding of irreparable harm.

**C. Balance of Equities and Public Interest**

The Court considers the balance of the equities between the parties and the public's interest together. *See Walden v. Kosinski*, 153 F.4th 118, 141 (2d Cir. 2025) ("With respect to the factors of the public interest and the balance of the equities, in a suit against the government, balancing of the equities merges into [the Court's] consideration of the public interest." (cleaned up)).

Kalshi argues that the "public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities."[65] Conversely, Kalshi says, "Defendants cannot show any harm as a result of being prevented from enforcing a statute until after a determination of its constitutionality."[66] And lastly, Kalshi contends, "[i]mmediate compliance with Connecticut law to avoid criminal penalties will harm Kalshi's users in

---

[64] *Id.*

[65] ECF No. 30-1 at 31.

[66] *Id.* at 32.

Connecticut and impose intractable technological difficulties on a very short timeframe.[67] Defendants respond that "the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising"; "the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom."[68]

Defendants' interests in regulating gaming in Connecticut and ensuring that the DCP has the ability to effectuate statutes enacted to protect the public heavily outweigh the interests articulated by Kalshi. Particularly, the Court agrees that states have a strong interest in reducing "the social costs associated" with gambling, a "vice activity," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), and to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Further, the public has a strong interest "in deterring predatory marketing targeted at Connecticut's youth . . . due to the clear risks to youths and others from sports betting."[69] Additionally, an injunction prohibiting Connecticut's ability to regulate Kalshi would substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme and prevent the State from enforcing its duly enacted gaming laws, resulting in significant irreparable harm to the State and the public interest. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When

---

[67] *Id.*

[68] ECF No. 46 at 35–37.

[69] ECF No. 46 at 35 (citing Antonio Pequeno IV, Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men and Low Earners, Bank Warns, Forbes (Nov. 25, 2025)).

a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers) ("Any time [a state is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Lastly, the Court is not persuaded by Kalshi's argument that its users will suffer harm if it is made to unwind ongoing sports-event contracts. Kalshi has been on notice of the potential for state enforcement against its contracts since it began offering them. It has provided no disclosures or warnings to its users, and has instead continued to advertise itself as the "first app for legal sports betting in all 50 states." *Hendrick*, 817 F. Supp. 3d at 1020. Any resulting harm to Kalshi's approximately 24,000 Connecticut users from unwinding existing contracts does not outweigh the State's and the public's strong interests in enforcing Connecticut's gaming laws.

Accordingly, the balance of the equities and the public's interest weigh in favor of Defendants.

## III. <u>CONCLUSION</u>

"Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers." *Hendrick*, 817 F. Supp. 3d at 1029. Kalshi itself has touted its platform as offering legal sports betting nationwide. But sports wagering has long been subject to state regulation pursuant to the states' police powers because of the significant public interests and risks associated with gambling. The Court declines to conclude either that these sports wagers are properly categorized as swaps and fall under the CFTC's authority, or that Congress clearly displaced Connecticut's traditional authority to regulate sports wagering and vested that

authority in the CFTC, an agency that has not historically regulated sports wagering and has not exercised meaningful oversight over Kalshi's sports event contracts.

For the foregoing reasons, the Motion is **DENIED**. Per the Court's previous order at ECF No. 48, the parties are ordered to file their Rule 26(f) Report on or before **August 24, 2026**. Defendants may respond to the Complaint in this matter on or before **August 31, 2026.**

**SO ORDERED.**

Hartford, Connecticut
August 7, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,<br><br>*Defendants*. | Case No.: 3:25-cv-02016-VDO |

**DECLARATION OF XAVIER SOTTILE**

1. I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2. My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission ("CFTC"). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3. The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4. I offer this Declaration to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the Connecticut Department of Consumer Protection ( "DCP") from enforcing its demand that Kalshi immediately cease and desist from offering sporting event-based contracts in Connecticut. Porter Decl., Ex. 1 at 1. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. *Id.* at 1-2. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This Declaration reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, and even likely, given the nature of the DCP's letter and the uncharted territory into which it would lead.

## I. Harms Resulting from Noncompliance

5. If Kalshi declines to comply with the letter and continues to offer sports event contracts in the state of Connecticut, the company and its representatives risk criminal and civil jeopardy in Connecticut.

6. Connecticut authorities have threatened Kalshi and its representatives with civil and criminal penalties. *Id*. at 1-2. The DCP has expressed that it believes that Kalshi's operations in Connecticut are in violation of several Connecticut statutes. *Id*. The DCP stated that Kalshi's conduct violates Conn. Gen. Stat. §§ 53-278b and 53-278d, which can give rise to potential criminal charges. *Id.*

7. The DCP's December 2, 2025 cease & desist letter stated that "[f]ailure to comply" with the letter "may result in additional action including, but not limited to, civil penalties under [the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq.] and/or criminal penalties." Porter Decl., Ex. 1 at 2.

8. Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that Connecticut authorities have highlighted in their letter. *See id.* at 1-2. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

9. Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal law—risk exposing the company and representatives to criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that Connecticut will make good on its threat to file criminal and civil charges against Kalshi, its representatives, and possibly even its contractual counterparties. That fear becomes all the more distressing given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

## II. Harms Resulting from Attempted Compliance

10. Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter in short order would be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in Connecticut would cause severe harm to Kalshi's existing user base. Compliance would also risk Kalshi's status as a designated contract market under the CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

11. Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Connecticut, (c) risk that complying with Connecticut law would jeopardize

Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Connecticut. I describe each of these categories in more detail below.

*a. Harms Resulting from Technical Barriers to Compliance*

12. The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement immediately, under the threat of imminent litigation. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

13. The DCP's letter requires Kalshi to cease all of its event contracts in Connecticut under threat of imminent enforcement. *Id*. at 1-2. If Kalshi attempted to comply with this demand, it would be required to, first, undertake efforts to geolocate which of its users are in Connecticut, and, second, cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance would be difficult to implement even under a relaxed timeline and could not be done immediately.

i. Step One – Identifying Connecticut Users

14. Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

15. Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While

IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

16. It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

17. The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction level rather than the user level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

18. Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

19. Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

20. Kalshi has no evident way to comply immediately with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify Connecticut-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as Connecticut even if they place

positions when they are located outside of Connecticut. Conversely, the KYC data could fail to capture users whose permanent residence is outside of Connecticut but who travel to the state and place a position while there.

21. If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the DCP's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Connecticut law does not apply to Kalshi.

22. Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take longer still. Thus, attempting to comply with the DCP's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

ii. <u>Step Two - Geographical Cessation</u>

23. Only after identifying Kalshi users who are physically present in Connecticut could Kalshi cease offering its event contracts to users in Connecticut. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of Connecticut. Again, this process would be technically challenging, time-consuming, and expensive.

24. While geofencing might block *newcomers* from trading on the platform from Connecticut, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 29,920 accounts on Kalshi that have registered with a Connecticut address; 24,302 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have millions of dollars in

open interest on the Kalshi platform, meaning Connecticut users have millions of dollars' worth of open positions on Kalshi markets that have not yet been settled.

25. The DCP's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

26. If the DCP's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in Connecticut, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

27. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally-regulated contract market. In contrast to a casino, an exchange facilitates trades between different users on the platform. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

28. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the immediate threat of criminal and civil liability from Connecticut state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

*b. Irreparable Harms to Kalshi's Users*

29. Ceasing operations in Connecticut would impose irreparable harm on Kalshi's existing user base. Ceasing operations could be understood to require either pausing current trades

Case: 26-2295, 08/24/2026, DktEntry: 23.1 (202 of 208)

pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

i. Pausing Positions

30. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

31. Pausing positions pending the outcome of the event would deny Connecticut users access to their property. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access funds could result in substantial losses.

32. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to alter their investments as facts on the ground change. Due to the unique market sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes, so does the price of the event contract. A trader may make an investment at 45 cents on the electric vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

Case: 26-2295, 08/24/2026, DktEntry: 23.1 (203 of 208)

33. Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change, so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

34. Hitting pause on all Connecticut-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in Connecticut, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be lost. A Kalshi user that entered into a contract on whether President Trump would impose tariffs on pharmaceutical imports to the United States before December 31, 2025, for example, would not be able to exit that contract even if facts on the ground change dramatically in the meantime.[1] Traders would be forced either to leave the state to change positions or suffer whatever losses they may endure as a result of being locked out.

35. Pausing all Connecticut-based trades would not solely affect Connecticut-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states, given that Kalshi does not distinguish between the geographic location of traders. If traders in Connecticut are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in Connecticut on contracts related to water availability in the American

[1] This is a politics-based event contract that is currently offered through the Kalshi exchange. KalshiEX, *Will Trump impose pharma tariffs this year?*, https://kalshi.com/markets/kxtariffpharma/pharma-tariffs/kxtariffpharma-25.

Southwest. But if the Connecticut-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in Connecticut would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii. Liquidating Positions

36. Liquidating Connecticut-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

37. By the same token, immediately liquidating Connecticut-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, Connecticut traders make up a plurality of the trades on a particular contract, the immediate liquidation of all Connecticut positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-Connecticut users. Alternatively, Kalshi

could liquidate the entire market for both Connecticut and non-Connecticut users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated company simply to stave off potential criminal or civil liability.

*c. Harms to Kalshi Resulting from the Risk of CFTC Decertification*

38. Compliance with Connecticut state law would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

39. As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Connecticut state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

40. CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[ ] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion."

41. CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "[a]ccess criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would conflict with this requirement, but that is exactly what Kalshi would have to do to comply with Connecticut's cease-and-desist letter. Traders who execute positions in Connecticut would be barred from accessing Kalshi's exchange

and placing positions on Kalshi's contracts, whereas traders in any other state would have unlimited access to the platform.

42. Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

43. Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

44. CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the DCP's letter would require Kalshi to do.

45. Compliance with Connecticut law thus places Kalshi in a regulatory Catch-22: Either it complies with Connecticut law and risks CFTC sanctions, or it continues operations in Connecticut and subjects itself to state criminal and civil liability.

*d. Economic and Reputational Harms to Kalshi*

46. Compliance with the cease-and-desist letter would also cause economic and reputational harm to Kalshi. Losses on both fronts would be irreparable even if Kalshi ultimately wins this case.

47. Kalshi has over 24,000 verified users in Connecticut with millions of dollars invested on the exchange. The market uncertainty created by abruptly closing its contracts in Connecticut could lead many users to leave the platform—even users outside of Connecticut. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the DCP's order and the prospect that other states may to follow Connecticut's lead. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance would impose significant and irrevocable economic harm on the company.

48. The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states because of state cease-and-desist letters. This is a massive disruption for Kalshi given Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one Connecticut issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping detect improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

49. The effects of Connecticut's cease-and-desist letter are not limited to the state but instead threaten to open a Pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

* * *

50. The DCP's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi did not comply with the DCP's demands, the company

faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempted to comply with the DCP's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the DCP's demands to follow Connecticut's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its user base. Compliance with the DCP's demands to ward off Connecticut criminal and civil liability would lead to economic and reputational harm that will be difficult to regain.

51. I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 5th day of December, 2025.



Xavier Sottile