**No. 26-2297**

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

COINBASE FINANCIAL MARKETS, INC.,

*Plaintiff-Appellant,*

v.

WILLIAM TONG, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Connecticut
No. 3:25-cv-2121 (Oliver, J.)

# REPLY IN SUPPORT OF MOTION FOR AN INJUNCTION PENDING APPEAL

Trevor Bondy Gopnik
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
tgopnik@gibsondunn.com

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

## INTRODUCTION

The legal issue at the heart of this case—whether Congress's grant of "exclusive jurisdiction" to the CFTC over swap transactions on federally registered exchanges preempts Connecticut's attempts to enforce its gambling laws against sports-related event contracts listed on such an exchange—is being addressed by courts across the country, with differing results. Two courts of appeals have now ruled on it. The Third Circuit concluded that New Jersey likely is preempted; the Ninth Circuit held that Nevada likely is not. Both courts agreed that swaps traded on CFTC-registered exchanges fall within the exclusive jurisdiction of the CFTC; they disagreed only on whether sports-related event contracts are excluded from the definition of "swaps" under the statute. If sports-related event contracts are swaps, both the Third and Ninth Circuits would hold that Connecticut is barred from enforcing its laws against Coinbase here.

This is exactly the scenario that injunctive relief pending appeal is designed to address. As Kalshi explains in its reply brief in support of its motion for an injunction pending appeal,[1] this Court is likely to reach the same

[1] *See* App. Dkt. No. 33.1, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir. Aug. 28, 2026) ("Kalshi Reply," attached hereto as Exhibit A).

conclusion as the Third Circuit—i.e., that sports-related event contracts are swaps under the Act's plain terms—and hold that Connecticut is preempted from intruding on the CFTC's "exclusive" regulatory domain. And Coinbase should not be subjected to a looming threat of enforcement while this Court considers and addresses this critical legal issue that has divided federal courts and appears destined for ultimate resolution by the Supreme Court.

Defendants' opposition identifies no persuasive reason this Court should deny that interim relief to Coinbase. Beyond incorporating their merits arguments made in opposition to Kalshi's motion, defendants additionally contend that (1) Coinbase's harm is "speculative" because sports-related event contracts are supposedly a "new and unproven" line of business, and (2) any harm to Coinbase is "self-inflicted" because it entered the market after Connecticut issued its cease-and-desist letter. As explained below, defendants are wrong on both counts.

## ARGUMENT

### I. Coinbase Will Likely Prevail On Appeal.

As to the merits, defendants incorporate the arguments that they made in opposition to Kalshi's motion for an injunction pending appeal as to the preemption issues at the heart of this case. Opp. 1, 4. For the reasons

explained in the Kalshi Reply, Ex. A. at 2-11, those arguments fail to rebut the strong showing that this Court is likely to reverse the district court.

The Commodity Exchange Act grants the CFTC "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps" traded on designated contract markets (DCMs). 7 U.S.C. § 2(a)(1)(A). And it broadly defines "swap" to mean, among other things, any "contract" that provides for payment "dependent on the occurrence" or "nonoccurrence" of "an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). In the first appellate decision to address the preemption issue here, the Third Circuit held that the Act preempts states from enforcing their gambling laws against swaps traded on DCMs, and that—as even the dissenting judge acknowledged—"sports-event contracts fit comfortably within the statutory definition" of "swap." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227, 233 (3d Cir. 2026).

Recently, the Ninth Circuit issued its decision in an analogous case. It agreed that the Act preempts state regulation of swaps traded on DCMs, and acknowledged the "dictionary definitions" and "plain-language appeal" of the argument that "sports events contracts fit within the meaning of swap." *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *8 (9th Cir. Aug.

28, 2026). And it did not point to anything in the "swap" definition that expressly distinguished sports-related events from other kinds of events. But based on its view of the "statutory context" and the "relevant backdrop" of "legislation involving gambling," the court concluded that "sports event contracts are, in reality, sports bets," and thus excluded from the definition of "swap." *Id.* at *9-10.

The Third Circuit was right to apply the plain language of the statute Congress enacted, rather than carve out sports as a category. Notably, the CFTC itself agrees—it has sued Connecticut (and other States) to enjoin enforcement of state law against the event contracts at issue here. *See United States v. Connecticut*, No. 3:26-cv-498 (D. Conn.). There is a substantial likelihood that this Court will agree with the conclusion of the Third Circuit and the CFTC. At a minimum, in the context of a closely contested legal question relating to an issue that inherently requires nationwide uniformity, Coinbase has made a sufficiently strong showing on the merits to warrant interim relief to preserve the status quo while this Court reaches its view of that same issue.

## II. Coinbase Has Demonstrated Irreparable Harm Absent Relief.

Defendants mostly contest Coinbase's irreparable harm, contending that such harm is speculative and self-inflicted. These arguments are plainly incorrect.

### A. Coinbase's Harm Is Not Speculative.

Defendants assert that Coinbase has not shown irreparable harm because sports-related event contracts are a "new and unproven line of business." Opp. 5. That assertion gets both the law and the facts wrong.

To start, defendants' argument incorrectly implies that a business must be long-established to suffer irreparable harm. Of course there is no such requirement. The irreparable-harm inquiry asks whether the threatened injury can be adequately remedied by monetary damages, not how long the movant has been in operation. *See fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 148, 150 (S.D.N.Y. 2024) (finding "no support for the implication that only sturdy and well-established firms are entitled to the protection of" a preliminary injunction). A business that has operated for nine months and one that has operated for many years are equally entitled to protection from losses that cannot be undone. As defendants do not dispute, that is the case here: if forced to shut down, Coinbase will likely be unable to

recover its losses from the State due to sovereign immunity. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025); *United States v. New York*, 708 F.2d 92, 93-94 (2d Cir. 1983) (affirming district court's finding of irreparable harm "even though [plaintiff's] losses were only pecuniary because a suit in federal court against [the state] to recover the damages . . . would be barred by the Eleventh Amendment.").

Nor would the "newness" of a business or venture make the existence of its losses speculative. *See trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 713, 728 (S.D.N.Y. 2017) (granting injunctive relief where the plaintiff's relatively new business venture faced a threat to its continued existence). As expected for any major product launch, well before launching its prediction-market platform in January 2026, Coinbase invested substantial resources in product development, technological infrastructure, and strategic partnerships—including its partnership with Kalshi—to build a platform capable of offering event contracts in compliance with federal law. *See* Declaration of Andrew Sears ¶¶ 19-20, Dkt. 5-10, *Coinbase Financial Markets, Inc. v. Tong, et al.*, No. 3:25-cv-02121 (D. Conn. Dec. 18, 2025) (Sears Decl.). Those expenditures were made in reliance on the federal regulatory framework that Defendants now seek to displace.

In any event, this argument also misstates the facts. Coinbase's event-contract business is not new. Coinbase has offered event contracts to its customers for the better part of a year, and in that time its prediction-market business has been one of the fastest growing products in the company's history. Olivia Stephanie, *Prediction markets hit $100M annualized in two months: Coinbase's fastest product ever*, crypto.news (July 15, 2026), https://tinyurl.com/yrjnnejt; *Can Prediction Markets Power Coinbase Global's Next Phase of Growth?*, TradingView (Aug. 18, 2026), https://tinyurl.com/3xr53tu7. That growth tracks the market as a whole: monthly trading volume on prediction-market platforms grew from less than $5 billion in September 2025 to approximately $24 billion in April 2026 alone. *See* Sears Decl. ¶¶ 12, 14. Defendants cannot credibly claim that Coinbase suffers no harm when it stands to lose the entirety of a fast-growing business built through months of pre-launch investment, development, and preparation undertaken in reliance on federal authorization. And that is to say nothing of the customer relationships and market position that Coinbase has built over the last nine months.

Finally, Coinbase is suffering an actual, current harm from being subjected to an existing threat of enforcement while it is seeking to vindicate

its legal claims. As a matter of law, a party forced to the Hobson's choice of facing serious liability or complying with a preempted state law suffers irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Notably, Coinbase's predicament is even starker than a typical case where a business seeks relief from being forced to comply with a preempted state law. In the face of these state enforcement threats, the CFTC has directed its registrants to continue operating and has issued emergency orders to that effect. *See In re KalshiEX LLC's Notice Regarding Market Emergency Declaration*, Order Directing Kalshi to Continue Exercising DCM Functions (CFTC Aug. 11, 2026), https://tinyurl.com/3tausnrv; *In re KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Comm'n Regulation 40.6(a)*, Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (CFTC July 14, 2026), https://tinyurl.com/3fuwrv35. In essence, Coinbase faces conflicting federal and state commands: if it complies with Connecticut's demands, it risks violating its obligations to its federal regulator and losing its status as a CFTC-regulated intermediary. But continuing to operate in accordance with the

CFTC's orders leaves Coinbase under the threat of state enforcement. *See Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) ("The linchpin of such interim relief is that *threatened* irreparable harm *will be prevented* by [an] injunction." (emphasis added)).

### B. Coinbase's Harm Is Not Self-Inflicted.

Defendants' attempt to dismiss Coinbase's harm as "self-inflicted" also falls flat. Opp. 6-7. A party does not "self-inflict" harm by operating pursuant to authorization from its federal regulator. Indeed, virtually every affirmative preemption case involves a party potentially violating state law that conflicts in some respect with federal law. Coinbase entered the event-contract market as a CFTC-registered futures commission merchant, which its federal regulator authorized it to do without regard to state gambling laws. By defendants' logic, any federally regulated entity that commences lawful operations despite a state's threats forfeits its right to injunctive relief. Again, that is not the law. *See Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Fairfield*, 790 F. Supp. 1197, 1209 (D. Conn. 1992) (finding that a "plaintiff does not have to acquiesce in a violation of its rights to avoid a claim of self-infliction of injury").

## III. The Equities And The Public Interest Favor An Injunction.

Finally, the equities and public interest favor interim relief here. Defendants argue that they will suffer irreparable harm if they are "enjoined by a court from effectuating statutes enacted by representatives of its people." Opp. 7 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). But that general principle yields where, as here, the statute is preempted by federal law. A State has no legitimate interest in enforcing a law that exceeds its authority. *See Felder v. Casey*, 487 U.S. 131, 138 (1988).

Defendants also try to dismiss Coinbase's harm as "purely commercial." Opp. 8. But courts frequently consider commercial harm in balancing the equities. *See Red Earth LLC v. United States*, 657 F.3d 138, 146 (2d Cir. 2011) (holding that the "equities tip in the plaintiffs' favor because of the adverse economic effects that will result from enforcement of the statute" where the core legal issue was whether a statute violated due process). And the public interest extends beyond the drastic commercial impact that would befall Coinbase. Congress determined that a uniform national market in derivatives—free from a patchwork of conflicting state regulation—serves the public interest, and it broadly preempted state law to protect that interest. Threatened enforcement of state laws against a federally regulated entity

undermines the very federal regulatory framework that Congress intentionally designed.

Ultimately, an injunction pending appeal merely preserves the status quo while this Court resolves the preemption question. Defendants will lose nothing from briefly refraining from enforcement during the pendency of this appeal. Coinbase, by contrast, faces a substantial risk of losing its business, its reputation, its federal compliance status, and more. The equities and asymmetry of harms plainly favor relief.

## CONCLUSION

For the reasons stated above and those set forth in Coinbase's Motion, the Court should grant an injunction pending appeal.

Dated: September 4, 2026

Respectfully submitted,

/s/ *Judson. O. Littleton*

Trevor Bondy Gopnik
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
tgopnik@gibsondunn.com

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant*
*Coinbase Financial Markets, Inc.*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,104 words, excluding the parts of the motion exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT 14-point typeface.

Dated: September 4, 2026

*/s/ Judson O. Littleton*

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 4, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the Appellate CM/ECF System. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: September 4, 2026

*/s/ Judson O. Littleton*

Judson O. Littleton
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
jlittleton@gibsondunn.com

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

# INDEX OF EXHIBITS

| Exhibit | Date | Document |
|---|---|---|
| A | August 28, 2026 | Reply, App. Dkt. No. 33.1, *KalshiEX LLC v. Cafferelli*, No. 26-2239 (2d Cir.) |

# EXHIBIT A

# 26-2239

IN THE

# United States Court of Appeals
# for the Second Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

BRYAN T. CAFFERELLI, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut
No. 3:25-cv-2016 (Oliver, J.)

**REPLY IN SUPPORT OF KALSHIEX LLC'S MOTION FOR AN INJUNCTION PENDING APPEAL**

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
*Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

August 28, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

# TABLE OF CONTENTS


INTRODUCTION .......................................................................................... 1

ARGUMENT ................................................................................................. 2

I. KALSHI IS LIKELY TO PREVAIL ON APPEAL ................................................ 2

A. Kalshi's Contracts Are Subject to the CFTC's Exclusive Jurisdiction ................................................................................. 2

B. Defendants' Preemption Arguments Fail ................................... 7

II. THE EQUITIES STRONGLY FAVOR RELIEF ................................................ 11

CONCLUSION .......................................................................................... 14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES:** <u>Page(s)</u>

*Am. Agric. Movement v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .............................................................. 1

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) .............................................................. 5, 6

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) .............................................................. 10

*Dickson v. Uhlmann Grain Co.*,
288 U.S. 188 (1933) .............................................................. 10

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) .............................................................. 7

*KalshiEX LLC v. Assad*,
No. 25-7516 (9th Cir. Aug. 28, 2026) .............................................................. 7, 8

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .............................................................. 3, 4, 5, 8, 12

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .............................................................. 1, 7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .............................................................. 11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .............................................................. 8

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .............................................................. 11, 12

*N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*,
635 F.3d 66 (2d Cir. 2011) .............................................................. 7

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .............................................................. 13

## TABLE OF AUTHORITIES—Continued

Page(s)

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................................12

*Rice v. Santa Fe Elevator*,
331 U.S. 218 (1947) ..............................................................................7

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
60 F.3d 27 (2d Cir. 1995) ....................................................................12, 13

*United States v. Minnesota*,
--- F. Supp. 3d ----, No. 26-cv-2661, 2026 WL 2150211
(D. Minn. July 27, 2026) .......................................................................3, 8

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025)....................................................................6

**STATUTES:**

5 U.S.C. § 551(13) ..................................................................................2, 3

7 U.S.C. §§

1a(47)(A)(ii) ........................................................................................3

1a(47)(A)(iv) .......................................................................................3

2(a)(1)(A) ....................................................................................1, 2, 5, 8

2(e) ........................................................................................................6

7a-2(c)(5)(C)(i) ...............................................................................4, 9, 10

12a(5) ....................................................................................................11

12a(7) ....................................................................................................11

12a(9) ....................................................................................................11

# TABLE OF AUTHORITIES—Continued

Page(s)

16(e)(1)(B)(i) .................... 9

16(e)(2) .................... 9

16(h) .................... 9

15 U.S.C. § 8302(d)(1) .................... 5, 6

**REGULATIONS:**

17 C.F.R. § 38.151(b) .................... 10, 11

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) .................... 11

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) .................... 5, 6

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026) .................... 3

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5906 (daily ed. July 15, 2010) .................... 10

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) .................... 8

H.R. Rep. No. 97-565, pt. 1 (1982) .................... 9

H.R. Rep. No. 106-711, pt. 2 (2000) .................... 9

**OTHER AUTHORITY:**

*Occurrence*, Webster's New World Dictionary of American English
(3d Coll. ed. 1988) .................... 4

## INTRODUCTION

This case cries out for relief pending appeal. Defendants cannot reconcile their theory of concurrent state jurisdiction with the CEA's grant of "exclusive jurisdiction" to the CFTC. 7 U.S.C. § 2(a)(1)(A). Defendants do not dispute that the decision below contradicts the CFTC's position. Defendants cannot distinguish this Court's precedent holding that the CEA "preempts the application of state law" to derivatives transactions. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.). And Defendants cannot overcome the impossibility of offering 50 state-by-state markets while running a nationwide exchange.

Defendants ask this Court to ignore statutory text in favor of extratextual policy arguments and fail to grapple with the radical consequences of their position: If states can apply their gambling laws to DCMs, then 50 states can impose "varying and potentially contradictory legal standards" that will result in "total chaos" and prevent DCMs from "operat[ing] efficiently" or even "at all." *Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (citation modified).

Defendants' recent conduct refutes their assertion that Kalshi suffers no irreparable harm. On August 26, Defendants sought an *ex parte* temporary injunction in Connecticut state court to prohibit Kalshi from

offering sports-event contracts in Connecticut. Defendants identify no reason to subject Kalshi to irreparable harm—liability, unrecoverable costs, reputational harms, and the threat of enforcement by the CFTC—while this appeal proceeds. The Court should grant an injunction pending appeal.

## ARGUMENT

## I. KALSHI IS LIKELY TO PREVAIL ON APPEAL.

### A. Kalshi's Contracts Are Subject to the CFTC's Exclusive Jurisdiction.

Section 2(a) unambiguously preempts state law by granting the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps" that are "traded or executed" on DCMs. 7 U.S.C. § 2(a)(1)(A). It has been settled for 50 years that this language preempts states from regulating on-DCM trading. Defendants argue otherwise principally by arguing that Kalshi's contracts are not swaps. That argument fails.

1. Defendants ignore that the CFTC's exclusive jurisdiction extends not just to swaps, but to all "agreements" "traded or executed" on DCMs. Kalshi's sports-event contracts are unquestionably "agreements" traded on a DCM, so they fall within CFTC jurisdiction. That does not leave states without recourse if DCMs list improper contracts. States may sue under the Administrative Procedure Act if they believe the CFTC is not enforcing the

CEA against DCMs, including by challenging the CFTC's forthcoming rule. *See* 5 U.S.C. § 551(13). But they may not prosecute Kalshi for offering contracts its exclusive federal regulator has allowed.

2. Regardless, Kalshi's contracts are swaps. The CEA defines "swap" as any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence" or any contract "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(ii)-(iv). This broad definition "reflects congressional intent to … cover many transactions and agreements." *United States v. Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026). "It is not difficult to see how" contracts on, for example, "which NBA team would sign LeBron James" or "which team would win the World Cup" fit this definition. *Id.* at *14. As the CFTC has explained, "sporting events" "generate billions of dollars in economic activity and materially affect both regional and national markets." Prediction Markets, 91 Fed. Reg. 35,806, 35,807-08 (June 12, 2026) (citation omitted). "Kalshi's sports-event contracts fit comfortably" within the definition. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026) (quoting *id.* at 233 (Roth, J., dissenting)). Defendants' contrary arguments fail.

*First*, Defendants have no answer to the Special Rule. There, Congress listed "swaps" "involv[ing]" "gaming" as one type of "event contract[ ]" falling within CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule is irrefutable textual proof that Congress did not exclude contracts involving "gaming" from CFTC jurisdiction or subject them to concurrent state-by-state jurisdiction. Instead, Congress authorized the CFTC to prohibit these contracts *only if* it determines they are "contrary to the public interest." *Id.* Defendants have no response.

*Second*, Defendants claim (at 11) the term "event" excludes "outcome[s]." *See* Op.16. But Defendants cite no authority for that proposition, which contravenes dictionary definitions confirming that "event[s]" include "outcome[s]." Mot. 16-17. Defendants note (at 11-12) the definition refers to "the 'occurrence' of an 'event' " and that "occurrence" and "event" must have different meanings. But no one disputes that they have different meanings—"occurrence" means "the act or fact of occurring," *Occurrence*, Webster's New World Dictionary of American English (3d Coll. ed. 1988), whereas an "event" is what occurs. And while Defendants mistakenly assert (at 12) that *Flaherty* did not consider that requirement, the Third Circuit concluded that Kalshi's contracts "depend on *event outcomes*

associated with economic consequences" and therefore "comfortably" qualify as swaps. 172 F.4th at 227-228 (emphasis added) (citation modified).

*Third*, Defendants make the staggering claim (at 12) that sports events are not "associated with a potential financial, economic, or commercial consequence." That assertion is self-evidently incorrect, and Defendants make no effort to dispute Kalshi's or the CFTC's evidence that sports events generate "billions" in economic consequences. *See* Mot. 13. Nor do Defendants defend the district court's suggestion that consequences from "broadcast rights, and advertising costs" are sufficiently direct but consequences for "sponsors" and "broadcasters" are not. Op.22.

Defendants claim (at 12) that an extratextual limitation is needed to prevent the "swap" definition from being "limitless." But the definition is not limitless; it excludes events not "associated" with any prospect of financial consequences, subject to ordinary causation principles. That limit precludes any artificial categorical rule that all sports events lack potential financial consequences.

*Fourth*, Defendants err in claiming (at 13) that if Kalshi's sports-event contracts are swaps, run-of-the-mill sports bets must also be swaps. To be a swap or other derivative, an instrument must be capable of being "traded" on an exchange. 7 U.S.C. § 2(a)(1)(A). Pursuant to an express delegation

from Congress, *see* 15 U.S.C. § 8302(d)(1), the CFTC and SEC have clarified that swaps are "*traded* on organized markets and over the counter," Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012) (emphasis added); *see CFTC v. Erskine*, 512 F.3d 309, 323-324 (6th Cir. 2008) (derivatives are "standardized," "fungible," and "traded on an exchange"). That swaps are tradeable explains why Congress placed them under exclusive CFTC jurisdiction in Dodd-Frank. The financial crisis showed that when swaps are traded, their financial risks can migrate to other markets. *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). Congress thus mandated that swaps be traded on-DCM, subject to extensive and exclusive federal oversight.

Kalshi's sports-event contracts are customer-to-customer transactions with prices set by market forces and are structured like other derivative instruments, so they are tradeable instruments subject to the CEA. But bets offered by sportsbooks are company-to-customer transactions with prices set by bookmakers that cannot be traded, in which financial risk stays between the parties. For that reason, Section 2(e) supports Kalshi. The CFTC can force unregulated swaps onto DCMs. But Section 2(e) simply does not apply to sports bets.

### B. Defendants' Preemption Arguments Fail.

Defendants claim that even if Kalshi's contracts are swaps, the CFTC's exclusive jurisdiction does not preempt state law. That is obviously incorrect.

**Express Preemption:** Defendants fail to address Kalshi's argument that the CEA expressly preempts state law. Mot. 10-14. The Supreme Court and this Court have easily concluded that statutes granting "exclusive" "jurisdiction" to federal agencies preempt state law. *Rice v. Santa Fe Elevator,* 331 U.S. 218, 233-234 (1947) (citation omitted); *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 72 (2d Cir. 2011). These jurisdictional grants preempt states from intruding on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). Defendants make no effort to explain how the CFTC's "exclusive jurisdiction" could give them *concurrent* jurisdiction over Kalshi. Nor do they cite, let alone distinguish, this Court's binding precedent that "[section] 2(a)(1) of the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. The Ninth Circuit agrees that "the CEA expressly preempts state law regulating swaps 'traded or executed on' a DCM." *KalshiEX LLC v. Assad*, No. 25-7516, slip op. at 20 (9th Cir. Aug. 28, 2026) (citation omitted).

**Field Preemption:** If the CEA's text left any doubt, its "comprehensive regulatory structure" confirms states may not regulate on-DCM trading. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). Indeed, Congress announced that the CEA "preempt[s] the field," leaving no "need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35-36 (1974) (Conf. Rep.). Defendants have no response.

Defendants cite CEA provisions permitting state regulation. But each authorizes state regulation of *off-DCM* trading, *outside* the field Congress preempted. Thus, while Defendants tout Section 2(a)'s savings clauses, neither clause "reserve[s] to the states the power to regulate transactions involving swaps that take place on DCMs." *Minnesota*, 2026 WL 2150211, at *11. The first savings clause specifies that state law is *not* "supersede[d]" "[e]xcept as" "provided" by the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A). It thus confirms state law *is* superseded where the CFTC's exclusive jurisdiction applies. *See Assad*, slip op. at 21 ("§ 2(a)(1)(A)'s saving clause shows that Congress meant it to be a preemptive provision."). The second savings clause preserves state *court* authority, which "does not contravene the grant of CFTC's exclusive jurisdiction." *Minnesota*, 2026 WL 2150211, at *11 (quoting *Flaherty*, 172 F.4th at 231).

Defendants also cite Section 16's preemption provisions. Again, these provisions support Kalshi. Section 16(e)(1)(B)(i) provides that the CEA shall *not* "supersede or preempt" state regulation of transactions *not* "conducted on" a DCM. The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* preempt on-DCM transactions. Indeed, when Congress added this provision in 1982, it noted that the CEA already "bestowed on the CFTC exclusi[ve] jurisdiction" to regulate on-DCM trading, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44 (1982). The second provision, Section 16(e)(2), preempts state regulation of certain *off-DCM* transactions, known as "exempted" transactions. When Congress added this provision in 2000, it again recognized "the current" CEA already "supersedes and preempts" state laws with respect to *on-DCM* transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). The third provision, Section 16(h), added to the CEA in 2010, forbids states from regulating swaps as "insurance," whether they occur on- or off-DCM. None of those provisions calls into doubt that Congress preempted state regulation of on-DCM trading.

Defendants next cite (at 18) the Special Rule, asserting that "Kalshi does not explain who, if not the States" can prohibit event contracts as unlawful under State law. But Congress named the regulator who can

exercise that authority—"the Commission." 7 U.S.C. § 7a-2(c)(5)(C)(i). And while Defendants cite (at 18) the Special Rule's legislative history, it further supports Kalshi by underscoring Congress's intent to "restore *CFTC's* authority to prevent trading that is contrary to the public interest," 156 Cong. Rec. S5906 (daily ed. July 15, 2010) (emphasis added)—*not* to subject event contracts to concurrent state jurisdiction.

Defendants assert (at 18) that Congress did not intend "to specifically preempt state wagering law." Of course, Congress did not preempt states from applying their gambling laws to off-DCM transactions. But Congress *did* preempt state regulation of on-DCM trading, including by state gambling laws. Indeed, before Congress's grant of exclusive federal jurisdiction, many states regulated futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933); *see Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888) (futures trading is "gambling" and a "crime"). If Defendants were correct, they could criminalize all derivatives trading tomorrow—an utterly implausible result that Defendants themselves do not defend.

**Conflict Preemption:** Defendants identify no conceivable way Kalshi could comply with 50 different states' laws while adhering to its federal obligation to provide a nationwide marketplace. They assert (at 19-20) that CFTC regulations prohibit only discrimination "based on net worth."

But the regulations mandate "impartial access" across-the-board, 17 C.F.R. § 38.151(b), and the CFTC has confirmed compliance with state laws is "impossible," *see* Mot. 15. Defendants further claim (at 20) that Kalshi can obtain a Connecticut gaming license. But they ignore that all three of Connecticut's wagering licenses have been issued. Mot. 15.

Defendants dismiss (at 19) the CFTC's "reversal of position." But the CFTC has *always* maintained "the CEA supersedes and preempts … state and local gaming and bucket shop laws" as to on-DCM transactions. Concept Release, 73 Fed. Reg. 25,669, 25,673 (May 7, 2008). Defendants cite (at 19 n.7) *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but the CEA *expressly* delegates authority to the CFTC to effectuate it. 7 U.S.C. §§ 12a(5), (7), (9). A state law or court order requiring Kalshi to violate CFTC directives therefore conflicts with federal law, as the CFTC's emergency order recently confirmed. Mot. 25.

## II. The Equities Strongly Favor Relief.

**Irreparable Harm:** Defendants cannot seriously dispute Kalshi faces irreparable harm. Since filing their opposition, Defendants sought an *ex parte* temporary injunction in state court prohibiting Kalshi from offering sports-event contracts in Connecticut. *State v. KalshiEX LLC*, No. HHD-CV26-6230345-S (Conn. Super. Ct. filed Aug. 26, 2026). If Defendants

obtain that relief, Kalshi will face the "Hobson's choice" between disobeying state law, potentially upon penalty of contempt, and "suffer[ing] the injury of obeying the law" while the appeal is pending. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Kalshi's irreparable harm is even clearer given recent developments in New York. New York sought to prohibit *all* Kalshi's event contracts, to shut Kalshi down *nationwide*, and to subject Kalshi to a minimum *$36 billion* in damages. *See* Ex. B to Mot. at 2-3. In response, the CFTC declared a "market emergency" and directed Kalshi not to comply with any state-court order. *Id.* Kalshi is caught in the middle.

Defendants respond (at 21-22) that civil penalties imposed on Kalshi may be challenged and vacated. But Kalshi's irreparable harm stems from the loss of business from tens of thousands of Connecticut users—business Kalshi undisputedly *cannot* recoup as damages. When "funds 'cannot be recouped,' " monetary harms are irreparable. *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) (citation omitted). Cutting off Connecticut users would also cause Kalshi "reputational harm, including loss of" "goodwill." *Flaherty*, 172 F.4th at 231. Defendants minimize (at 22) this reputational harm and any revenue loss because Kalshi has not shown its "very viability" is at stake. But that standard only applies where "money

damages" are available to the party seeking preliminary relief. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). Here they are not.

**Balance of Equities:** The irreparable harms Kalshi will suffer absent relief easily outweigh any harms to Defendants or the public. Defendants identify no case holding that the equities favor enforcement of a preempted law. This Court has held the opposite. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). While Defendants invoke (at 24) their interest in protecting the public, they have not identified a single Connecticut user allegedly harmed by Kalshi. Kalshi imposes myriad consumer-protection measures, Mot. 25-26 & n.6, and Defendants do not explain why these measures are inadequate. And though Defendants cite revenue loss from Kalshi's customers, they (unlike Kalshi) may seek to recover any claimed monetary harms if they prevail on appeal.

## CONCLUSION

The Court should grant an injunction pending appeal.

Date: August 28, 2026

Respectfully submitted,

*/s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
NATASHA R. KHAN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
DAVIS B. CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(C) because it contains 2,583 words, excluding the parts of the reply exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).

This reply also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point typeface.

Date: August 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 28, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Second Circuit by using the ACMS.

Date: August 28, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal