# 26-2297

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

COINBASE FINANCIAL MARKETS, INC.,

*Plaintiff-Appellant,*

–v.–

WILLIAM TONG, ATTORNEY GENERAL, in his official capacity as Attorney General of Connecticut; BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Connecticut
(No. 3:25-cv-2121) (Hon. Vernon D. Oliver)

## BRIEF FOR APPELLANT COINBASE FINANCIAL MARKETS, INC.

JEFFREY B. WALL
JUDSON O. LITTLETON
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955.8500

YAIRA DUBIN
*Counsel of Record*
TREVOR BONDY GOPNIK
PARISA SADEGHI
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351.4000

*Counsel for Coinbase Financial Markets, Inc.*

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant Coinbase Financial Markets, Inc. is wholly owned by Coinbase Global, Inc. No other entity or individual owns 10% or more of Coinbase Financial Markets, Inc.

# TABLE OF CONTENTS

Introduction....1
Statement of Jurisdiction....5
Questions Presented....5
Statement of the Case....5
I. Legal Background....5
A. The History of the Commodity Exchange Act and Dodd-Frank Act....6
B. The Present-Day Statutory and Regulatory Framework Governing Event Contracts....12
1. The Derivative Instruments At Issue Here: Event Contracts....13
2. The CFTC's "Exclusive Jurisdiction" Over Swaps Offered by Registered Exchanges and Intermediaries....16
3. The CFTC's Extensive Regulation of Swaps, Including Event Contracts....20
II. Factual and Procedural Background....22
A. Coinbase Financial Markets, A CFTC-Registered Intermediary, And Its CFTC-Regulated Event-Contracts Offerings....22
B. Connecticut's Threatened Enforcement Against Coinbase....23
Summary of Argument....28
Standard of Review....33
Argument....33
I. The CEA Expressly Preempts Connecticut's Attempt To Regulate Event Contracts Traded On Federally Registered Exchanges.....33
A. Section 2 of the CEA Expressly Preempts States From Regulating Swaps Traded On Federally Registered Exchanges.....34
B. The Event Contracts At Issue Here Are "Swaps." ....42

1. Coinbase's Event Contracts Are Swaps. .......................... 43

2. The District Court's Contrary Conclusion Was Incorrect. ................................................................... 48

II. The CEA Impliedly Preempts Connecticut's Enforcement Of State Law Against The Event Contracts At Issue. ................. 57

A. The CEA's Text, Structure, and History Indicate That Congress Intended To Occupy the Field of On-Exchange Derivatives Trading. ............................................................ 58

B. Connecticut's Laws Conflict With Federal Law. .................... 61

III. The Remaining Factors Favor Injunctive Relief. ........................ 65

A. The District Court Erred In Finding No Irreparable Harm. ................................................................................ 65

B. The District Court Erred In Finding the Equities Weigh Against Coinbase. ...................................................... 68

Conclusion ........................................................................................ 70

Certificate of Compliance .................................................................. 71

Certificate of Service ......................................................................... 72

## TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Ali* v. *Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ....................................................................................54

*Am. Ag. Movement* v. *Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992)....................................................................12, 61

*Antonyuk* v. *Bruen*,
624 F. Supp. 3d 210 (N.D.N.Y. 2022)...........................................................68

*Arizona* v. *United States*,
567 U.S. 387 (2012) ...............................................................................58, 61

*Board of Trade* v. *Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ......................................................................................8

*Brenntag Int'l Chems., Inc.* v. *Bank of India*,
175 F.3d 245 (2d Cir. 1999) .........................................................................68

*Briggs* v. *Bremby*,
792 F.3d 239 (2d Cir. 2015) .........................................................................33

*Burrage* v. *United States*,
571 U.S. 204 (2014) ....................................................................................50

*Capital Cities Cable, Inc.* v. *Crisp*,
467 U.S. 691 (1984) ....................................................................................33

*Chamber of Com. of the U.S.* v. *Edmondson*,
594 F.3d 742 (10th Cir. 2010).......................................................................68

*Chamber of Commerce* v. *Whiting*,
563 U.S. 582 (2011) ....................................................................................39

*Coinbase Fin. Mkts., Inc.* v. *Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026)..........................................*passim*

*Cothran* v. *Ellis*,
16 N.E. 646 (Ill. 1888)........................................................................7, 61

*Coventry Health Care of Mo., Inc.* v. *Nevils*,
581 U.S. 87 (2017) ..............................................................................40

*FTC* v. *Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001)..............................................................59

*Hughes* v. *Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ............................................................................34

*Hunter* v. *FERC*,
711 F.3d 155 (D.C. Cir. 2013)................................................................9

*In re Int. Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)..................................................11

*Irwin* v. *Williar*,
110 U.S. 499 (1884) ..........................................................................6, 7

*KalshiEX LLC* v. *Schuler*,
2026 WL 2884087 (6th Cir. Sept. 25, 2026)...........................................*passim*

*KalshiEX, LLC* v. *Assad*,
2026 WL 2543846 (9th Cir. Aug. 28, 2026) ...........................................*passim*

*KalshiEX, LLC* v. *Flaherty*,
172 F.4th 220 (3d Cir. 2026)...................................................27, 36, 46

*Leist* v. *Simplot*,
638 F.2d 283 (2d Cir. 1980) ...........................................................16, 36

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*,
456 U.S. 353 (1982) ..........................................................................5, 58

*Mississippi* v. *Louisiana*,
506 U.S. 73 (1992) ..............................................................................34

*Morales* v. *Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................................................66

*Oneok, Inc.* v. *Learjet, Inc.*,
575 U.S. 373 (2015) ....................................................................................57

*Prysmian Cables & Systems USA LLC* v. *ADT Commercial LLC*,
665 F. Supp. 3d 236 (D. Conn. 2023) ............................................................50

*Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ....................................................................................38

*Register.com, Inc.* v. *Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ........................................................................66

*Rice* v. *Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ......................................................................36, 37, 41

*State Farm Mut. Auto. Ins. Co.* v. *Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024)..........................................................................33

*United States Postal Serv.* v. *Konan*,
607 U.S. 391 (2026) ....................................................................................53

*United States* v. *New York*,
708 F.2d 92 (2d Cir. 1983) ..........................................................................68

*United States* v. *Quality Stores, Inc.*,
572 U.S. 141 (2014) ....................................................................................47

**STATUTES**

7 U.S.C. § 1a(9) ..........................................................................................46

7 U.S.C. § 1a(47)...........................................................................................12

7 U.S.C. § 1a(47)(A) .............................................................................16, 43

7 U.S.C. § 1a(47)(A)(i) ..........................................................................44, 52

7 U.S.C. § 1a(47)(A)(ii) .......................................17, 18, 29, 43, 46, 51, 53, 55

7 U.S.C. § 1a(47)(A)(iii) ................................................................................53

7 U.S.C. § 2(a)(1)(A) ........ *passim*

7 U.S.C. § 2(a)(1)(I) ........ 35

7 U.S.C. § 2(e) ........ 18, 54

7 U.S.C. § 6c(a)(4) ........ 22

7 U.S.C. § 7(d)(1)(A)(i) ........ 18

7 U.S.C. § 7(d)(1)(A)(ii) ........ 18

7 U.S.C. § 7(d)(2) ........ 59

7 U.S.C. § 7(d)(3) ........ 18, 59

7 U.S.C. § 7(d)(4) ........ 59

7 U.S.C. § 7(d)(5)(A) ........ 19

7 U.S.C. § 7(d)(11)(A) ........ 19

7 U.S.C. § 7(d)(13) ........ 19

7 U.S.C. § 7(d)(20)(A) ........ 19

7 U.S.C. § 7a-2(c) ........ 59

7 U.S.C. § 7a-2(c)(5)(C) ........ 17, 39, 40, 47, 54

7 U.S.C. § 7b-3(a)(1) ........ 18

7 U.S.C. § 9(1) ........ 22

7 U.S.C. § 9(2) ........ 22

7 U.S.C. § 9a ........ 19

7 U.S.C. § 12a(1) ........ 19

7 U.S.C. § 12a(5) ........ 17, 18

7 U.S.C. § 12a(9) ........ 20

7 U.S.C. § 12c ....................................................................................19

7 U.S.C. § 13 ......................................................................................19

7 U.S.C. § 13a ....................................................................................20

7 U.S.C. § 13a-1 .................................................................................20

7 U.S.C. § 13a-2(1) ............................................................................35

7 U.S.C. § 13a-2(7) ............................................................................35

7 U.S.C. § 16(e)(1)(B)(i) ..............................................................36, 55

15 U.S.C. § 8302(d)(1) ................................................................17, 56

28 U.S.C. § 1292(a)(1) ..........................................................................5

28 U.S.C. § 1331 ...................................................................................4

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, 114 Stat. 2763A-365, 2763A-371 ................................46

Commodity Futures Trading Commission Act of 1974,
Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 ........................................10, 46

Conn. Gen. Stat. Ann. § 42-110a et seq. ................................................24

Conn. Gen. Stat. § 12-863(a)(1)(B) .......................................................64

Conn. Gen. Stat. § 12-863(b)(A)(i) ........................................................64

Conn. Gen. Stat. § 53-278b .............................................................24, 67

Conn. Gen. Stat. § 53-278d .............................................................24, 67

Minn. Stat. § 609.7615 ..........................................................................63

N.Y. Racing, Pari-Mutuel Wagering & Breeding L.
§ 1367(1)(b) ..........................................................................................64

N.Y. Racing, Pari-Mutuel Wagering & Breeding L.
§ 1367-a(4)(a)(ii) ...................................................................................64

Pub. L. No. 675, 49 Stat. 1491, 1494 ........................................................8

**OTHER AUTHORITIES**

120 Cong. Rec. 30,418 (Sept. 9, 1974) ........................................................11, 37

120 Cong. Rec. H34736 (Oct. 9, 1974) ........................................................60

156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln) ........................................................12

Anthony M. Diercks *et al.*, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series, Fed. Reserve Bd. 11 (Feb. 12, 2026) ........................................................62

*Associated*, Black's Law Dictionary (12th ed. 2024) ........................................................43

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019) ........................................................12

CFTC, Futures Glossary, "Derivative," https://tinyurl.com/bdejexjb (last visited Oct. 6, 2026) ........................................................6

CFTC, Order Staying Emergency Rule Filed by KalshiEx LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents (July 14, 2026), https://perma.cc/SX97-STDJ ........................................................65

CFTC, Contracts & Products, https://tinyurl.com/bdmrjfew (last visited Oct. 7, 2026) ........................................................13

*Contingency*, Black's Law Dictionary (9th ed. 2009) ........................................................43, 51

David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335 (2006) ........................................................7

*DealBook: Hedging, not betting, on sports via prediction markets*, N.Y. Times (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 ........................................................16

*Event*, Am. Heritage Dictionary (2d coll. ed. 1985) .......... 43

*Event*, Merriam-Webster's Collegiate Dictionary (10th ed. 2000) .......... 43

*Event*, Webster's II New College Dictionary (3d ed. 2005) .......... 48

*Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) .......... 48

*Exclusive*, Black's Law Dictionary (5th ed. 1979) .......... 34

*Extent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2009) .......... 51

*Forme Science Becomes the First E-Commerce Brand to Hedge Risk on Kalshi*, PR Newswire (June 29, 2026) .......... 15

GAO, The Commodity Exchange Act: Legal and Regulatory Issues Remain, U.S. 5 (Apr. 7, 1997), https://perma.cc/HHZ3-VZG7 .......... 9

Governor Ned Lamont, *Governor Lamont Announces New Actions Against Illegal Prediction Markets Offering Sports Wagers in Connecticut* (Sept. 10, 2026), https://perma.cc/GC3E-W8GN .......... 25, 67

H.R. Rep. No. 93-975 (1974) .......... 61, 63

H.R. Rep. No. 93-1383 (1974) .......... 11, 60

Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285 (2008) .......... 14

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) .......... 7, 9

*Legislation Affecting Commodity and Stock Exchanges*, 45 Harv. L. Rev. 912 (1932) .......... 8

Lynn A. Stout, *Derivatives and the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1 (2011) .......... 11, 12

Paolo Paesani & Annalisa Rosselli, *How Speculation Became Respectable: Early Theories on Financial and Commodity Markets*, 28 Eur. J. Hist. Econ. Thought 273 (2021) .......... 6

*Potential*, Black's Law Dictionary (12th ed. 2024) .......... 44

*Potential*, Merriam-Webster's Collegiate Dictionary (10th ed. 2000) .......... 44

Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the House Comm. on Agric., 93d Cong., 1st Sess. 3 (1973) (Oct. 1973 Hearing) .......... 9, 10

Sentinel-Record, *American Pharoah: Up to you in New York* (June 6, 2015), https://perma.cc/NJD7-5D3G .......... 49

Stuart Banner, *Speculation: A History of the Fine Line Between Gambling and Investing* (2016) .......... 57

**REGULATIONS**

17 C.F.R. § 1.10(b) .......... 19

17 C.F.R. § 1.10(d) .......... 19

17 C.F.R. § 1.12 .......... 19

17 C.F.R. § 1.14 .......... 19

17 C.F.R. § 1.17 .......... 19

17 C.F.R. § 1.18 .......... 19

17 C.F.R. § 1.55 .......... 19

17 C.F.R. § 17.00 .......... 19

73 Fed. Reg. 25,669 (May 7, 2008) .......... 44

77 Fed. Reg. 48,208 (Aug. 13, 2012) .......... 20

89 Fed. Reg. 48,968 (June 10, 2024) ........ 49
91 Fed. Reg. 35,806 (June 12, 2026) ........ 21, 45, 47

# INTRODUCTION

Every day, Americans trade hundreds of millions of dollars in event contracts on federally registered nationwide exchanges. This appeal is not about whether these markets should be regulated. All agree that these markets, like all derivatives markets, require careful and comprehensive regulation; Coinbase has built its business on that premise. The question at the heart of this case is instead *who* should do the regulating: the federal agency Congress charged with overseeing nationwide derivatives markets, or fifty different States according to their own shifting priorities?

Congress answered that question half a century ago, and the Supremacy Clause gives Congress the final word. In 1974, after decades of failed experiments with concurrent federal and state regulation that harmed both markets and the investing public, Congress expressly committed the Nation's derivatives markets to federal control. It amended the Commodity Exchange Act (CEA) to create the Commodity Futures Trading Commission (CFTC), gave the CFTC "exclusive jurisdiction" over derivatives trading, and expressly preempted state regulation of the same. And in 2010, Congress expanded the CFTC's authority, making clear that all "swaps"—like the event contracts at issue here—fall within that exclusive domain.

In operation, event-contract markets are no different from markets for other familiar exchange-traded financial instruments. The exchanges where event contracts are bought and sold operate like the New York Mercantile Exchange (NYMEX) or the Nasdaq, matching buyers and sellers at a market-clearing price. Like futures contracts on the NYMEX or securities on the Nasdaq, event contracts are used to hedge risk and offset underlying exposures and can offer valuable predictive data about future events. And like other derivatives markets, event-contract markets are national by design, pooling buyers and sellers from across the country to supply liquidity and depth. That is why Congress vested the CFTC with exclusive authority over these transactions: so that nationwide markets would be governed by a uniform set of rules, free from the regulatory whims of fifty different States.

But Connecticut now seeks to inject itself into the CFTC's regulatory sphere, asserting independent authority over just one category of event contracts: those tied to sports. The district court sided with Connecticut, holding that sports-related event contracts are not "swaps" and thus fall outside the CFTC's exclusive jurisdiction. But there is no sports exception to the CEA. To the contrary, aside from a few explicit exceptions, the CEA's "swap" definition does not discriminate based on a contract's subject matter.

Just as Congress appointed the CFTC the sole regulator of traditional commodity futures, regardless of whether they concern grain, oil, or copper, Congress appointed the CFTC the sole regulator of event contracts, regardless of whether they turn on the Fed raising rates, Republicans keeping the Senate, or the Giants winning the Super Bowl. And the CEA's "Special Rule"—which empowers (but does not require) the CFTC to ban certain "gaming" contracts—confirms that Congress contemplated such contracts and expressly committed them to the agency's exclusive jurisdiction.

The district court's fallback reasoning—that even if sports event contracts are "swaps" under the CEA, the Act still does not preempt States from regulating them—fares even worse. For starters, the court ignored Coinbase's argument that the CEA's grant of "exclusive jurisdiction" over swaps to the CFTC *expressly* preempts state regulation. It instead analyzed only whether Connecticut law is *impliedly* preempted. Moreover, if the court were right that the CEA effects no preemption "even [as to] contracts [that are] properly characterized as swaps," JA208, then *all* swaps and potentially all derivatives—not just sports-related event contracts—could be subject to fifty different state regimes. That is precisely the approach Congress rejected in granting the CFTC "exclusive jurisdiction" over covered transactions.

The decision below was driven by an extra-textual concern: that classifying sports event contracts as swaps would sweep state-regulated sportsbook wagers under federal jurisdiction too. Reasoning backwards from that perceived consequence, the district court narrowed the CEA's "swap" definition and drained the exclusive-jurisdiction provision of its preemptive force. But the concern is unfounded. As the CFTC has confirmed, sports bets are not "swaps" and thus remain subject to state regulation. That conclusion makes perfect sense: The CEA regulates *exchanges*—*i.e.*, neutral marketplaces that connect counterparties at the market-clearing price—and the instruments traded on those exchanges. Sportsbook wagers, by contrast, are one-time transactions between a customer and the sportsbook itself. In any event, a policy concern gives no license to rewrite Congress's work.

The district court's decision puts Coinbase to an impossible choice. Coinbase can abandon its event-contract offerings in Connecticut, jeopardizing partnerships, market share, and the continued viability of a key component of its business plan—despite full compliance with federal law. Or it can continue operating, but risk civil liability and criminal prosecution under state law. Congress enacted the CEA so that companies like Coinbase would not face that choice. The decision below should be reversed.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the U.S. Constitution. On August 10, 2026, the district court denied Coinbase's motion for a preliminary injunction. JA181. Coinbase timely appealed on August 14, 2026. JA224-25. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## QUESTIONS PRESENTED

1. Whether the CEA expressly preempts state regulation of event contracts traded on federally regulated exchanges.
2. Whether the CEA impliedly preempts state regulation of event contracts traded on federally regulated exchanges.
3. Whether the balance of harms and equities weigh in favor of a preliminary injunction.

## STATEMENT OF THE CASE

### I. Legal Background

The Commodity Exchange Act establishes a "comprehensive regulatory structure" to govern derivatives trading on federally designated exchanges. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353, 356 (1982) (citation omitted). The Act defines the relevant universe of regulated derivatives; specifies when and how those derivatives may be lawfully traded;

and confers "exclusive jurisdiction" on a federal regulator—the CFTC—to regulate that trading activity. 7 U.S.C. § 2(a)(1)(A).

### A. The History of the Commodity Exchange Act and Dodd-Frank Act

The current CEA is the product of nearly a century of careful calibration of the proper framework for regulating derivatives—*i.e.*, tradeable financial instruments whose value depends on, or "derives" from, an underlying asset, rate, or variable.[1]

1. The CEA emerged from a national debate about a particular type of derivative called a futures contract: a "contract for the sale of goods to be delivered at a future day." *Irwin* v. *Williar*, 110 U.S. 499, 508 (1884). Early futures were often traded on commodity-specific exchanges, like the Chicago Board of Trade (for grain) and the New York Cotton Exchange. See Paolo Paesani & Annalisa Rosselli, *How Speculation Became Respectable: Early Theories on Financial and Commodity Markets*, 28 Eur. J. Hist. Econ. Thought 273, 284-85 (2021).

As organized futures trading proliferated, however, so did predatory institutions known as "bucket shops," which stole quotations from leading

[1] See CFTC, Futures Glossary—"Derivative," https://tinyurl.com/bdejexjb (last visited Oct. 6, 2026).

exchanges, posted them, and then accepted "bets and wagers on the price movement of stocks and commodities." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663, 666 (1982). These institutions, which tried to piggyback off the legitimacy of exchanges, inherited their name from nineteenth-century stores where impoverished youths would sell buckets of collected dregs from drained beer kegs thrown out by pubs. David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335, 335 (2006).

Many States saw little daylight between the imitation and the original, treating grain futures transactions as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and "nothing more than a wager," *Irwin*, 110 U.S. at 509. And they enacted what became known as bucket-shop laws, which typically prohibited any transaction "where the parties did not actually intend to deliver … the contract's underlying commodity." Van Wart, *supra*, at 664. Despite the shorthand, these laws banned not only bucket-shop transactions but also commodity futures contracts executed on organized exchanges. *Ibid.*

Over time, however, it became apparent that organized trading of futures contracts could have immense value. Futures trading provided a

"means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want," *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905), allowing people to plan for an economically uncertain future. By the early 20th century, the "necessity" of "[b]road speculative markets for securities and commodities … to the efficient functioning of modern systems of production and distribution" became "practically unchallenged by students of economics." *Legislation Affecting Commodity and Stock Exchanges*, 45 Harv. L. Rev. 912, 912 (1932).

Congress agreed, passing the Grain Futures Act in 1922 to begin centralizing trading of grain futures on federally approved "contract market[s]." Ch. 369, 42 Stat. 998, 1000-02 (1922). Soon after, Congress enacted the Commodity Exchange Act, Pub. L. No. 675, 49 Stat. 1491, 1492-99 (1936), which expanded federal oversight over these exchanges and broadened the universe of federally regulated underliers.

Congress did not originally make that federal oversight exclusive. It instead preserved parallel state regulation of derivatives markets through a savings clause, which provided that federal law would not "impair any State law applicable to any transaction" regulated by several of the Act's key provisions. Pub. L. No. 675, 49 Stat. 1491, 1494 (1936).

2. Derivatives trading exploded in the following decades. Between 1963 and 1973, commodity exchanges went from handling $60 billion in futures contracts to $268 billion—outpacing the total value of stock traded that year ($200 billion). See Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the House Comm. on Agric., 93d Cong., 1st Sess. 3, 15 (1973) (Oct. 1973 Hearing). But because the original CEA "covered only a fraction of commodity futures," much of that trading activity fell outside the scope of federal regulation. *Hunter* v. *FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013).[2] And even as to activity within the CEA's scope, the limited powers of the Commodity Exchange Authority (the agency then charged with administering the CEA) hindered federal regulatory efforts. Oct. 1973 Hearing at 1, 11-12. The States, meanwhile, proved incapable of effectively filling that regulatory void. Van Wart, 58 Chi.-Kent L. Rev. at 673. The result was a "hodgepodge regulatory system" that often left investors "without any regulatory protection" at all. *Hunter*, 711 F.3d at 157. Manipulative schemes involving nonregulated commodities cost investors

---

[2] See, *e.g.*, GAO, The Commodity Exchange Act: Legal and Regulatory Issues Remain 5 (Apr. 7, 1997), https://perma.cc/HHZ3-VZG7 (discussing how nonagricultural commodities futures were outside scope of CEA and federal regulation).

millions. See Oct. 1973 Hearing at 11. And because the CEA constrained the federal government's ability to intervene, such misconduct went unchecked. *Ibid.*

That dysfunctional regime prompted calls for reform. In a 1973 hearing, Congressman Neal Smith—who had led a three-year investigation into the commodity markets—warned that lack of consistent oversight had brought the futures trading system "near … to collapsing" and left it "vulnerable … to manipulation and abuses." Oct. 1973 Hearing at 3. He recommended that "all futures trading" be brought "under Federal regulation," and that the understaffed and under-resourced Commodity Exchange Authority be "reorganized into an agency which has a stature and capability comparable to the SEC." *Id.* at 10-11, 15.

Congress responded in 1974 by overhauling the CEA. It established a uniform federal regulatory regime covering a far broader universe of derivatives with an extensive list of underliers, and created a new federal agency—the CFTC—to oversee it. See Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (1974) (codified at 7 U.S.C. §§ 1a(9), 2(a)(1)(A)). This time, with the benefit of hindsight, Congress vested the new CFTC with "exclusive jurisdiction" over

transactions involving derivative instruments traded on registered exchanges. *Ibid.* And to "assure that Federal preemption is complete," Congress eliminated the savings provision that had preserved state authority over transactions regulated by the Act's key provisions. See 120 Cong. Rec. 30,464 (1974); H.R. Rep. No. 93-1383, at 35 (1974).

3. Congress's next major course correction came on the heels of the Great Recession. After a deregulatory period in the early 2000s, Congress witnessed a tremendous expansion in off-exchange derivatives trading, including "swaps," or contracts in which two parties agree to exchange or "swap" cash flows or payments. See Lynn A. Stout, *Derivatives and the 2008 Credit Crisis*, 1 Harv. Bus. L. Rev. 1, 22 (2011). Excessive speculation on those under-regulated markets contributed to the 2008 collapse and highlighted the dangers posed by innovative financial instruments traded outside federal oversight. *Id.* at 29.

Congress responded in the Dodd-Frank Act. Among (many) other things, Dodd-Frank "amended the [CEA] to establish a comprehensive new regulatory framework for swaps" and "vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017). The Act gave the CFTC an

"explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference[.]" Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 13 (2019). And it defined the term "swap" broadly to sweep in a wide range of derivatives instruments, see 7 U.S.C. § 1a(47); Stout, 1 Harv. Bus. L. Rev. at 33, and to prevent regulated entities from "'gam[ing] the system' by labeling or structuring transactions that are swaps" to nonetheless fall outside the CEA's reach, 156 Cong. Rec. S5923 (daily ed. July 15, 2010) (statement of Sen. Lincoln).

"The crisis," after all, had "ar[isen] from unforeseen risks, so risky financial instruments might arise unexpectedly in the future, too." *Coinbase Fin. Mkts., Inc.* v. *Raoul*, 2026 WL 2969682, at *9 (N.D. Ill. Oct. 2, 2026). Congress thus designed the "swap" definition to cover a "whole world of potentially dangerous financial instruments," as a "broad-spectrum regulatory intervention" rather "than a surgical response to the 2008 crisis." *Ibid.* (internal quotations omitted).

### B. The Present-Day Statutory and Regulatory Framework Governing Event Contracts

The current CEA establishes a robust, "comprehensive" federal regulatory regime for derivatives trading, see *Am. Ag. Movement* v. *Bd. of*

*Trade of Chicago*, 977 F.2d 1147, 1155 (7th Cir. 1992) (citation omitted)—including the derivative instruments at the heart of this case.

**1. The Derivative Instruments At Issue Here: Event Contracts**

The derivative instruments at issue here are known as event contracts. Event contracts enable parties to trade on their predictions about "a specified event, occurrence, or value," like the value of a macroeconomic indicator or the level of snowfall at Mohawk Mountain.[3] They are typically structured as binary, yes-or-no contracts where each "yes" position corresponds to an opposing "no" position. When the contract expires, the party who predicted correctly receives a payout; the counterparty who predicted wrong receives nothing. Because parties can freely exit their positions or purchase new ones at any point, an event contract's price—like the price of a traditional commodity futures contract—will fluctuate as parties trade positions.

By putting money behind opinions, event contracts produce information of real public value: they give investors a financial incentive to share their predictions about the likelihood of future events. Take the Federal Reserve's October meeting. Traders naturally have different views on whether the Fed

[3] CFTC, Contracts & Products, https://tinyurl.com/bdmrjfew (last visited Oct. 7, 2026).

will raise rates. Every time a trader purchases, sells, or trades event contracts based on those views, he necessarily shares his predictions with the public. The contract's market price thus reflects the real-time, aggregated expectations of all market participants. See Joyce E. Berg et al., *Prediction Market Accuracy in the Long Run*, 24 Int'l J. Forecasting 285, 287 (2008). For example, if the "Fed rate hike in October" contract is trading at 70 cents, that means market participants currently predict a 70% chance of that event coming to pass. But if inflation trends lower than expected, holders of the "Fed rate hike" position may be incentivized to sell, which will drive the price down; conversely, if the Fed's meeting minutes reflect openness to increasing rates, demand for the contract will increase and so too its price.

The predictive force of event-contract pricing thus increases with widespread market participation: The greater the number of participants—*i.e.*, the more liquid the market—and the more geographically diverse the participant base, the more reflective the market will be of national expectations.

Event contracts, like other derivatives, also serve a valuable hedging function. They permit market participants to mitigate risk by offsetting underlying exposure. An adventure-tourism operator in Hawaii might

purchase event contracts to offset lost revenue in the event of a hurricane. Likewise, a pharmaceutical company might purchase contracts that pay out if the FDA approves a competitor's generic alternative, again to offset potential lost revenue.

So too for event contracts related to sports. Sports carry real economic exposure that event contracts can offset. The revenue of broadcasters, arenas, and concession companies correlates with the number of games played in a series, and sponsors' returns depend on player performance. *Raoul*, 2026 WL 2969682, at *11. And businesses have already begun to use sports event contracts to hedge. During this year's World Cup, an e-commerce brand promised customers a 100% refund on certain purchases if Team USA won the tournament. The company hedged that potential revenue loss by purchasing event contracts that would pay out if Team USA won.[4] Likewise, an insurance company helping sports teams mitigate the risk of performance-based incentives for athletes could purchase event contracts that would pay out if the

---

[4] *Forme Science Becomes the First E-Commerce Brand to Hedge Risk on Kalshi*, PR Newswire (June 29, 2026), https://perma.cc/JHU3-KSBV.

event triggering the performance-based incentive occurs—*e.g.*, if a closer records a certain number of saves.[5]

Event-contract markets also provide opportunities to speculate, which is essential to the market's proper function. As this Court has recognized, a derivative market "would not function … if only hedgers sold and purchased" on it, because "speculative investor[s] … take on the risks which the hedgers want to shift." *Leist* v. *Simplot*, 638 F.2d 283, 288, 304 (2d Cir. 1980). In other words, speculators generate the market depth and liquidity that are essential to the market's predictive and hedging uses.

### 2. The CFTC's "Exclusive Jurisdiction" Over Swaps Offered by Registered Exchanges and Intermediaries

a. Congress amended the CEA in 2010 to address "swaps," broadly defining the term "swap" in twenty-eight enumerated paragraphs and subparagraphs. 7 U.S.C. § 1a(47)(A); see pp. 11-12, *supra*. As particularly relevant here, a swap includes:

> any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

---

[5] *DealBook: Hedging, not betting, on sports via prediction markets*, N.Y. Times (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

7 U.S.C. § 1a(47)(A)(ii). A "swap" thus encompasses any "contract" whose payout is "dependent on" "the occurrence" of an "event or contingency" that is "associated with a potential financial, economic, or commercial consequence." The "swap" definition also includes a broad catch-all that sweeps in any "transaction that … in the future becomes[] commonly known to the trade as a swap" or "any combination or permutation of" any of the expressly listed examples. *Id.* § 1a(47)(A).

b. The Act appoints the CFTC the exclusive regulator of swaps traded on federally registered exchanges. See p. 11, *supra*. Section 2(a) provides that:

> the Commission shall have exclusive jurisdiction … with respect to accounts, agreements … and transactions involving swaps … traded or executed on a [designated exchange].

7 U.S.C. § 2(a)(1)(A). The Act also authorizes the CFTC to "make and promulgate such rules and regulations as … are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter," *id.* § 12a(5), and to "further define" "swaps" and related terms in consultation with the SEC and Federal Reserve, 15 U.S.C. § 8302(d)(1).

The CEA further directs the CFTC to exercise its exclusive jurisdiction over "event contracts" in accordance with a "Special rule." 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule empowers the CFTC to bar trading of a swap

"that [is] based upon the occurrence, extent of an occurrence, or contingency" *if* it determines that a particular contract is "contrary to the public interest" and the contract involves:

> (I) activity that is unlawful under any Federal or State law;
> (II) terrorism;
> (III) assassination;
> (IV) war;
> (V) gaming; or
> (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Ibid.*

c. The CEA gives the CFTC comprehensive authority to regulate the exchanges that offer swaps for public trading. An exchange must be designated by the CFTC as a contract market ("designated contract market" or "DCM"). 7 U.S.C. § 2(e); *id.* § 7b-3(a)(1). To receive and maintain federal "designation," an exchange must comply with a set of "core principle[s]," *id.* § 7(d)(1)(A)(i), and with "any requirement that the [CFTC] may impose" pursuant to its general rulemaking authority. *Id.* § 7(d)(1)(A)(ii); *id.* § 12a(5) (rulemaking authority); see 17 C.F.R. pt. 38. For example, an exchange must implement measures to prevent market manipulation and minimize risk, including by listing only those contracts that are "not readily susceptible to manipulation," 7 U.S.C. § 7(d)(3); adopting position limitations as necessary to

reduce the "potential threat of market manipulation," *id.* § 7(d)(5)(A); establishing and enforcing rules to ensure the "financial integrity of transactions," *id.* § 7(d)(11)(A); enforcing disciplinary procedures, including against market participants that violate applicable rules, *id.* § 7(d)(13); and "maintain[ing] a program of risk analysis" to minimize and be prepared for any operational risks, *id.* § 7(d)(20)(A).

The CFTC also regulates "futures commission merchants" (FCMs), which serve as intermediaries. Intermediaries partner with registered exchanges to offer customers access to the exchange's products on the intermediary's familiar platform. Intermediaries, like exchanges, must be registered "upon application in accordance with [CFTC] rules and regulations … ." 7 U.S.C. § 12a(1). And they must adhere to comprehensive statutory and regulatory requirements, including reporting rules, public disclosure obligations, financial requirements, and recordkeeping demands. See 17 C.F.R. §§ 1.10(b), 1.10(d), 1.12, 1.14, 1.17, 1.18, 1.55, 17.00.

d. Finally, the CEA equips the CFTC with a robust enforcement toolkit. The CFTC may initiate investigations, pursue enforcement actions, and seek monetary penalties and injunctive relief for violations of the CEA. CFTC, Div. of Enforcement, Enforcement Manual § 3.3 (2020); see 7 U.S.C. §§ 9a, 12c, 13,

13a, 13a-1. And if the agency "has reason to believe that a [market] emergency exists," it may "direct [a registered entity] … to take such action as in the Commission's judgment is necessary to maintain or restore orderly trading in or liquidation of any futures contract." 7 U.S.C. § 12a(9).

### 3. The CFTC's Extensive Regulation of Swaps, Including Event Contracts

To effectuate its statutory mandate, the CFTC has long regulated swaps, event contracts, exchanges, and intermediaries.

First, as directed by Congress, the CFTC has further defined the term "swaps"—including as it applies to event contracts—through rulemaking. In 2012, together with the SEC, the agency issued a rule clarifying that certain contracts—which "could be read" woodenly to be "include[d]" in the statutory definition—"are not swaps" under a proper understanding of the statute. See CFTC, Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,211, 48,246-47, 48,308 (Aug. 13, 2012). The rule sets forth principles to identify what qualifies as a "swap" subject to federal regulation, including whether the product is "traded on an organized market"; whether an arrangement serves a purpose beyond "speculative, hedging, or investment purposes," *id.* at 48,247; and whether the product

"[h]istorically … has been regulated as [a swap]," *id.* at 48,212 n.29. And in September of this year, the agency submitted for review a proposed rule and interim rule—respectively titled "Further Definition of 'Swap' to Include Event Contracts," and "Further Definition of 'Swap' to Exclude Casino-Style Gambling Products"—to further define the term under this same statutory authority. See OIRA, RIN 3038-AF82 (received Sept. 28, 2026); OIRA, RIN 3038-AF81 (received Sept. 28, 2026).

Second, the CFTC actively oversees the listing of event contracts on registered exchanges and intermediaries. Earlier this year, for example, the Commission published a Notice of Proposed Rulemaking articulating a detailed framework for exercising the Commission's authority under the CEA's Special Rule. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026). In that notice, the Commission confirmed that sports-related event contracts are "swaps" within the agency's exclusive jurisdiction. *Id.* at 35,813. And it elaborated on the criteria it would use to determine whether certain event contracts are "contrary to the public interest." *Id.* at 35,834-37.

Third, the agency has exercised its enforcement authority to ensure that those trading on regulated exchanges do not compromise the fairness and

integrity of event-contract markets. For example, the CFTC has taken legal action to enforce the CEA's prohibitions on using nonpublic information to enter into swaps; on "manipulation" and use of false information; and on insider trading. See 7 U.S.C. §§ 6c(a)(4), 9(1), (2); *In the matter of: Gabriel Perez*, CFTC Docket No. 26-06 (Aug. 28, 2026); *In the matter of: George Anthony Devolder Santos*, CFTC Docket No. 26-05 (July 31, 2026); *CFTC* v. *Van Dyke*, No. 26-cv-3369 (S.D.N.Y.).

## II. Factual and Procedural Background

### A. Coinbase Financial Markets, A CFTC-Registered Intermediary, And Its CFTC-Regulated Event-Contracts Offerings

Coinbase, Inc., and its affiliates offer customers a trusted, user-friendly platform to trade digital and other assets. The company's mission is as ambitious as it is simple: to create an open financial system that proliferates economic freedom around the world. Because reliable markets require clear and workable rules, Coinbase, Inc., has steadfastly advocated for effective regulation of the digital-asset space, establishing a track record as an industry leader in compliance.

Coinbase Financial Markets (Coinbase) is a CFTC-registered intermediary. In December 2025, Coinbase announced that it would offer customers the ability to trade event contracts on Coinbase's platform through

a partnership with KalshiEX, LLC, a CFTC-registered exchange that lists event contracts for trading. JA113. Kalshi began listing sports-related event contracts in January 2025, after complying with applicable federal requirements. JA85; JA114.

In January 2026, Coinbase began offering its customers access to event contracts nationwide. Coinbase's customers can access the full array of contracts listed on Kalshi's exchange. JA111-13. By virtue of using Coinbase's simple, familiar, and user-friendly interface, users can be confident they are trading on a secure platform that complies with all relevant laws. JA113-14. They can likewise rely on Coinbase to perform the core functions of an intermediary—*i.e.*, to hold customer funds in segregated accounts, to reconcile positions and trade data, and to provide customers with daily statements and regulatory reporting. JA114.

**B. Connecticut's Threatened Enforcement Against Coinbase**

1. On December 2, 2025, the Connecticut Department of Consumer Protection sent identical cease-and-desist letters to Kalshi, Robinhood, and Crypto.com, three registered exchanges and intermediaries. Connecticut alleged that by offering sports-related event contracts consistent with the federal framework, Kalshi, Robinhood, and Crypto.com are "conducting

unlicensed online gambling, more specifically sports wagering," in violation of Connecticut General Statutes §§ 53-278b, 53-278d and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. JA96, JA99, JA102. The State further asserted that the companies are engaged in unfair trade practices designed "to gain a competitive advantage over appropriately licensed entities" by promoting "unlicensed and illegal gambling services." JA97, JA100, JA103. The State threatened civil and criminal penalties. *Ibid.*

2. On December 18, 2025, Coinbase filed this suit to bar Connecticut from enforcing its laws to restrict Coinbase's event-contract offerings. Coinbase explained that the CEA's text, structure, and history—and every other marker of congressional intent—demonstrate that Connecticut's laws are preempted insofar as the State seeks to regulate event contracts, including sports-related event contracts, offered on CFTC-registered exchanges. JA20. The complaint sought both declaratory and injunctive relief. JA26-27. On the same day, Coinbase moved for a preliminary injunction to prevent the State from enforcing its preempted laws. JA80.

On August 10, the district court denied Coinbase's motion, relying on a companion order it had issued in a similar suit brought by Kalshi. JA181.[6] The court first held that Coinbase was not likely to succeed on the merits because its sports event contracts are not "swaps" covered by the CEA. JA201-05. The court then held that, even if they were "swaps," the CEA would not impliedly preempt state regulation of these same transactions. JA208-17. The court did not address express preemption. *Ibid.* Finally, the court held that the remaining injunctive-relief factors favored Connecticut. JA217-22. Coinbase immediately appealed.

Since Coinbase filed this appeal, the very enforcement it sought to forestall has materialized. On September 8, Connecticut sent Coinbase a letter—similar to those sent to Kalshi and others—ordering Coinbase to "immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online sports wagering within Connecticut," on pain of civil and criminal penalties.[7]

---

[6] Because the court's relevant reasoning is contained in the Kalshi opinion, this brief refers to that opinion when discussing the district court's reasoning.

[7] See Governor Ned Lamont, *Governor Lamont Announces New Actions Against Illegal Prediction Markets Offering Sports Wagers in Connecticut* (Sept. 10, 2026), https://perma.cc/GC3E-W8GN.

3. Meanwhile, as States across the country have attempted to enforce their laws against regulated exchanges and intermediaries, the CFTC has vigorously defended its exclusive jurisdiction. The agency has affirmatively sued nine States—including Connecticut—to block state-enforcement efforts.[8] In each suit, its position has been the same: Event contracts (including sports-related ones) are "swaps" under the CEA; when traded on regulated exchanges and intermediaries, they are subject to the CFTC's exclusive jurisdiction; and state attempts to regulate those contracts are preempted. See, *e.g.*, *United States* v. *Connecticut*, No. 26-cv-498, Dkt. 1 (Compl.) ¶ 3 (D. Conn. Apr. 2, 2026). And in many suits—including against Connecticut—the CFTC has sought injunctive relief, citing the widespread, irreparable harm that state enforcement would cause. *Id.* Dkt. 102 (D. Conn. Sept. 11, 2026).

---

[8] *United States* v. *Connecticut*, No. 26-cv-498 (D. Conn. Apr. 2, 2026); *United States* v. *Illinois*, No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States* v. *New York*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States* v. *Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States* v. *Arizona*, No. 26-cv-2246 (D. Ariz. May 5, 2026); *United States* v. *Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026); *United States* v. *New Mexico*, No. 26-cv-1912 (D.N.M. June 12, 2026); *United States* v. *Kentucky*, No. 26-cv-49 (E.D. Ky. June 23, 2026); *KalshiEX LLC* v. *Furcolo* et al., No. 26-cv-327, Dkt. 37 (CFTC Intervenor Compl.) (D.R.I. June 26, 2026).

The CFTC has also exercised its emergency powers to protect the public from market distortions threatened by those same state enforcement efforts. Most recently, in response to a state enforcement action against Kalshi, the CFTC ordered Kalshi to continue to perform its functions as an exchange "in accordance with the CEA's Core Principles." See *In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration* (Aug. 11, 2026). The CFTC determined that the state action created a risk of a "major market disturbance" that would prevent the market from "accurately reflecting the forces of supply and demand with respect to event contracts." *Id.* at 4.

4. Courts across the country have divided on these issues. The Third and Ninth Circuits have held that the CEA's grant of "exclusive jurisdiction" to the CFTC preempts state law. *KalshiEX, LLC* v. *Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); *KalshiEX, LLC* v. *Assad*, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026). The Sixth Circuit disagreed. *KalshiEX LLC* v. *Schuler*, 2026 WL 2884087, at *18 (Sept. 25, 2026). And while the Third Circuit held that sports event contracts are "swaps" subject to the CFTC's exclusive jurisdiction, *Flaherty*, 172 F.4th at 227-28, the Sixth and Ninth Circuits held that they are not. *Schuler*, 2026 WL 2884087, at *8; *Assad*, 2026 WL 2543846, at *15.

District courts, too, are divided. Most recently, the Northern District of Illinois granted in relevant part Coinbase's motion for a preliminary injunction, concluding—contrary to the district court here—that the CEA preempts state regulation that directly affects the trading of sports event contracts on regulated exchanges. *Raoul*, 2026 WL 2969682, at *13. The court held that the at-issue sports event contracts are "swaps," *id.* at *6-9, and that Illinois's threatened enforcement of its licensing requirements against Coinbase "constitute[d] impermissible control over … the trading of swaps," *id.* at *14.

## SUMMARY OF ARGUMENT

I. The CEA expressly preempts Connecticut's attempt to regulate the event contracts at issue here. The Act vests the CFTC with "exclusive jurisdiction" over "swap" transactions executed on federally registered exchanges. Because the event contracts Coinbase offers are swaps traded on such an exchange, Connecticut's laws have no role to play.

A. Section 2(a) of the CEA provides that the CFTC "shall have exclusive jurisdiction" over "transactions involving swaps" on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A). Exclusive means exclusive: States may not regulate those same transactions. That is exactly what Congress intended when it created the CFTC in 1974, added the exclusive-

jurisdiction provision, and deleted the savings clause that had previously preserved broad state regulatory authority. Courts, including the Third and Ninth Circuits, have accordingly read Section 2(a) to displace state authority over the area it reserves to the CFTC.

The district court never analyzed Section 2(a) as an express-preemption clause, as Coinbase had principally argued, instead focusing on Kalshi's *implied*-preemption arguments. But express preemption is an independent basis for relief. And left standing, the court's failure to enforce the CEA's express-preemption provision would open the door to state regulation of every derivative covered by Section 2(a)—precisely the patchwork regime that Congress amended the CEA to dismantle.

B. The event contracts Coinbase offers are "swaps" and thus fall within the scope of Section 2(a)'s exclusive-jurisdiction provision. The CEA defines a "swap" to include any "agreement, contract, or transaction" that pays out "depend[ing] on the occurrence," "nonoccurrence," or "extent of the occurrence" of an "event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That expansive definition readily captures the contracts at issue. Whether a contract is predicated on the Fed deciding to raise interest rates, a hurricane

making landfall in Hawaii, or the Mets winning the World Series, the contract pays out depending on whether a given event occurs, and each event carries significant financial and economic consequences. The CFTC has confirmed that all of these event contracts are swaps within its exclusive jurisdiction.

The district court accepted Connecticut's argument that one category of event contracts—those related to sports—does not qualify as "swaps." But the court reached that conclusion only by inventing "meaningful boundar[ies]" (JA206) found nowhere in the statute. First, the court distinguished between an "event" and an "outcome," holding that the CEA reaches only contracts that turn on whether a sporting event occurs but not on the "outcome." That line cannot be squared with the ordinary meaning of "event," which dictionaries, courts, and the CFTC alike define to include outcomes. Nor is the line administrable: outcomes can often be described as events, and vice versa. The same is true of the court's second move. It held that the economic and commercial consequences associated with sports events do not count because they are not "embedded" in the events themselves. But the statute contains no such requirement; to the contrary, it expressly enumerates many swaps that carry no embedded financial consequence.

By its own admission, the district court imposed these atextual limitations because it feared that reading "swaps" to reach sports event contracts would sweep ordinary sports bets under the CFTC's exclusive jurisdiction, too. That is wrong. The CFTC has repeatedly made clear that sports event contracts fall within its exclusive jurisdiction, but sportsbook wagers do not. That makes perfect sense: event contracts and other CEA-covered swaps are exchange-traded instruments; traditional sportsbook wagers are not. Giving effect to Congress's judgment that the CFTC alone regulates the former does nothing to undermine the States' authority to regulate the latter. In any event, a policy concern is no warrant for departing from the text Congress enacted.

II. The CEA also impliedly preempts Connecticut's attempted regulation of Coinbase's sports event contracts. Congress has occupied the field of derivatives traded on federally registered exchanges, and allowing States to enforce their own laws to regulate those transactions would irreconcilably conflict with the federal scheme.

A. Connecticut's enforcement efforts are impliedly preempted because the CEA's comprehensive regulatory structure governing derivatives traded on federally registered exchanges leaves no room for state

supplementation. Congress has repeatedly amended the CEA to ensure that federal law occupies the field. The Act governs the entire life cycle of event contracts and the entities that offer them, while equipping the CFTC with a panoply of tools to enforce that regime.

B. Allowing Connecticut to enforce its laws against Coinbase's event-contract offerings would also create an irreconcilable conflict with federal law. On Connecticut's view, national exchanges would answer to fifty different state regulatory regimes. That balkanized system would leave the most restrictive State's rules to govern nationwide, or else fracture a single national market into fifty smaller ones. Either result would undermine those markets' function and utility and produce precisely the chaos that Congress enacted the CEA to prevent.

III. The remaining preliminary-injunction factors also favor Coinbase.

A. Absent relief, Connecticut's enforcement actions will put Coinbase to an impossible choice: abandon a critical part of its business in the State—forfeiting revenue, market share, partnerships, and goodwill—or continue operating under threat of civil liability and criminal prosecution. Courts have long recognized such harms as irreparable.

B. The equities and public interest point the same way. While Connecticut has no cognizable interest in enforcing a statute that federal law displaces, allowing Connecticut to engage in that enforcement will cause Coinbase substantial harm. And the public has no interest in the enforcement of preempted laws.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion." *State Farm Mut. Auto. Ins. Co.* v. *Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024). That said, "[w]here allegations of error in a preliminary injunction involve questions of law, [the Court's] review is *de novo*." *Briggs* v. *Bremby*, 792 F.3d 239, 241 (2d Cir. 2015).

## ARGUMENT

### I. The CEA Expressly Preempts Connecticut's Attempt To Regulate Event Contracts Traded On Federally Registered Exchanges.

When "Congress … has expressed a clear intent to pre-empt state law," federal law must prevail. *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 699 (1984). Here, Congress expressly preempted state regulation of event contracts traded on CFTC-registered exchanges by granting the CFTC "exclusive jurisdiction" over "swaps." That grant of "exclusive jurisdiction" preempts state law, and the CEA's capacious definition of "swaps" squarely

encompasses the event contracts at issue here. The district court's contrary determinations should be reversed.

### A. Section 2 of the CEA Expressly Preempts States From Regulating Swaps Traded On Federally Registered Exchanges.

Text, precedent, and history all confirm that Section 2 of the CEA expressly preempts the application of state law to transactions involving swaps and all other covered derivatives transactions.

1. The Act grants the CFTC "exclusive jurisdiction" to regulate "transactions involving swaps … traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A). "[E]xclusive" means "debarring from interference or participation; vested in one [entity] alone." *Exclusive*, Black's Law Dictionary (5th ed. 1979). "[E]xclusive jurisdiction" thus means "power … over a[ matter] to the exclusion of all other[s]." *Ibid.* In granting the CFTC "exclusive jurisdiction" over swaps traded on regulated exchanges, Congress barred state interference in those transactions. See *Mississippi* v. *Louisiana*, 506 U.S. 73, 77-78 (1992) ("[T]he description of … jurisdiction as 'exclusive' necessarily denies jurisdiction" to other entities, which "follows from the plain meaning of 'exclusive.'"); *Hughes* v. *Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (where the Federal Power Act makes FERC's

jurisdiction exclusive, that precludes state law "inva[sion] [of] FERC's regulatory turf").

Congress reinforced the point later in the same provision. Near the end of Section 2(a)(1)(A), Congress provided that "nothing contained in this section" would "supersede or limit" other regulation under the laws "of any State" "*[e]xcept as hereinabove provided*"—*i.e.*, only to the extent that state regulation does not concern matters subject to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A) (emphasis added). Congress thus confirmed that the Act *does* "supersede," *i.e.*, preempt, state regulation of matters falling within Section 2(a)'s grant of "exclusive jurisdiction." *Ibid.*

Several later-adopted provisions identify specific carveouts from the CFTC's "exclusive jurisdiction," further demonstrating Congress's intent that state law would be preempted unless otherwise specified. See, *e.g.*, 7 U.S.C. § 2(a)(1)(I) (preserving "*State regulatory authority* … with respect to" agreements entered into pursuant to authorized tariffs or rate schedules that are not traded on registered exchanges (emphasis added)); *id.* § 13a-2(7) (authorizing States to enforce general "antifraud statute[s]"); *id.* § 13a-2(1) (authorizing States to sue non-designated exchanges for CEA violations); *id.*

§ 16(e)(1)(B)(i) (authorizing state regulation of transactions conducted *off* of regulated exchanges).

2. Unsurprisingly, multiple federal courts of appeals have interpreted Section 2(a) to preempt state-law attempts to regulate covered transactions. Both the Third and Ninth Circuits have held, in similar prediction-market suits, that "the [CEA] preempts state law purporting to regulate futures trading." *Assad*, 2026 WL 2543846, at *7; see *Flaherty*, 172 F.4th at 228. Those decisions align with this Court's longstanding recognition that the CEA's grant of exclusive jurisdiction to the CFTC "preempts the application of state law." *Leist*, 638 F.2d at 322.

Those rulings follow directly from the Supreme Court's recognition that Congress's grant of "exclusive jurisdiction" to a federal regulator displaces state regulation of the same subject matter. In *Rice* v. *Santa Fe Elevator Corp.*, the Court interpreted a provision in the United States Warehouse Act providing that the "power, jurisdiction, and authority conferred upon the Secretary of Agriculture under this Act shall be exclusive with respect to all persons" with a valid license under the Act. 331 U.S. 218, 224 (1947). The Court held that this provision preempted state regulation by clarifying that "the matters regulated by the Federal Act cannot be regulated by the States;

that on those matters a federal licensee … is subject to regulation by one agency and by one agency alone." *Id.* at 234.

3. The CEA's history leaves no doubt that Congress meant what it said in Section 2. Indeed, when Congress amended the CEA in 1974, it did so with the express goal of ensuring federal preemption. As originally enacted, the CEA did not "impair any State law applicable to any transaction" regulated by the Act. See p. 8, *supra*. In 1974, Congress eliminated that clause to "assure that Federal preemption is complete." 120 Cong. Rec. 30,418, 30,464 (Sept. 9, 1974) (statement of Sen. Curtis). And when vesting the CFTC instead with "exclusive jurisdiction," Congress used language mirroring the United States Warehouse Act's preemption provision, which the Supreme Court had already confirmed preempts state law. *Rice*, 331 U.S. at 224; pp. 36-37, *supra*.

4. Nevertheless, the district court (and more recently, the Sixth Circuit) concluded that the CEA would not preempt enforcement of state laws against event-contract transactions on regulated exchanges even if those transactions fell within the scope of Section 2(a)(1)(A). JA208 ("[E]ven if the contracts were properly characterized as swaps," the "preemption arguments would still fail …."); *Schuler*, 2026 WL 2884087, at *18 (similar).

That is wrong. For one thing, the district court erred at the threshold by overlooking Coinbase's express-preemption argument. Although Coinbase emphasized that the CEA expressly preempts state law, the district court simply incorporated the reasoning in its opinion in Kalshi's related case—which addressed only implied preemption. See JA208-17; *Coinbase* v. *Tong*, No. 25-cv-2121, Dkt. 5-1 (Coinbase Mem. ISO Prelim. Inj.) at 12-23 (D. Conn. Dec. 18, 2025) (arguing express preemption); JA184 n.11 (failing to substantively address Coinbase's distinct arguments).

The district court's analytical error led to its flawed interpretation of the CEA. Most obviously, the court relied heavily on a "presumption against preemption" in concluding that the CEA does not preempt Connecticut law. JA209-10. But as the Supreme Court has made clear, and as the Ninth Circuit echoed in *Assad*, that presumption has no application to an express-preemption analysis. See *Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *Assad*, 2026 WL 2543846, at *7 ("declin[ing] to apply any presumption against preemption"). Instead, courts interpret express-preemption provisions like any other statutory text: by "'focus[ing] on [their] plain wording …, which necessarily contains the best evidence of Congress' preemptive intent.'" *Franklin*, 579 U.S. at 125 (quoting *Chamber of*

*Commerce* v. *Whiting*, 563 U.S. 582, 594 (2011)). And here, Section 2(a)(1)(A)'s "plain wording" expressly and unambiguously preempts state regulation of "transactions involving swaps."

To be sure, the district court considered some aspects of the CEA's text in "rejecting Kalshi's claim that Congress intended the CEA to occupy the field." JA210. But nothing in that analysis justifies disregarding the express-preemption provision in Section 2(a)(1)(A). First, the court relied on the savings clause near the end of that section, but it ignored the crucial qualifier at the beginning of that clause: "Except as hereinabove provided." JA211. Read in its entirety, the savings provision *confirms* Section 2(a)'s preemptive effect by preserving state regulatory authority only in areas *outside* the CFTC's exclusive domain. See *Assad*, 2026 WL 2543846, at *7 (noting that qualifier would be superfluous if Section 2(a)(1)(A) did not have preemptive effect); p. 35, *supra*.

The other CEA provisions the district court invoked confirm the CFTC's exclusive authority rather than qualify it. The court suggested that the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C), indicates a congressional intent to preserve state authority. JA211. But illegality under state law is a factor for the CFTC to weigh in exercising *its* authority; the Special Rule empowers the *CFTC* to

consider whether to prohibit an event contract as "contrary to the public interest" if the contract involves "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C). If those contracts fell outside the CFTC's exclusive jurisdiction in the first instance, a provision empowering the CFTC to ban them would make no sense. The Special Rule thus presupposes the very authority the district court read it to constrain.

The district court pointed to other provisions in Section 16 of the CEA as supposed evidence that Congress could have used different language in Section 2(a)(1)(A) if it "intended to occupy the field with respect to the types of contracts at issue here." JA212; see *Schuler*, 2026 WL 2884087, at *20-21 (stating that Section 2 does not use "typical" preemption language). But the relevant inquiry for express preemption is not whether Congress sought to occupy any particular field; the question is the plain meaning of Section 2(a)(1)(A). And although Congress used different preemptive language when enacting Section 2(a)(1)(A) in 1974 than it did when enacting other preemption provisions decades later in Section 16, "there are no magic words that a statute must employ to preempt state law." *Assad*, 2026 WL 2543846, at *7 (holding that Section 2(a)(1)(A) is an express-preemption provision); *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581 U.S. 87, 99 (2017) ("[W]e do not require

Congress to employ a particular linguistic formulation when preempting state law[.]"). In any event, the Supreme Court's decision in *Rice*—which held that a grant of "exclusive jurisdiction" to an agency has full preemptive force—confirms the language of Section 2(a)(1)(A) preempts state law. See *Rice*, 331 U.S. at 224, 236; pp. 36-37, *supra*.

Notably, the district court offered no theory for what else Congress could have meant in giving the CFTC "exclusive jurisdiction … with respect to … transactions involving swaps" on a national exchange. And the Sixth Circuit's proposal—that the language is meant only to preempt "direct [state] enforcement and regulatory authority pertaining to the licensing and operation of DCMs," *Schuler*, 2026 WL 2884087, at *20-21—cannot be squared with the text. The CFTC's "exclusive jurisdiction" applies "with respect to … *transactions* involving swaps … traded or executed" on a designated exchange. 7 U.S.C. § 2(a)(1)(A) (emphasis added). There is no basis for interpreting that transaction-focused language to apply only to DCM "licensing and operation" requirements. In any event, that contrived interpretation would still bar Connecticut's enforcement efforts here, because the State seeks to "directly regulate the licensure and operation of transactions," *Schuler*, 2026 WL 2884087, at *22, on CFTC-regulated entities by imposing licensing

requirements on Coinbase and limiting which transactions it can offer. See JA193-95.

Taken to its logical conclusion, the district court's failure to respect the CEA's grant of exclusive jurisdiction would leave *all* derivatives trading on regulated exchanges vulnerable to concurrent state regulations. Section 2(a)(1)(A)'s express-preemption provision does not distinguish between event contracts and other derivatives; rather, it applies to *all* "transactions involving swaps or contracts of sale of a commodity for future delivery … traded or executed" on CFTC-regulated exchanges. 7 U.S.C. § 2(a)(1)(A). So the upshot of holding that Connecticut's enforcement attempts would not be preempted "even if the [event] contracts were properly characterized as swaps," JA208, is that Section 2 does not preempt the State from regulating *any* kind of swap—or any other kind of derivative either. The district court thus opened the door to fifty-state regulation of *all* those transactions, restoring the fragmented regime Congress deliberately dismantled in 1974.

### B. The Event Contracts At Issue Here Are "Swaps."

That leaves the district court's holding (echoed by the Sixth and Ninth Circuits) that the event contracts at issue here are not "swaps" at all. But that holding, too, is untethered from the statutory text. The event contracts

Coinbase offers fall squarely within the CEA's "swap" definition, and nothing in the statutory text carves out sports.

**1. Coinbase's Event Contracts Are Swaps.**

Congress in the Dodd-Frank Act adopted an expansive definition of "swap" in order to bring wide swaths of tradeable financial instruments under the CFTC's jurisdiction. See 7 U.S.C. § 1a(47)(A); pp. 11-12, *supra*. As most relevant here, a "swap" includes:

> **any agreement, contract**, or transaction … **that provides for** any purchase, sale, **payment**, or delivery (other than a dividend on an equity security) **that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.**

*Id.* § 1a(47)(A)(ii) (emphases added).

Every operative term in that definition is capacious. An "event" is "something that happens," including an "outcome or final result." *Event*, Merriam-Webster's Collegiate Dictionary (10th ed. 2000); *Event*, Am. Heritage Dictionary (2d coll. ed. 1985). A "contingency" is a "possibility." *Contingency*, Black's Law Dictionary (9th ed. 2009). Two things are "associated" so long as they are "link[ed]" or "connect[ed]." *Associated*, Black's Law Dictionary (12th ed. 2024). And "associated with" is "followed by

an even broader catch-all": "Not just financial consequences count, but financial, economic, and commercial consequences." *Raoul*, 2026 WL 2969682, at *7. And the consequence need only be "potential," which requires only that the consequence be "capable of coming into being" or "possible." *Potential*, Black's Law Dictionary (12th ed. 2024); see *Potential*, Merriam-Webster's Collegiate Dictionary (10th ed. 2000) ("Existing in possibility"). In sum, "[t]he clause reads about as broadly as it could." *Raoul*, 2026 WL 2969682, at *7.

The swap definition thus readily encompasses event contracts like those Coinbase offers its customers.[9] Those contracts are structured as binary options where the person correctly predicting "yes" or "no" receives a payout. Payment thus depends on whether an "event" or "contingency" occurs. And because the underlying events or contingencies are "associated with a

[9] Section 2(a) also gives the CFTC exclusive jurisdiction over "agreements" that are "traded or executed on" an exchange. 7 U.S.C. § 2(a)(1)(A). And depending on how it is structured, an event contract could also satisfy other swap definitions, including "any agreement, contract, or transaction" that is an "option of any kind" based on the value of one or more "quantitative measures." *Id.* § 1a(47)(A)(i). Event contracts may also be structured like futures contracts, which likewise fall under the CFTC's exclusive jurisdiction when traded on regulated exchanges. See Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008).

potential financial, economic, or commercial consequence," the contracts qualify as swaps.

For example, an event contract might pay out if the Fed increases rates by the end of the year. That rate increase is "something that happens" (*i.e.*, an "event"), as well as a "possibility" (*i.e.*, a "contingency"). And the Fed's interest rate decisions are "connected" to (*i.e.*, "associated with") various "potential financial, economic, or commercial consequence[s]," including for stock prices, loan interest rates, and more. Or an event contract might pay out if a hurricane makes landfall in Hawaii this fall. The hurricane is an event, and it is associated with many financial, economic, and commercial consequences for local communities and businesses.

The sports-related event contracts Coinbase offers also squarely qualify. For example, a contract might pay out if the Mets win the World Series. That victory, like the Fed's rates decision or the hurricane, is both "something that happens" (and thus an "event") and a "possibility" (and thus a "contingency"). And that victory, like the rates decision or hurricane, is connected to significant potential economic impacts in New York, including merchandise sales, restaurant and hotel revenue, and remuneration for the team and its ownership. See 91 Fed. Reg. at 35,807-08 (noting that sporting events

"generate billions of dollars in economic activity and materially affect both regional and national markets"); *Flaherty*, 172 F.4th at 227-28 (sporting events have "potential" to affect many stakeholders like "sponsors, advertisers, television networks, franchises, and local and national communities").

Nothing in the CEA suggests that event contracts tied to sports are somehow carved out of the swap definition. To the contrary, a "swap" includes "*any*" contract providing for "*any*" payment based on the "occurrence" of "an event or contingency," so long as the "event" or "contingency" is "*associated* with a *potential* financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphases added).

Indeed, the CEA does not generally discriminate between derivatives based on the subject matter of the underlier, and where it does, Congress was exceedingly clear. After multiple amendments to expand the universe of covered underlier "commodit[ies]," the CEA now sweeps in "all [ ] goods and articles, except onions … and motion picture box office receipts." 7 U.S.C. § 1a(9); see, *e.g.*, Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (expanding definition of "commodity" to reach "all other goods and articles … and all services, rights, and interests"); Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat.

2763A-365, 2763A-371 (adding subset of non-tangible commodities). As those two express carveouts illustrate, when Congress wants to exclude a particular underlier, it knows how to say so—and it nowhere excluded sports. See *United States* v. *Quality Stores, Inc.*, 572 U.S. 141, 148 (2014) (declining to imply unwritten exceptions to statutory definition because the "specificity of [statutory] exemptions reinforces the [definition's] broad nature").

Some States have nevertheless argued that the Special Rule's reference to contracts involving "gaming" provides the requisite hook to carve out sports-related event contracts from the CEA's scope. That reasoning is backward. The Special Rule empowers the Commission to determine whether event contracts related to some subject matters—including "terrorism," "war," or "gaming," among others—should be prohibited in the name of the public interest. 7 U.S.C. § 7a-2(c)(5)(C); see p. 18, *supra*. But, as the CFTC explained in its recent Notice of Proposed Rulemaking, the premise of that Rule is that such contracts fall within the CFTC's jurisdiction to regulate in the first instance. 91 Fed. Reg. at 35,813; see CFTC Amicus Br. 21-28, *KalshiEX LLC* v. *Williams*, No. 26-1835 (2d Cir. Sept. 8, 2026), Dkt. 51.1 (same).

### 2. The District Court's Contrary Conclusion Was Incorrect.

The district court's contrary holding—that sports-related event contracts are not swaps—departs from the statutory text at every turn, and this Court should reject it.

a. First, the court reasoned that the "swaps" definition is "concerned with whether an event takes place," not with the event's "outcome[]." JA200. Therefore, the court held, the statute captures only event contracts that depend on the occurrence of the "sporting event itself, not who wins it." JA201; see *Assad*, 2026 WL 2543846, at *9.

But the meaning of "event" is not nearly so cramped. An "event" simply means "something that happens." See p. 43, *supra*. Dictionaries routinely define the term as reaching "outcomes" because, after all, an outcome, too, is something that happens. *E.g.*, *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"); *Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ("the outcome, issue, or result of anything"). See also *Schuler*, 2026 WL 2884087, at *9 (rejecting distinction between "event" and "outcome"). Unsurprisingly, the CFTC has thus explained that an event contract is a type of derivative based on the "*outcome* of an underlying

occurrence or event." Event Contracts, 89 Fed. Reg. 48,968, 48,969 (June 10, 2024) (emphasis added).

Attempting to distinguish contracts that turn on "whether an event takes place" from those that turn on the event's "outcome" is "basically semantics." *Raoul*, 2026 WL 2969682, at *7. True, as the district court said, a contract that pays out based on "who wins the Kentucky Derby" could be described as turning on an "outcome." JA202. But it could just as easily be described as turning on the "event" of an American Pharoah victory. Ordinary Americans do that all the time, speaking of what will happen "in the event American Pharoah prevails."[10] Or consider the *Raoul* court's example:

> Imagine two contracts, both made on August 28 before the first pitch of a game between the Chicago Cubs and the Cincinnati Reds. One bets on the Cubs winning the game. The other bets on the Cubs's season-long record going up. Both contracts hedge against the same possibility: the Cubs losing. They pay out under exactly the same circumstances. Under defendants' interpretation, though, one is a swap and the other is not.

2026 WL 2969682, at *7.

Or look beyond sports: The Supreme Court striking down public-school segregation was both a seminal event and the outcome of *Brown* v. *Board of*

---

[10] *American Pharoah: Up to you in New York*, The Sentinel-Record (June 6, 2015), https://perma.cc/NJD7-5D3G.

*Education*. A contract relating to a clinical trial could be characterized as turning on an outcome (success or failure) or an event (a successful trial). So too with a political event contract, which could equally be based on the outcome of an election (do the Republicans keep the Senate) or based on an event (the emergence of a Democratic-controlled Senate).

The line, then, between a contract based on an "event" and a contract based on an "outcome" exists only in the eye of the beholder. But "statutes do not usually draw lines so capriciously." *Raoul*, 2026 WL 2969682, at *7. And "[w]hen picking between two plausible interpretations" of a statute—"one [of which] draws a consistent line, [while] the other does not"—a court should "favor consistency." *Ibid.*

Courts, like ordinary English speakers, also use "outcome" and "event" interchangeably. See, *e.g.*, *Burrage* v. *United States*, 571 U.S. 204, 212 (2014) ("[I]t is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter"); *Prysmian Cables & Systems USA LLC* v. *ADT Commercial LLC*, 665 F. Supp. 3d 236, 246 (D. Conn. 2023) ("[Event is] a term that ordinarily refers to an 'outcome' or 'occurrence.'") (citation omitted).

The district court's strained interpretation also ignores the statute's reference to agreements that depend on "the extent of" the occurrence of an event. 7 U.S.C. § 1a(47)(A)(ii). "Extent" means "the point, degree, or limit to which something extends." *Extent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2009). The phrase "extent of the occurrence of an event or contingency" thus "implies a result that is measurable along a spectrum." *Raoul*, 2026 WL 2969682, at *6 (citation and internal quotations omitted). If "occurrence" refers to whether an event happens, the "extent of the occurrence extends to how an event resolves." *Ibid.* (citation and internal quotations omitted).

Finally, sports event contracts also qualify as "swaps" because they depend on the occurrence of a "contingency," 7 U.S.C. § 1a(47)(A)(ii)—*e.g.*, the "possibility" that a particular team will win a game or a player will score a certain number of points, *Contingency*, Black's Law Dictionary (9th ed. 2009).

In short, even if it were possible to read the word "event" in isolation and in its "narrowest sense[]" to "refer only to the game itself," Congress's use of "all these general words together" refutes that interpretation. *Raoul*, 2026 WL 2969682, at *6.

b. The district court also rewrote the statutory requirement that the underlying event or contingency be "associated with a potential financial, economic, or commercial consequence." The court construed that phrase to require that the event "ha[ve] embedded within it some potential financial, economic, or commercial consequence," such that the consequence "arise[s] from the event or contingency itself, rather than from externalities such as downstream financial effects." JA205-06; see also *Schuler*, 2026 WL 2884087, at *12.

The district court admitted that its reading departed from the text, acknowledging that "the text of the CEA does not explicitly require an event to be 'inherently joined or connected with' a potential financial consequence." JA206. Nor, the court continued, "does the statutory text recite" any "embedded within" requirement. *Ibid.* Quite right. To the contrary, the statute requires only that the event be "associated with" a "potential" consequence. See p. 16-17, *supra*. Congress's use of those broad terms was intentional: While the first and third clauses of the "swaps" definition describe instruments that "depend on 'financial or economic interests,'" 7 U.S.C. §§ 1a(47)(A)(i), (iii), the second clause—at issue here—uses the phrase "*associated with* a potential financial, economic, or commercial consequence,"

*id.* § 1a(47)(A)(ii) (emphasis added). *Raoul*, 2026 WL 2969682, at *7. That "difference" is "meaningful." *Ibid.*

The Sixth Circuit, for its part, wrongly suggested that this narrowed reading was necessary to avoid surplusage. *Schuler*, 2026 WL 2884087, at *13. But the "canon against surplusage is subordinate to the 'cardinal canon' that 'a legislature says in a statute what it means and means in a statute what it says there.'" *United States Postal Serv.* v. *Konan*, 607 U.S. 391, 406 (2026). That is especially true in a case like this, where the "statutory language is a smorgasbord of redundancy, repetition, superfluity, duplication and redundancy," *Raoul*, 2026 WL 2969682, at *9 (citation and internal quotations omitted), and where history confirms that repetition was intentional. See pp. 11-12, *supra*.

Just as important, surrounding provisions confirm that Congress did not limit "swaps" only to underliers with "embedded" financial consequences. Contra *Schuler*, 2026 WL 2884087, at *11. For one, Congress itself expressly defined the term to include various swaps—like "weather swaps" and "emissions swaps"—whose underliers are decidedly not "inherently" economic. 7 U.S.C. § 1a(47)(A)(iii)(XVII), (XXI). The Special Rule, too, refutes the Sixth Circuit's reading. That provision expressly empowers the

CFTC to regulate contracts based on "terrorism," "assassination," or "gaming." 7 U.S.C. § 7a-2(c)(5)(C). Those underliers do not have "embedded" economic consequences (JA205), yet the Special Rule is premised on them falling within the CFTC's purview. If there is any lesson to be taken from these "contextual cues," it is that the "swaps" definition "sweeps as broadly as its language suggests." *Ali* v. *Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008).

c. Ultimately, the district court (like the Sixth and Ninth Circuits) grafted atextual limitations onto the "swap" definition to avoid a result it disliked: that treating Coinbase's sports event contracts as "swaps" would "strip states of their ability to regulate sports betting … ." JA204; *Schuler*, 2026 WL 2884087, at *14 (expressing same concern); *Assad*, 2026 WL 2543846, at *10-11 (same). The reasoning ran as follows: if a sports event contract is a "swap," then so is an ordinary sportsbook wager; and because the CEA requires all "swaps to be" traded on listed exchanges, every "state regulated sportsbook[] … would be violating federal law by offering" wagers off-exchange. JA205 (citing 7 U.S.C. § 2(e)).

That reasoning is doubly flawed. It substitutes policy for text and rests on a false equivalence. For one thing, the district court's analysis should have begun and ended with the text of the CEA. The text makes clear that sports

event contracts are "swaps," because those contracts provide for "payment" "dependent on the occurrence … of an event … with a potential … economic … consequence." 7 U.S.C. § 1a(47)(A)(ii); see pp. 43-47, *supra*.

And the court's assumption that sports event contracts and ordinary sportsbook wagers necessarily rise and fall together misunderstands the federal framework, which draws a line between instruments structured to be traded on an exchange, and transactions that occur elsewhere. The CEA centralizes regulation of the *former*: It designates the CFTC as the sole overseer of "transactions involving swaps … traded or executed on a" designated contract market. 7 U.S.C. § 2(a)(1)(A). But the Act expressly preserves state authority to regulate the latter—*i.e.*, "transaction[s]" that are "not conducted on" a registered exchange. *Id.* § 16(e)(1)(B)(i). Event contracts, including sports event contracts, fall within the first category: like other derivatives the CEA covers, they are financial instruments bought and sold by counterparties on neutral, regulated exchanges. Sportsbook wagers are different in kind. A wager is a one-time transaction between a customer and the house, which sets the odds and takes the other side of the bet; wagers are not tradeable or structured as exchange-traded instruments.

The agencies charged with defining the term "swap" have long adhered to that distinction. In promulgating regulations to implement Dodd-Frank—exercising their authority to "further define the term[] 'swap,'" 15 U.S.C. § 8302(d)(1)—the CFTC and SEC identified tradability as a "key component[]" separating everyday "agreements, contracts, and transactions" from swaps, which are "traded on an organized market or over-the-counter." 77 Fed. Reg. at 48,247-48; see *id.* at 48,214 (considering whether a particular agreement had "traditionally … been entered into on or subject to the rules of an organized exchange [or] traded in secondary market transactions"). That consideration places sportsbook wagers and sports event contracts on opposite sides of the "swap" definition—as the CFTC has consistently explained, see, *e.g.*, CFTC *Williams* Br. 23, No. 26-1835 ("[T]he CFTC's jurisdiction over event contracts in no way implies that it has jurisdiction over gambling wagers[.]"), and as the agency appears poised to do again in a proposed rule and interim final rule, see p. 21, *supra*.

By claiming authority to regulate Coinbase's sports event contracts because Connecticut believes they resemble casino sports betting, Connecticut is reintroducing the very problem Congress intended the CEA to solve. States have long struggled to draw lines between "gambling" and

legitimate financial markets trading. Even the stock market was once described as a "Mammoth Gambling Machine." Stuart Banner, *Speculation: A History of the Fine Line Between Gambling and Investing* 171 (2016). Derivatives fared no better: States conflated exchange-traded derivatives with bucket-shop transactions and tried to regulate both as "gambling in grain." See p. 7, *supra*. But Congress drew a line around the former, expressly including event contracts, and subjected that category to exclusive federal jurisdiction. What falls outside those bounds, including traditional sportsbook wagers, Congress left to the States. This Court should reject Connecticut's attempt to unsettle that regime.

## II. The CEA Impliedly Preempts Connecticut's Enforcement Of State Law Against The Event Contracts At Issue.

Federal law also displaces state law if the federal scheme evinces Congress's intent to occupy the field or if state and federal law irreconcilably conflict. See *Oneok, Inc.* v. *Learjet, Inc.*, 575 U.S. 373, 377 (2015). The CEA preempts Connecticut's laws as applied to event contracts traded on regulated exchanges for both reasons.

### A. The CEA's Text, Structure, and History Indicate That Congress Intended To Occupy the Field of On-Exchange Derivatives Trading.

When Congress enacts a comprehensive scheme of "federal statutory directives" over a particular subject matter that "provide a full set of standards … designed [to function] as a 'harmonious whole,'" "complementary state regulation" has no role to play. See *Arizona* v. *United States*, 567 U.S. 387, 401 (2012) (citation omitted). The CEA's text, structure, and history all confirm that Congress intended to leave no room for state regulation of derivatives, including event contracts, traded on regulated exchanges.

1. To start, Section 2(a)(1)(A) evinces Congress's intent to reserve this area to the CFTC alone. The CEA grants the CFTC "exclusive jurisdiction" over "accounts," "agreements," and "transactions involving" swaps and other derivatives traded on a federally regulated exchange. 7 U.S.C. § 2(a)(1)(A); see p. 17, *supra*.

The CEA's "comprehensive regulatory structure" governing event contracts, registered exchanges, and intermediaries confirms that Congress occupied the field. *Merrill Lynch*, 456 U.S. at 355-56. Federal law governs the entire life cycle of event contracts, as well as the exchanges and intermediaries that facilitate trading of them, leaving no room for supplementation by state regulation. An exchange can attain DCM status only

by demonstrating compliance with the full panoply of relevant federal laws and regulations designed to safeguard the integrity of derivatives markets and protect those who trade on those markets. See pp. 18-19, *supra*. Intermediaries like Coinbase must likewise be registered with the CFTC and adhere to comprehensive federal requirements. See pp. 19-20, *supra*. Exchanges cannot list event contracts without either seeking affirmative approval from the CFTC or certifying that the new product complies with the CEA's strictures. See 7 U.S.C. § 7a-2(c). And once listed on an exchange, an event contract remains subject to the CFTC's continuing oversight. *Id.* § 7(d)(2), (3), (4).

Congress has given teeth to these rules by charging the CFTC and the Department of Justice with enforcing the CEA's requirements. The CFTC may initiate investigations, pursue enforcement actions in administrative proceedings or in federal court, seek a wide range of sanctions, and refer certain matters for criminal prosecution. See p. 20, *supra*.

The Act's "legislative history" also "repeatedly emphasizes that the CFTC's jurisdiction was to be exclusive with regard to the trading of futures on organized contract markets." *FTC* v. *Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001). The conference report accompanying the 1974

amendments says this expressly, explaining that the CEA was meant to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (emphasis added). House Agriculture Committee Chairman Poage likewise explained that the amendments were enacted to "avoid unnecessary overlapping and duplicative regulation." 120 Cong. Rec. H34736 (Oct. 9, 1974). To accomplish that goal, Congress conferred "exclusive jurisdiction" on the CFTC over derivatives traded on federal exchanges, while at the same time eliminating a broad savings provision that preserved concurrent state-law jurisdiction over those same transactions. See p. 11, *supra*.

2. In holding otherwise, the district court reasoned that Congress would not have "hid[] [an] elephant[] in [a] mousehole[]" by "displac[ing] the States' historic police powers over sports betting" through Dodd-Frank. JA212-13. But the CEA does *not* displace state police power over actual sports betting. It instead governs event contracts traded on CFTC-regulated nationwide exchanges, including sports event contracts. See pp. 43-47, *supra*. And with respect to those instruments, Congress hid nothing. From the beginning, federal regulation of derivatives exchanges was a direct response to States'

interference with such transactions on grounds they were illegal "gambling" by another name. *Cothran*, 16 N.E. at 647.

### B. Connecticut's Laws Conflict With Federal Law.

Connecticut's laws as applied to Coinbase's event-contract offerings are also preempted because they impede Congress's objectives in enacting the CEA, and because it is impractical for Coinbase to comply with both federal and state law.

1. First, Connecticut's enforcement efforts "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399-400. Connecticut seeks to "regulate the market [for event contracts] itself," including who may trade event contracts and from where. *Raoul*, 2026 WL 2969682, at *15. If Connecticut's view of the CEA were to prevail, event-contract markets could be subject to fifty different, potentially conflicting, state regulatory regimes. But that would subvert Congress's goal in amending the CEA in 1974, which was to *prevent* States from "regulat[ing] the futures markets themselves," *Am. Ag. Movement*, 977 F.2d at 1156, and to ensure that "all exchanges and all persons in the industry" would operate "under the same set of rules and regulations," H.R. Rep. No. 93-975, at 80 (1974).

Congress amended the CEA because it recognized that a fifty-state regime would wreak havoc on the nationwide exchanges and intermediaries that offer derivatives like event contracts. A fifty-state regulatory patchwork is incompatible with the functioning of *nationwide* derivatives markets. The only way to maintain a national market in such a balkanized regulatory environment would be to subject the entire exchange to the strictest state requirements—a result that would permit even a single outlier State to shut down event-contract markets nationwide.

Nor could exchanges simply abandon their nationwide character and splinter into fifty separate markets, each tailored to a State's individual requirements. Each state-specific market, superintended by a different regulator enforcing different rules, would necessarily have but a fraction of the liquidity of a single nationwide exchange. And even assuming each State could sustain an individual market, the reduced liquidity of each of the fifty markets would make the markets more susceptible to manipulation and less reflective of public expectations. See, *e.g.*, Anthony M. Diercks *et al.*, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series, Fed. Reserve Bd. 11 (Feb. 12, 2026) (noting importance of liquidity to "ensure prices reflect real-time information from incoming news").

What is more, a fragmented market landscape would prove harder to effectively regulate. When transactions occur on a single, nationwide exchange, a single regulator can maintain a bird's-eye view of the system and monitor for system-wide malfeasance. By contrast, when fifty regulators oversee only their own slice of a splintered exchange, transactions that are manipulative or problematic in the aggregate risk escaping unnoticed. Indeed, this lack of adequate oversight is exactly why Congress expanded the CEA in 1974, see pp. 9-11, *supra*, and eventually brought all manner of "swaps" within the CFTC's exclusive purview. See pp. 11-12, *supra*. Reverting to a fifty-state patchwork would reintroduce the same oversight vacuum and chaos that prompted those reforms.

That threat is not theoretical. Amid legal uncertainty about the CEA's preemptive effect, States have already begun enacting an incoherent patchwork of regulatory regimes, with no clear end in sight. Compare, *e.g.*, Ill. S.B. 3019 (enacting tax on event-contract markets and licensing regime), with Minn. Stat. § 609.7615 (creating felony liability for those who create or operate event-contract markets). This is exactly the "chaos" that Congress sought to avoid in 1974 when it brought "all futures trading … under a single regulatory umbrella." H.R. Rep. No. 93-975, at 46 (1974).

2. Second, it is impracticable for Coinbase to comply with both federal law and Connecticut's laws as applied to its event-contract offerings. See *Raoul*, 2026 WL 2969682, at *15 (holding Illinois licensing laws preempted as applied to sports event contracts in light of "conflicting regulatory demands" on regulated entities). Connecticut's legal requirements are fundamentally inconsistent with Coinbase's status as a nationwide intermediary. Connecticut would have Coinbase obtain a state gambling license, which would obligate the company—which has users in all fifty States—to restrict its services to those physically located within Connecticut. Conn. Gen. Stat. § 12-863(a)(1)(B), (b)(A)(i) (2025); JA117. Other States would impose similar geographic limitations. See, *e.g.*, N.Y. Racing, Pari-Mutuel Wagering & Breeding L. §§ 1367(1)(b), 1367-a(4)(a)(ii) (2025). These geographic barriers, besides being impractical and prohibitively costly to maintain, would sap prediction markets of their liquidity, impairing their operation and leaving them vulnerable to manipulation.

Once again, the risk of conflicting regulations is not theoretical. In July, Kalshi confronted dueling state and federal orders about how to handle event-contract trades by users in Michigan. A Michigan state court, at the urging of a Michigan regulator, issued an order that required Kalshi to "unwind open,

previously executed trades."[11] When Kalshi informed the CFTC of its plan to comply, the agency ordered Kalshi to "fulfill[]" the open trades in question "in the normal course."[12] The conflict put Kalshi to an impossible choice: violate an order from a federal agency or violate an order from a state court.

These conflicts confirm that Connecticut, like other States, is effectively trying to "control[] what the CFTC can permit on designated contract markets" and, more broadly, to "control … the operation of the trading of swaps on federally regulated markets." *Raoul*, 2026 WL 2969682, at *15. "[T]hat control is not permissible." *Ibid.*

## III. The Remaining Factors Favor Injunctive Relief.

### A. The District Court Erred In Finding No Irreparable Harm.

Absent an injunction, Coinbase will suffer irreparable harm, and the district court erred in finding otherwise. Connecticut's attempts to enforce state law against Coinbase's federally sanctioned activities have put Coinbase to "a Hobson's choice: continually violate [state] law and expose [itself] to potentially huge liability" or "suffer the injury of obeying the law during the

---

[11] See CFTC, Order Staying Emergency Rule Filed by KalshiEx LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, at 6 (July 14, 2026), https://perma.cc/SX97-STDJ.
[12] *Id.* at 8.

pendency of the proceedings and any further review." *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). If Coinbase attempts to comply with Connecticut's preempted laws by refraining from offering its federally sanctioned sports event contracts, it would have to forgo a critical part of its business plan, disrupt existing partnerships, lose valuable market share it may never recover, and jeopardize its reputation and goodwill among consumers. JA115-16; *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (recognizing reputational harms are irreparable).

The district court did not independently analyze Coinbase's arguments and record on harm. See JA185 (adopting Kalshi harm findings). But many of the reasons it gave for finding no irreparable harm as to Kalshi—that (1) Kalshi's harms were "self-inflicted" because it "continued offering sports-event contracts despite repeated regulatory warnings"; (2) Kalshi was already ordered to geofence in Nevada and Michigan; and (3) Kalshi's reputation harms and alleged disruption were too "conjectural," JA219-20—do not apply in the same way to Coinbase, which initiated this suit as soon as it became aware of an imminent threat of enforcement, was not directly subject to the Michigan and Nevada orders when it sued, and which independently substantiated the reputational harm and disruption it suffered. See *Raoul*,

2026 WL 2969682, at *17 (finding that Coinbase would suffer irreparable harm absent an injunction).

The rest of the court's analysis was similarly flawed. First, the district court found there was no risk of harm because "any potential criminal enforcement remains speculative." JA218. But Connecticut has repeatedly stated that continuing to operate prediction markets exposes intermediaries like Coinbase to "civil … and/or criminal penalties." JA97, JA100, JA103. And Connecticut has ordered Coinbase to "immediately cease and desist advertising, offering, promoting, or otherwise making available" its event contracts in the State, or else face "criminal penalties" under Conn. Gen. Stat. §§ 53-278b and 53-278d.[13] The State has since made good on that threat against at least one registered exchange. Compl., *Connecticut* v. *KalshiEX, LLC*, No. HHD-CV-26-6230345-S (Conn. Super. Ct., J.D. Hartford, filed Aug. 26, 2026).

The district court also held that any potential business losses or civil penalties "are largely monetary" and therefore not irreparable. JA219. But as the case the court relied on makes clear, monetary loss fails to support

---

[13] See Governor Ned Lamont, Governor Lamont Announces New Actions Against Illegal Prediction Markets Offering Sports Wagers in Connecticut (Sept. 10, 2026), https://perma.cc/GC3E-W8GN.

irreparable harm only when it "can be estimated and compensated." *Brenntag Int'l Chems., Inc.* v. *Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); JA219. And the monetary losses Coinbase faces here cannot be retroactively compensated because the Eleventh Amendment bars Coinbase from recouping damages from Connecticut. *United States* v. *New York*, 708 F.2d 92, 93 (2d Cir. 1983).

**B. The District Court Erred In Finding the Equities Weigh Against Coinbase.**

The balance of equities strongly favors Coinbase. Absent an injunction, Coinbase must either withdraw from Connecticut, forfeiting revenue and market share that it can never recover from the State, or accumulate penalties that compound with every transaction.

Connecticut, by contrast, has no cognizable interest in enforcing a statute that federal law displaces. See *Raoul*, 2026 WL 2969682, at *18 ("Neither [the State] nor the public has much interest in enforcing laws that are likely preempted."); *Chamber of Com. of the U.S.* v. *Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Nor is it in the public interest "to perpetrate the unconstitutional application of a statute." *Antonyuk* v. *Bruen*, 624 F. Supp. 3d 210, 261 n.50 (N.D.N.Y. 2022). The district court's assertion that Connecticut has "a strong interest in reducing 'the social costs associated' with gambling,"

JA221, thus rises and falls with its merits analysis. And the injunction Coinbase seeks would not "substantially disrupt Connecticut's carefully crafted, decades-old regulatory scheme." *Id.* Coinbase's proposed injunction would simply allow it to continue offering event contracts listed on a federally designated exchange to customers in Connecticut—as it has done for nearly a year. Connecticut's regulatory authority over unlicensed sportsbooks would remain intact.

* * *

Congress had a choice between two fundamentally different regulatory regimes. In one, nationwide derivatives exchanges and intermediaries would operate under a uniform, federal framework designed to facilitate the millions of interstate transactions executed on these exchanges each day. In the other, those same nationwide exchanges and intermediaries would answer to fifty separate state regulators, each empowered to impose overlapping, inconsistent, or even irreconcilable requirements. When it amended the CEA in 1974, and again when it enacted the Dodd-Frank Act in 2010, Congress chose the former: nationwide markets governed by nationwide rules. This Court should reject Connecticut's attempt to resurrect the very regulatory regime Congress rejected.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below.

Dated: October 7, 2026

Respectfully Submitted,

*/s/ Yaira Dubin*

YAIRA DUBIN
TREVOR BONDY GOPNIK
PARISA SADEGHI
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351.4000

JEFFREY B. WALL
JUDSON O. LITTLETON
GIBSON, DUNN & CRUTCHER LLP
1700 M St. NW
Washington, DC 20036
(202) 955.8500

*Counsel for Coinbase Financial Markets, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32.1(a)(4)(A) because it contains 13,772 words, excluding items exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point CenturyExpd BT font.

October 7, 2026

/s/ *Yaira Dubin*
YAIRA DUBIN

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using ACMS on October 7, 2026.

I certify that all participants in this case are registered ACMS users and that service will be accomplished by ACMS.

October 7, 2026

/s/ *Yaira Dubin*
YAIRA DUBIN

*Counsel for Plaintiff-Appellant Coinbase Financial Markets, Inc.*

# ADDENDUM: STATUTORY PROVISIONS

## TABLE OF CONTENTS

PROVISIONS FROM THE COMMODITY EXCHANGE ACT (AS CODIFIED AT 7 U.S.C.):

7 U.S.C. § 1a(9) .......... A1
7 U.S.C. § 1a(47) .......... A1
7 U.S.C. § 2(a)(1)(A) .......... A6
7 U.S.C. § 2(a)(1)(I) .......... A7
7 U.S.C. § 2(e) .......... A8
7 U.S.C. § 7(d)(1)(A) .......... A8
7 U.S.C. § 7(d)(3) .......... A8
7 U.S.C. § 7(d)(5)(A) .......... A8
7 U.S.C. § 7(d)(11)(A) .......... A9
7 U.S.C. § 7(d)(13) .......... A9
7 U.S.C. § 7(d)(20)(A) .......... A9
7 U.S.C. § 7a-2(c)(5)(C) .......... A9
7 U.S.C. § 12a(5) .......... A11
7 U.S.C. § 16(e) .......... A11

PROVISIONS FROM THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT (AS CODIFIED AT 15 U.S.C.):

15 U.S.C. § 8302(d)(1) .......... A12

**<u>Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):</u>**

**7 U.S.C. § 1a(9)**

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

**7 U.S.C. § 1a(47)**

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk

associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

(B) Exclusions

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the

purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction

covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be [sic] regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause

(i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

**7 U.S.C. § 2(a)(1)(A)**

(A) In general

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts,

agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b–3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

**7 U.S.C. § 2(a)(1)(I)**

(I)

(i) Nothing in this chapter shall limit or affect any statutory authority of the Federal Energy Regulatory Commission or a State regulatory authority (as defined in section 796(21) of title 16) with respect to an agreement, contract, or transaction that is entered into pursuant to a tariff or rate schedule approved by the Federal Energy Regulatory Commission or a State regulatory authority and is—

(I) not executed, traded, or cleared on a registered entity or trading facility; or

(II) executed, traded, or cleared on a registered entity or trading facility owned or operated by a regional transmission organization or independent system operator.

(ii) In addition to the authority of the Federal Energy Regulatory Commission or a State regulatory authority described in clause (i), nothing in this subparagraph shall limit or affect—

(I) any statutory authority of the Commission with respect to an agreement, contract, or transaction described in clause (i); or

(II) the jurisdiction of the Commission under subparagraph (A) with respect to an agreement, contract, or transaction that is executed, traded, or cleared on a registered entity or trading facility that is not owned or operated by a regional transmission organization or independent system operator (as defined by sections 796(27) and (28) of title 16).

**7 U.S.C. § 2(e)**

(e) Limitation on participation

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

**7 U.S.C. § 7(d)(1)(A)**

(A) In general

To be designated, and maintain a designation, as a contract market, a board of trade shall comply with—

(i) any core principle described in this subsection; and

(ii) any requirement that the Commission may impose by rule or regulation pursuant to section 12a(5) of this title.

**7 U.S.C. § 7(d)(3)**

(3) Contracts not readily subject to manipulation

The board of trade shall list on the contract market only contracts that are not readily susceptible to manipulation.

**7 U.S.C. § 7(d)(5)(A)**

(A) In general

To reduce the potential threat of market manipulation or congestion (especially during trading in the delivery month), the board of trade shall adopt for each contract of the board of trade, as is necessary and appropriate, position limitations or position accountability for speculators.

**7 U.S.C. § 7(d)(11)(A)**

The board of trade shall establish and enforce—

(A) rules and procedures for ensuring the financial integrity of transactions entered into on or through the facilities of the contract market (including the clearance and settlement of the transactions with a derivatives clearing organization); and

**7 U.S.C. § 7(d)(13)**

(13) Disciplinary procedures

The board of trade shall establish and enforce disciplinary procedures that authorize the board of trade to discipline, suspend, or expel members or market participants that violate the rules of the board of trade, or similar methods for performing the same functions, including delegation of the functions to third parties.

**7 U.S.C. § 7(d)(20)(A)**

The board of trade shall—

(A) establish and maintain a program of risk analysis and oversight to identify and minimize sources of operational risk, through the development of appropriate controls and procedures, and the development of automated systems, that are reliable, secure, and have adequate scalable capacity;

**7 U.S.C. § 7a-2(c)(5)(C)**

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

**7 U.S.C. § 12a(5)**

The Commission is authorized—

. . .

(5) to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter;

**7 U.S.C. § 16(e)**

(e) Relation to other law, departments, or agencies

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

**Provisions from the Dodd-Frank Wall Street Reform and Consumer Protection Act (as codified at 15 U.S.C.):**

**15 U.S.C. § 8302(d)(1)**

(1) In general

Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 78c(a)(78) of this title.